# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

United HealthCare Services, Inc.,

                    Plaintiff,

      v.

Gilead Sciences, Inc.; Gilead
Holdings, LLC; Gilead Sciences,
LLC; Gilead Sciences Ireland UC;
and Teva Pharmaceuticals USA, Inc.

              Defendants.

Civil No. _____

**COMPLAINT**

JURY TRIAL DEMANDED

## TABLE OF CONTENTS

I.      INTRODUCTION ......................................................................................... 1

II.     PARTIES ...................................................................................................... 7

III.    JURISDICTION AND VENUE.................................................................. 11

IV.     BACKGROUND ........................................................................................ 14

      A.   The Regulatory Structure for the Approval of Generic Drugs and the
           Substitution of Generic Drugs for Brand-Name Drugs............................. 14

      B.   The Hatch-Waxman Act and ANDA Approval Process ............................ 15

      C.   Paragraph IV Certifications....................................................................... 16

      D.   Benefits of Generic Drugs......................................................................... 18

      E.   The Impact of Authorized Generics .......................................................... 20

      F.   The Economics of Reverse-Payment Agreements ..................................... 21

V.      HIV cART DRUGS.................................................................................... 22

VI.     THE ANTICOMPETITIVE CONDUCT.................................................... 28

      A.   Gilead Entered into Anticompetitive Settlement Agreements with Teva to
           Delay and Suppress Generic Competition ................................................. 28

           1.   Viread (TDF).................................................................................. 29

                  a.   Viread was a Significant Source of Revenue for Gilead ...... 29

                  b.   Gilead's Viread Hatch-Waxman Exclusivities and Weak,
                     Evergreened, and Ancillary Patent Portfolio ....................... 31

                  c.   Multiple Generic Challenges to Viread Patents.................... 33

                  d.   Gilead and Teva Settled the Viread Patent Infringement
                     Litigation the Day Before Trial on Terms Outwardly and
                     Highly Favorable to Gilead................................................... 35

                  e.   The Parties Were Forced to Disclose to the Court the
                     Existence of a "No Authorized Generic" Agreement After the

Federal Trade Commission Objected to the Settlement Based on Antitrust Grounds ............................................................ 37

f.    Teva Would Not Have Agreed to Simply Give Up Millions of Dollars of Revenue, As Was Represented to the Court ........ 39

g.    Defendants Improvised with Unfair and Anti-Competitive Most Favored Entry Provisions That Achieved the Same Objective ............................................................................... 43

2.    Truvada (TDF/FTC) and Atripla (TDF/FTC/EFV) ........................ 52

a.    Truvada is a Significant Source of Revenue for Gilead ....... 53

b.    Atripla is a Significant Source of Revenue for Gilead ......... 55

c.    Gilead's Truvada and Atripla Hatch-Waxman Exclusivities and Weak, Evergreened and Ancillary Patent Portfolios ...... 56

d.    Multiple Generic Challenges to Truvada and Atripla ........... 59

e.    Gilead and Teva Settled the Truvada and Atripla Patent Infringement Litigations on Terms Outwardly and Highly Favorable to Gilead, Before a Trial Court Decision ............. 68

f.    Teva Would Not Have Agreed to Give Up Millions of Dollars of Revenue Absent The Anticompetitive Most Favored Entry Clauses ................................................................................. 70

B.    Gilead Entered into Unlawful No-Generics Restraints with BMS and Janssen to Suppress Generic Competition .................................................... 74

1.    Gilead and BMS Combined their Drugs into Atripla and Shielded Gilead's Truvada from Generic Competition .................................. 74

2.    Gilead and Janssen Combined their Drugs into Complera, and Shielded Gilead's Truvada from Generic Competition ................... 81

3.    Gilead and Janssen Combined their Drugs into Prezcobix, and Shielded Janssen's Prezista from Generic Competition ................. 85

4.    Gilead and BMS Combined their Drugs into Evotaz, and Shielded BMS's Reyataz from Generic Competition ..................................... 88

5.    Gilead and Janssen Extended Their Agreements to TAF-Based Treatments, Odefsey and Symtuza .................................................. 91

C.     Gilead Delayed the Launch of TAF as Part of Its Anticompetitive Scheme to Keep Gilead Drug Prices Artificially High ............................................... 95

D.     Market Power ....................................................................................... 108

       1.     The Individual Markets for Specific cART Drugs......................... 108

       2.     The Market for cART Drugs......................................................... 111

E.     Effects on Interstate and Minnesota Commerce ...................................... 112

F.     Antitrust Injury .................................................................................... 114

G.     Accrual and Tolling of the Statute of Limitations.................................... 116

VII.     CLAIMS FOR RELIEF........................................................................... 117

VIII.     DEMAND FOR JUDGMENT ................................................................. 145

IX.     JURY DEMAND.................................................................................... 147

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff United HealthCare Services, Inc. ("Plaintiff" or "UHS"), by and through

its undersigned attorneys, brings this antitrust action against Defendants Gilead Sciences,

Inc, Gilead Holdings, LLC, Gilead Sciences, LLC, and Gilead Sciences Ireland UC

(collectively, "Gilead"), and Teva Pharmaceuticals USA, Inc. ("Teva"), and alleges as

follows:

## I.    INTRODUCTION

1.    This antitrust action concerns the unlawful efforts of Defendants and their

co-conspirators to restrain competition and illegally inflate prices for combination

antiretroviral therapy ("cART") drugs used to treat and prevent Human

Immunodeficiency Virus ("HIV"), a deadly virus that affects more than 1 million

people in the United States.

2.    Defendant Gilead has built a business empire and generated enormous

illegal profits off of sales of HIV medications based on tenofovir, a molecule first

invented and patented by Czech scientists in the 1980s.  Gilead developed a "prodrug"

of tenofovir called tenefovir disoproxil fumarate ("TDF").  A prodrug is a medication

that is taken orally and then automatically converted by the body into a pharmacologically

active drug like tenofovir.

3.    Gilead launched and began selling TDF as Viread in 2001.  It quickly

became a blockbuster, with over $500 million in revenues per year.  Gilead then

followed Viread by launching a franchise of other TDF-based drugs that dominated the

cART market, including Truvada (TDF + Emtriva or "FTC"), which until recently was

the only drug approved by the FDA for pre-exposure prophylaxis ("PrEP")—the most effective method of *preventing* HIV infection in HIV-negative individuals.  Then, before generic versions of those TDF-based drugs came on to the market, Gilead launched a line extension of drugs based on a different prodrug of tenofovir called tenofovir alafenamide fumarate ("TAF").  Today, more than 80% of patients with HIV take one or more of Gilead's cART drugs every day.

4.      Since 2001, Gilead has gone to extraordinary lengths to restrain competition and maintain and extend its monopoly power in violation of federal and state law, causing higher prices for and restricting access to these life-saving drugs.

5.      As one part of its anticompetitive scheme, Gilead entered into two unlawful reverse payment settlement agreements with Defendant Teva, with the intent and effect of defusing Teva's patent challenges to Gilead's core group of TDF-based drugs: Viread (TDF), Truvada (TDF/FTC), and Atripla (TDF/FTC + Sustiva or "EFV").

6.      In February 2013, the day before trial concerning Teva's attempt to launch generic Viread was set to begin, Gilead and Teva announced a settlement that delayed the introduction of generic Viread by more than 4.5 years until December 15, 2017, only six weeks before Gilead's patents relating to Viread were set to expire.  In exchange, Gilead granted Teva six weeks of exclusivity as the only seller of generic Viread—a deal that was worth over $100 million to Teva.

7.      Then, in February 2014, the day before closing arguments in the trial concerning Teva's attempt to launch generic Truvada and Atripla, Gilead and Teva

2

announced another settlement that delayed the introduction of generic Truvada and Atripla by more than 6.5 years until September 30, 2020, one year before the expiration of Gilead's patents.  In turn, Gilead granted Teva six *months* of exclusivity as the only seller of generic Truvada and Atripla—a deal that was worth more than $1 billion to Teva.

8.      As another part of its anticompetitive scheme, Gilead entered into a series of agreements with co-conspirators Bristol Myers Squibb (or, "BMS") and Janssen to combine their drugs together and insulate those "combination" drugs and their component parts from generic competition.  These agreements unlawfully restricted competition, restraining nonventure activities that were outside any joint production efforts.

9.      In 2004, Gilead entered into an agreement with BMS to combine Gilead's Truvada (TDF/FTC) and BMS's Sustiva (EFV) into the fixed-dose combination drug named Atripla (TDF/FTC/EFV) (the "Atripla Agreement").  At the time, Gilead expected to face imminent challenges to its patents covering Truvada, and sought to combine Truvada with Sustiva so that the resulting combination drug would be protected by BMS's patents as well, to benefit Gilead.  Gilead and BMS aggressively promoted Atripla, and induced physicians and patients to switch their prescriptions from other TDF-based drugs to Atripla, knowing that those physicians and patients would be reluctant to switch back to their earlier, individual drugs when generic versions of those drugs became available.  As a result, Gilead and BMS could continue

3

to charge supra-competitive prices for Atripla even after standalone generic versions of Truvada and other drugs were launched.

10.    The Gilead-BMS Atripla Agreement included a "No-Generics Restraint," which barred both parties from using generic versions of each others' standalone drugs to make partially-generic versions of Atripla.  For example, BMS could not make a combination drug that would compete with Atripla consisting of generic Truvada (TDF/FTC) and branded Sustiva (EFV).  The No-Generics Restraint limited potential generic competition to Atripla.

11.    Also in 2004, as part of its unlawful monopolization efforts and to limit competition, Gilead announced that it was shelving the development of TAF.  For years, Gilead had reported that TAF had high potential as a prodrug of tenofovir that was safer, more effective, and had fewer side effects than TDF.  However, Gilead chose to use the No-Generics Restraints and reverse payment settlements discussed herein to protect TDF-based drugs from competition, and held TAF in reserve.

12.    In 2009, Gilead entered into an agreement with Janssen to combine Gilead's Truvada (TDF/FTC) and Janssen's drug Edurant ("RPV") into a fixed-dose combination drug named Complera (TDF/FTC/RPV) (the "Complera Agreement").  At the time, Gilead was engaged in patent litigation against Teva in an attempt to prevent or delay the launch of generic Truvada, and sought to create additional protection from competition for its TDF-based franchise.  As with Atripla, Gilead and Janssen aggressively sought to switch physicians and patients from other TDF-based drugs to

Complera, knowing that they could continue to charge supra-competitive prices for Complera even after generic versions of Truvada and other drugs were launched.

13.     The Gilead-Janssen Complera Agreement included a No-Generics Restraint that was broader than the No-Generics Restraint in the Atripla Agreement. This No-Generics Restraint not only barred Janssen from making a partially-generic version of Complera using generic Truvada (TDF/FTC) and branded Edurant (RPV), it also barred Janssen from developing a competitor to Complera consisting of generic Viread (TDF), generic lamivudine ("3TC")—a substitute for FTC, which became available in 2012—and branded Edurant (RPV).

14.     The No-Generics Restraint in the Atripla Agreement did not bar the development of a 3TC-based counterpart to Atripla.  As a result, when generic Viread (TDF) became available in December 2017,  BMS licensed Mylan Pharmaceuticals to produce that counterpart, and it was sold under the names Symfi and Symfi Lo (TDF/3TC/EFV) at a 40% discount to the price of Atripla.  The Complera Agreement prevented Janssen from fostering a similar competitor to Complera.

15.     In 2011, Gilead entered into an additional agreement with Janssen to combine Janssen's Prezista (DRV) with Gilead's Tybost ("COBI") into a combination drug named Prezcobix (DRV/COBI) so that Janssen could take advantage of Gilead's longer-lived patents for COBI.  Gilead then entered into a similar agreement with BMS to combine BMS's Reyataz ("ATV") with Tybost into a combination drug named Evotaz (ATV/COBI).  Both agreements contained No-Generics Restraints.

16.     In 2014, Gilead entered into two agreements with Janssen expanding their prior relationship to Gilead's new TAF platform.  The parties agreed to develop Odefsey, a TAF-based successor to Complera, and Symtuza, a combination of TAF, FTC, and Prezcobix (DRV/COBI).  Both agreements contained No-Generics Restraints, and expanded prior No-Generics Restraints agreed upon by Gilead and Janssen.

17.     Gilead launched the first TAF-based drug, Genvoya (TAF/FTC/EVG/COBI), in November 2015, and Gilead then began an aggressive marketing campaign to switch physicians and patients from TDF-based drugs (including Viread, Truvada, Atripla, and Complera) to TAF-based drugs Genvoya, Odefsey, Descovy, and Biktarvy.

18.     By September 2020, when generic Truvada finally came on the market, 91% of Gilead's U.S. prescription base had been "converted to TAF-based regimens," and 46% of patients taking Truvada for PrEP had been converted to TAF-based Descovy.

19.     The conduct of Defendants and their co-conspirators unlawfully delayed and prevented generic competition and artificially inflated the prices of HIV cART drugs.  As a result, purchasers of and payors for those drugs, including UHS and its assignors, were overcharged and continued to be overcharged.  UHS brings this action to recover overcharge damages it has already and will continue to pay, and to to obtain requitable relief to stop Defendants' ongoing illegal conduct.

## II.    PARTIES

20.    UHS is a corporation organized and existing under the laws of Minnesota with its principal place of business in Hennepin County, Minnesota.  It is a wholly-owned subsidiary of UnitedHealth Group, Inc. ("UHG"), which is also headquartered in Minnetonka, Minnesota.

21.    UHS engages in servicing prescription drug managed care programs provided to members and beneficiaries under insurance plans offered by UHS's subsidiaries and affiliates, which, together, constitute the largest single health insurance carrier and services provider in the United States, and serve some 70 million individual insureds ("UnitedHealthcare Insureds").[1]  UHS is the centralized and primary contracting entity responsible for payments made for pharmaceutical drugs dispensed to UnitedHealthcare Insureds throughout the country.  From its headquarters in Hennepin County, Minnesota, UHS negotiated and executed contracts with Pharmacy Benefit Managers ("PBMs") on behalf of itself and its health plan subsidiaries and affiliates ("UnitedHealthcare Plans"), and during the relevant time period, was (and is) contractually responsible for the payments made under those contracts, including for branded and generic cART drugs dispensed to UnitedHealthcare Insureds during the relevant time period.

---

[1] For purposes of this Complaint, the term "UnitedHealthcare Insureds" does not include members of self-insured or self-funded health plans, also known as self-funded or Administrative Services Only ("ASO") customers.

22.     UHS is the parent company of, or otherwise an affiliate/related company to, each of the UnitedHealthcare Plans, which issue health insurance to UnitedHealthcare Insureds, including for coverage of prescription drug costs.  The UnitedHealthcare Plans issue insurance to UnitedHealthcare Insureds covering prescription drugs in the form of (1) fully insured commercial ("Commercial") plans; (2) Medicare plans; and (3) Medicaid plans.  The UnitedHealthcare Plans collectively provide these prescription drug insurance benefits to UnitedHealthcare Insureds in all 50 states, the District of Columbia, and Puerto Rico.  These UnitedHealthcare Plans are listed in the attached Exhibit A.

23.     UHS is also an affiliate and the assignee of OptumRx Group Holdings, Inc., OptumRx, Inc., OptumRx Holdings, LLC, and their wholly-owned pharmacy subsidiaries as pertaining strictly to the purchases of branded and generic cART drugs made for or arising out of the business of their wholly-owned pharmacy subsidiaries (collectively, "OptumRx Assignors").  OptumRx Assignors buy prescription drugs and dispense them to prescribed consumers, on a specialty and/or mail order retail pharmacy basis.  OptumRx Assignors have purchased both branded and generic cART drugs directly from Defendants and/or their co-conspirators, and have assigned to UHS their claims and the rights to obtain all recoveries arising out of such direct purchases and the matters alleged in this Complaint.

24.     UHS also brings this action as the assignee of claims originating from Cardinal Health, Inc. ("Cardinal"), which during the relevant period purchased both branded and generic cART drugs directly from Defendants and/or their co-conspirators

for resale to OptumRx Assignors.  Cardinal has assigned to OptumRx, Inc. its claims and the rights to obtain all recoveries arising out of such direct purchases and the matters alleged in this Complaint, and OptumRx, Inc. in turn has assigned those rights to UHS.

25.     UHS seeks recovery for all unlawful overcharges incurred in connection with indirectly paying for cART drugs dispensed to UnitedHealthcare Insureds, including all those receiving insurance or health benefits from any of the UnitedHealthcare Plans (or their predecessors or successors).  UHS also seeks recovery for all unlawful overcharges incurred in connection with the aforementioned direct purchases by OptumRx Assignors and Cardinal (together, "DP Assignors").

26.     UHS is the proper entity to pursue all forms of relief, including damages, for all injury and losses incurred as alleged in this Complaint.  Nonetheless, out of an abundance of caution, and to assure the Court that there is no potential for any duplicative indirect purchaser/payor recovery, UHS has obtained assignments from the UnitedHealthcare Plans, conveying to UHS any claims and rights to recoveries they may have in connection with the matters alleged in this Complaint.  UHS hereby asserts those assigned indirect purchaser/payor claims in the alternative to the claims of UHS, to the extent that such assignors are found to be sole owners of any claims that are non-duplicative to those of UHS.  Accordingly, to the extent the Court were to find such assignments are required for any claims, all subsequent references to "UHS" include itself and assignors UnitedHealthcare Plans, unless expressly indicated otherwise.

27.     Defendant Gilead Sciences, Inc. is a corporation organized and existing under the laws of the State of Delaware, with a principal place of business at 333 Lakeside Drive, Foster City, California 94404.

28.     Defendant Gilead Holdings, LLC is a limited liability company organized and existing under the laws of the State of Delaware, with a principal place of business at 333 Lakeside Drive, Foster City, California 94404.  Gilead Holdings, LLC is a wholly-owned subsidiary of Gilead Sciences, Inc.

29.     Defendant Gilead Sciences, LLC (formerly known as Bristol-Myers Squibb & Gilead Sciences, LLC) is a limited liability company organized and existing under the laws of the State of Delaware, with a principal place of business at 333 Lakeside Drive, Foster City, California 94404.  Gilead Sciences, LLC is a wholly-owned subsidiary of Gilead Sciences, Inc.

30.     Defendant Gilead Sciences Ireland UC (formerly known as Gilead Sciences Limited) is an unlimited liability company organized and existing under the laws of Ireland, with a principal place of business at IDA Business & Technology Park, Carrigtohill, Co. Cork, Ireland.  Gilead Sciences Ireland UC is a wholly-owned subsidiary of Gilead Sciences, Inc.

31.     Gilead Sciences, Inc., Gilead Holdings, LLC, Gilead Sciences, LLC, and Gilead Sciences Ireland UC are collectively referred to herein as "Gilead."

32.     Defendant Teva Pharmaceuticals USA, Inc., ("Teva") is a corporation organized and existing under the laws of the State of Delaware, with a principal place at 400 Interpace Parkway, #3, Parsippany, New Jersey 07054.

10

33.     Other persons and entities not named as Defendants joined and participated in Defendants' unlawful conspiracies in restraint of trade, including Bristol-Myers Squibb Company, and E.R. Squibb & Sons, L.L.C. (together referred to herein as "BMS"); and Johnson & Johnson, Janssen Pharmaceuticals, Inc., Janssen Products LP, and Janssen R&D Ireland (together referred to herein as "Janssen").

34.     All of the actions attributed to Defendants and their co-conspirators in this Complaint were authorized,  ordered and done by their respective officers, agents, employees or other representatives while  actively engaged in the management of that Defendant or co-conspirator's affairs and within the course and scope  of their agency or employment, and/or with actual, apparent or ostensible authority.

## III.     JURISDICTION AND VENUE

35.     This Court has subject-matter jurisdiction over this action pursuant to 15 U.S.C. § 26, and 28 U.S.C. §§ 1331, 1332, and 1337.

36.     This Court has subject-matter jurisdiction over the state law claims alleged in this action pursuant to 28 U.S.C. § 1367, as the state law claims are so related as to form part of the same case or controversy.  Such supplemental or pendent subject-matter jurisdiction will also avoid unnecessary duplication and multiplicity of actions, and should be exercised in the interests of judicial economy, convenience, and fairness. The court would also separately have jurisdiction over these claims under 28 U.S.C. § 1332(a), as the amount in controversy exceeds $75,000.00 and involves diversity of citizenship.

37.     Venue is proper in this District pursuant to 15 U.S.C. § 22, and 28 U.S.C. § 1391.  At all relevant times, Defendants resided, transacted business, and/or were found or had agents in the United States, including this District.  During the alleged time period, Defendants marketed, sold and/or shipped one or more of the pharmaceutical drugs at issue in a continuous and uninterrupted flow of interstate commerce in the United States, including into this District.  Further, Defendant Teva is registered to do business in the State of Minnesota, maintains a designated agent for service of process in Minnesota, and employs sales and other personnel in this District. Defendants' conduct alleged herein had a direct, substantial, and reasonably foreseeable effect on interstate commerce in the United States, including in this District. Defendants' conduct in artificially increasing prices for the drug products at issue was directed at, and had the intended effect of causing injury to, persons residing in, located in, or doing business throughout the United States, including in this District specifically, and Defendants are otherwise subject to the service of process provisions of 15 U.S.C. § 22.

38.     Defendants are subject to the personal jurisdiction of this Court for one or more of the reasons stated below:

a.     Defendants are subject to service of process for this action as provided in 15 U.S.C. § 22;

b.      Defendants are amenable to service of process because, as alleged in this Complaint, they inhabit, transact business in, have continuous or systematic contacts with, and/or are found or have sufficient minimum contacts in the United States

sufficient to satisfy due process.  While Defendants are headquartered outside this District, they nevertheless engaged in the business of developing, distributing, advertising and/or selling the drug products at issue into this District specifically and purposefully;

      c.      Defendants are amenable to service of process pursuant to Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure and the long-arm statute of the State in which this Federal Court sits because, *inter alia*, and as alleged in this Complaint, Defendants have transacted business in this District and have contracted to supply services or things in this District, and because the District's long-arm statute extends jurisdiction to the limits of due process and Defendants have sufficient minimum contacts with the District to satisfy due process;

      d.      Based on the allegations in this Complaint, Defendants are subject to the general and specific personal jurisdiction of this Court because they have purposefully directed their contacts and conduct at the forum District and have purposefully availed themselves of the laws of this District.  As alleged in this Complaint, Defendants engaged in anticompetitive conduct that was intended to have, and did have, direct, substantial and reasonably foreseeable effects on the commerce throughout the United States, including this District; and

      e.      Defendant Teva is registered to do business in the State of Minnesota, and maintains a designated agent for service of process within the State of Minnesota.

**IV.    BACKGROUND**

    **A.    The Regulatory Structure for the Approval of Generic Drugs and the Substitution of Generic Drugs for Brand-Name Drugs**

    39.    Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), manufacturers that create a new drug must obtain FDA approval to sell the product by filing a New Drug Application ("NDA").   21 U.S.C. §§ 301-392.   An NDA must include specific data concerning the safety and effectiveness of the drug, as well as any information on applicable patents.  21 U.S.C. § 355(a), (b).

    40.    When the FDA approves a brand-name manufacturer's NDA, it lists in a publication titled the "Approved Drug Products with Therapeutic Equivalence Evaluations" (known as the "Orange Book") any patents which, according to the information supplied to the FDA by the brand manufacturer: (1) claim the approved drug or its approved uses; and (2) for which a "claim of patent infringement could reasonably be asserted if a person is not licensed by the owner engaged in the manufacture, use, or sale of the drug." 21 U.S.C. §§ 355(b)(1) & (c)(2).  The manufacturer may subsequently list in the Orange Book within thirty days of issuance any such patents issued after the FDA approves the NDA.  21 U.S.C. §§ 355(b)(1) & 355(g)(7)(A)(iii).

    41.    The FDA relies completely on the brand manufacturer's truthfulness about patent validity and applicability, as it does not have the resources or authority to verify the manufacturer's patents for accuracy or trustworthiness.  In listing patents in the Orange Book, the FDA merely performs a ministerial act.

### B.    The Hatch-Waxman Act and ANDA Approval Process

42.    In 1984, Congress amended the FDCA through enactment of the Drug Price Competition and Patent Restoration Act, commonly known as the Hatch-Waxman Act.  Congress's principal intent was for Hatch-Waxman to simplify and reduce regulatory hurdles for prospective generic manufacturers, by replacing the lengthy and costly NDA approval process through the filing of an Abbreviated New Drug Application ("ANDA"), to introduce competition into the marketplace.

43.    An ANDA relies on the scientific findings of safety and effectiveness included in the brand manufacturer's original NDA, and must further show that the generic drug contains the same active ingredient(s), dosage form, route of administration, and strength as the brand drug and is absorbed at the same rate and to the same extent as the brand drug—that is, that the generic drug is pharmaceutically equivalent and bioequivalent[2] to the brand drug.  The FDA assigns oral-dosage-form generic drugs that are pharmaceutically equivalent  and bioequivalent to their brand-name counterpart an "AB" rating.

44.    Congress enacted the Hatch-Waxman Amendments to expedite the entry of  legitimate (non-infringing) generic competitors, thereby reducing healthcare expenses nationwide.   Congress also sought to protect pharmaceutical manufacturers' incentives to create  new and innovative products.

---

[2] Bioequivalence exists when the active ingredient of the proposed generic drug would be present in the blood of a patient to the same extent and for the same amount of time as the branded counterpart.  21 U.S.C. § 355(j)(8)(B).

45.     The Hatch-Waxman Amendments achieved both goals, advancing substantially the rate of generic product launches, and ushering in an era of historically high profit margins for brand manufacturers.  In 1983, before the Hatch-Waxman Amendments, only 35% of the top-selling drugs with expired patents had generic alternatives; by 1998, nearly all did.  In 1984, prescription drug revenue for branded and generic drugs totaled $21.6 billion; by 2009, total prescription drug revenue had increased many-fold to $300 billion.

### C.     Paragraph IV Certifications

46.     To obtain FDA approval of an ANDA, a manufacturer must certify that the generic drug will not infringe any patents listed in the Orange Book.  Under Hatch-Waxman, a generic manufacturer's ANDA must contain one of four certifications:

a.      no patent for the brand drug has been filed with the FDA (a "Paragraph I certification");

b.      the patent for the brand drug has expired (a "Paragraph II certification");

c.      the patent for the brand drug will expire on a particular date and the manufacturer does not seek to market its generic product before that date (a "Paragraph III  certification"); or

d.      the patent for the brand drug is invalid or will not be infringed by the generic manufacturer's proposed product (a "Paragraph IV certification").

47.     If a generic manufacturer files a Paragraph IV certification, a brand manufacturer can delay FDA approval of the ANDA simply by suing the ANDA applicant for patent infringement.  If the brand manufacturer initiates a patent

16

infringement action against the generic filer within forty-five days of receiving notification of the Paragraph IV certification ("Paragraph IV Litigation"), the FDA will not grant final approval to the ANDA until the earlier of: (a) the passage of 30 months, or (b) the issuance of a decision by a court that the patent is invalid or not infringed by the generic manufacturer's ANDA. Until one of those conditions occurs, the FDA may grant "tentative approval" but cannot authorize the generic manufacturer to market its product. The FDA may grant an ANDA tentative approval when it determines that the ANDA would otherwise be ready for final approval but for the 30-month stay.

48.    As an incentive to spur manufacturers to develop and seek approval of generic alternatives to branded drugs, Hatch-Waxman grants a 180-day period of market exclusivity to the first Paragraph IV ANDA applicant ("first filer") to file a substantially complete ANDA. During the 180-day exclusivity period (measured from the first commercial marketing of the generic drug or the date of a court decision finding the listed patent invalid, unenforceable, or not infringed, 21 U.S.C. § 355(j)(5)(B)(iv)), the first ANDA filer enjoys 180 days of freedom from competition from other generic versions of the drug (except in the case of an authorized generic, as discussed below), and during that period effectively has a duopoly with the brand manufacturer.

49.    To generic manufacturers, entering the market first with the 180-day exclusivity period is an important objective. Before generic entry, the brand drug is typically priced far above competitive levels. During the 180-day period of exclusivity, the generic price, while lower than the branded price, is still much higher than it would be in

the presence of two or more generic competitors. Generics are usually at least 25% less expensive than their brand-name counterparts when there is a single generic competitor, but this discount typically increases up to 80%, 90%, or more, when there are multiple generic competitors on the market. For a generic manufacturer, being able to sell at the higher duopoly price for 180 days may be worth hundreds of millions of dollars.

50.    Under this regulatory scheme, NDA-holders have strong financial incentives to "game the system" by listing patents in the Orange Book, even if such patents are not eligible for listing because they are invalid or unenforceable, and by suing any generic competitor that files an ANDA with a Paragraph IV certification, even if the generic competitor's product does not actually infringe the listed patent because merely filing suit delays generic entry during the automatic 30-month stay.

51.    Similarly, the first generic applicant can help the brand manufacturer "game the system" by agreeing to delay its own market entry, which effectively blocks the market entry of all generic manufacturers because later generic applicants cannot launch until the first generic applicant uses or forfeits its 180-day exclusivity period.

**D.    Benefits of Generic Drugs**

52.    Generic versions of brand-name drugs contain the same active ingredient, and are determined by the FDA to be just as safe and effective as their brand-name counterparts. ANDAs for orally available solid dosage forms (tablets, capsules, etc.) that meet all of the requirements for FDA approval are assigned an "AB" rating by the agency. AB-rated generics are deemed by the FDA to be therapeutically equivalent and pharmaceutically equivalent to their brand-name counterparts.

18

53.    An AB rating for a generic drug is significant.  All states permit (and some states require) pharmacists to substitute an AB-rated generic version of a drug for the brand-name drug without seeking or obtaining permission from the prescribing physician (unless the prescription is denominated "Dispense as Written").

54.    Many third-party payors, such as Plaintiff, whose members account for a substantial share of purchases in the market, have adopted policies to encourage the substitution of lower-cost AB-rated generic drugs for their branded counterparts.

55.    Until a generic manufacturer enters the market with an AB-rated generic product, there is no bioequivalent generic drug which competes with the brand-name drug and the brand-name manufacturer can continue to charge supra-competitive prices profitably without losing all or a substantial portion of its brand-name sales.  That monopoly allows brand manufacturers to charge prices far above competitive levels (i.e., above the prices that prevail for that drug upon generic entry) without losing all or a substantial portion of their brand drug sales.

56.    The launch of a  generic drug creates price competition that provides cost savings for all purchasers of the drugs.  When an AB-rated generic enters the market, it quickly captures sales of the corresponding branded drug, often capturing 80% or more of the market within the first six months.  The Federal Trade Commission has estimated that, within a year of the first generic entrant, the generic version on average takes over 90% of the brand's unit sales and sells for 15% of the price of the brand-name product. Prices for the generic drugs typically decline further as more generic companies

compete with one another.  As a result, brand-name companies, such as Gilead, view competition from generic drugs as a grave threat to their profits.

**E.    The Impact of Authorized Generics**

57.    The 180-day marketing exclusivity for first-filers does not prevent a brand manufacturer from marketing its own generic alternative to the brand drug during the exclusivity period, pursuant to its own approved NDA.  Such an "authorized generic" is identical to the brand drug, but is sold as a generic product either by the brand manufacturer itself or through an authorized third party.  Competition created by an authorized generic during the 180-day exclusivity period leads to lower prices for generic drugs and a decrease in brand-name sales.

58.    In its study, *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact* (August 2011), the Federal Trade Commission found that authorized generics capture a significant portion of sales, reducing the revenues generated by the first-filer's generic product by approximately 50% during the 180-day exclusivity period.  The first-filing generic makes significantly less money when it faces competition from an authorized generic because (1) the authorized generic takes a large share of unit sales away from the first-filer; and (2) the presence of an additional generic in the market leads to lower overall generic prices.  This competition benefits drug purchasers.  Conversely, the lack of such competition harms purchasers by reducing choice and increasing prices.

59.    As a practical matter, authorized generics are the only means by which brand-name manufacturers engage in price competition with manufacturers of AB-rated

generic drugs.  Brand-name manufacturers generally do not reduce the price of their branded drug in response to  the entry of an AB-rated generic.  Instead, brand manufacturers have typically raised the brand-name price to extract higher profits from the small number of "brand-loyal" patients.

### F.    The Economics of Reverse-Payment Agreements

60.    Reverse-payment agreements arise in response to the threatened loss of exclusivity from patent challenges by generic drug makers.  Reverse-payment agreements interrupt the well-worn process by which generic drug competition reduces drug prices.  In a reverse-payment agreement, the brand manufacturer pays the generic manufacturer (the alleged patent infringer) to dismiss its patent challenge and forego generic entry for a period of time.

61.    From an economic perspective, there is reason to scrutinize any reverse-payment agreement because it arises in a unique context.  In Hatch-Waxman litigation, the generic firm does not claim damages from the brand company that owns the patent.  Thus, a typical reason for a settlement payment—to compensate for damages that have allegedly accrued—does not exist.  Thus, the very existence of the payment is an unusual feature of the agreement that requires explanation and invites careful scrutiny.

62.    Absent the deterrence effect of antitrust law, reverse-payment agreements would be economically rational for both the branded drug maker and the generic manufacturer.  By delaying generic entry, the branded manufacturer preserves an immensely profitable stream of monopoly profits.  The branded manufacturer can use those monopoly profits to pay the generic manufacturer more than the generic

manufacturer would have earned had it entered the market and competed against the branded manufacturer's authorized generic (in the first 180 days of exclusivity) and subsequent generic entrants. Although both drug companies profit from that arrangement, they do so at the expense of drug purchasers who pay those monopoly profits and are deprived of the benefits of competition, including the opportunity to purchase lower-priced generics.

63.   Reverse-payment agreements that include an agreement by the branded manufacturer not to launch an Authorized Generic ("no-AG" provision) are even more harmful to competition than reverse-payment agreements involving only a cash transfer because, unlike cash payments, no-AG provisions delay generic entry and continue to restrict competition even after generic entry by eliminating competition between the generic manufacturer's product and the authorized generic. The profits used by the branded manufacturer to compensate the generic manufacturer in a no-AG provision come from the pockets of purchasers and payors (including Plaintiff) who would otherwise pay the drug companies less in the absence of the no-AG agreement.

## V.   HIV cART DRUGS

64.   HIV is a deadly virus that attacks and destroys the immune system.[3] If left untreated, HIV typically leads to Acquired Immunodeficiency Syndrome ("AIDS"), a

---

[3] There are two major types of HIV: HIV-1 and HIV-2. "HIV" as used throughout this Complaint refers to HIV-1, which was discovered first and is the most prevalent form of HIV worldwide. HIV-2 is uncommon outside of West Africa.

condition where the immune system is unable to combat infections and diseases.  Without treatment, AIDS is usually fatal.

65.     HIV and AIDS have caused the deaths of more than 700,000 people in the United States, and tens of millions of people worldwide.  Approximately 1.2 million people in the United States currently live with HIV.  In 2019, an estimated 34,800 new HIV infections occurred in the United States, and more than 15,000 people diagnosed with HIV died.[4]

66.     HIV can be treated with antiretroviral therapies ("ART") that suppress the virus.  Effective HIV treatments combine antiretroviral therapies with multiple mechanisms of action, and are referred to as "combination antiretroviral therapy" or "cART."  Those cART regimes can reduce viral replication to the point that copies of the HIV virus cannot be detected by standard viral load tests—generally meaning that there are fewer than 50 RNA copies of HIV per milliliter of blood.  People with HIV at "undetectable" levels have stronger immune systems than people with advanced HIV infections or AIDS, and generally cannot transmit the virus to others.

67.     cART treatments are not a cure for HIV.  People with HIV must continue taking cART drugs for the rest of their lives to prevent the virus from re-emerging and progressing.  As a result, people with HIV need ongoing access to affordable cART drugs to live longer, healthier, lives.  As a matter of public health, access to affordable cART drugs is an important factor in preventing the spread of HIV/AIDS.

---

[4] HIV.gov, *U.S. Statistics*, *available at* https://www.hiv.gov/hiv-basics/overview/data-and-trends/statistics.

68.     The "backbone" for most cART regimes typically consists of at least one nucleotide/nucleoside analogue reverse transcriptase inhibitor ("NRTI"), which functions as an analog of the naturally-occurring deoxynucleosides and deoxynucleotides needed to synthesize viral DNA.  Those NRTIs can disrupt the reverse transcription process needed to generate HIV DNA, thereby preventing integration of the proviral DNA into the genome of human cells.  The "NRTI backbone" is often combined with a "third agent" (a drug from another class of antiretroviral treatment) and a "booster" (a pharmacokinetic enhancer that inhibits the breakdown of the third agent).

69.     The need to use multiple drugs in cART regimens can be a barrier to patient compliance.  Thus, to reduce the burden on the patient, multiple cART drugs are often combined into a single pill, known as a "fixed dose combination," or "FDC."

70.     The principal NRTIs used in cART regimes are tenofovir disoproxil fumarate ("TDF") and tenofovir alafenamide fumarate ("TAF").  Both TDF and TAF are prodrugs of the same molecule, tenofovir—meaning that they are pharmacologically inactive compounds that are converted into tenofovir within the body.  Tenofovir itself cannot be administered orally.

71.     TDF and TAF are superior to other NRTIs because tenofovir is activated more quickly in the body than other similar drugs.  NRTIs are activated in a patient's cells when cellular kinase enzymes add a phosphate group to the molecule, a process known as "phosphorylation."  Tenofovir has a phosphate group analogue and thus

requires only two phosphate groups to activate, whereas other NRTIs require three phosphate groups.  As a result, tenofovir has superior pharmacokinetics.

72.     TDF or TAF are almost always used in combination with another NRTI—specifically, either emtricitabine ("FTC") or lamivudine ("3TC").  This is because when an HIV virus becomes resistant to either FTC or 3TC, that virus becomes more susceptible to TDF and TAF.  As a result, the combination of TDF or TAF with either FTC or 3TC makes it less likely that the virus will become resistant to a cART treatment.

73.     FTC and 3TC are very similar, differing only by one atom (a fluorine atom in FTC vs. a hydrogen atom in 3TC).  U.S. Department of Health and Human Services ("HHS") and World Health Organization ("WHO") guidelines state that the two drugs can be used interchangeably for HIV treatment.  Any cART regimen using FTC can use 3TC instead, and vice versa, without any loss of therapeutic efficacy.  However, FTC and 3TC are not AB-rated substitutes.

74.     This case concerns all HIV cART drugs, including:

a.      TDF and TDF-based FDCs, including:  (1) Viread (TDF); (2) Truvada (a combination of TDF and FTC); (3) Atripla (a combination of TDF, FTC, and third agent efavirenz ("EFV")); (4) Complera (a combination of TDF, FTC, and third agent rilpivirine ("RPV")); (5) Stribild (a combination of TDF, FTC, third agent elvitegravir ("EVG"), and booster cobicistat ("COBI")); and (6) AB-rated generic versions of those drugs;

b.      TAF and TAF-based FDCs, including:  (1) Vemlidy (TAF); (2) Descovy (a combination of TAF and FTC); (3) Odefsey (a combination of TAF, FTC, and RPV); (4) Genvoya (a combination of TAF, FTC, EVG, and COBI); (5) Symtuza (a combination of TAF, FTC, third agent darunavir ethanolate ("DRV"), and COBI); and (6) Biktarvy (a combination of TAF, FTC, and third agent bictegravir ("BIC"));

c.      Emtriva (FTC);

d.      Sustiva (EFV);

e.      Vitekta (EVG);

f.      Edurant (RPV);

g.      Tybost (COBI);

h.      Prezista (DRV) and Prezcobix (a combination of DRV and COBI); and

i.      Reyataz (third agent atazanavir sulfate ("ATV") and Evotaz (a combination of ATV and COBI)).

75.      The following chart summarizes the drugs listed above:

| Branded Drug *Manufacturer* | NRTI #1 | NRTI #2 | Third Agent | Booster |
|---|---|---|---|---|
| **Viread** *Gilead* | TDF | | | |
| **Emtriva** *Gilead* | | FTC | | |
| **Truvada** *Gilead* | TDF | FTC | | |

| Branded Drug *Manufacturer* | NRTI #1 | NRTI #2 | Third Agent | Booster |
|---|---|---|---|---|
| **Sustiva** *BMS* | | | EFV | |
| **Atripla** *Gilead* | TDF | FTC | EFV | |
| **Edurant** *Janssen* | | | RPV | |
| **Complera** *Gilead* | TDF | FTC | RPV | |
| **Tybost** *Gilead* | | | | COBI |
| **Vitekta** *Gilead* | | | EVG | |
| **Stribild** *Gilead* | TDF | FTC | EVG | COBI |
| **Vemlidy** *Gilead* | TAF | | | |
| **Descovy** *Gilead* | TAF | FTC | | |
| **Odefsey** *Gilead* | TAF | FTC | RPV | |
| **Genvoya** *Gilead* | TAF | FTC | EFV | |
| **Prezista** *Janssen* | | | DRV | |
| **Prezcobix** *Janssen* | | | DRV | COBI |

| Branded Drug *Manufacturer* | NRTI #1 | NRTI #2 | Third Agent | Booster |
|---|---|---|---|---|
| **Symtuza** *Janssen* | TAF | FTC | DRV | COBI |
| **Biktarvy** *Gilead* | TAF | FTC | BIC | |
| **Reyataz** *BMS* | | | ATV | |
| **Evotaz** *BMS* | | | ATV | COBI |

## VI.   THE ANTICOMPETITIVE CONDUCT

### A.   Gilead Entered into Anticompetitive Settlement Agreements with Teva to Delay and Suppress Generic Competition

72.    Since at least 2004, Gilead expected to face generic competition for TDF, FTC, and TDF/FTC.  Accordingly, during the years that followed, Gilead sought to enter into agreements with other drug manufactuers that would unlawfully limit competition to Gilead's drugs.  Gilead's efforts focused in part on eliminating the competitive threat to its TDF-based drugs posed by the patent challenges generic manufacturer Teva had made to Viread (TDF), Truvada (TDF/FTC), and Atripla (TDF/FTC/EFV).  Other generic manufacturers had also followed Teva's patent challenges with analogous challenges of their own.  Viread, Truvada, and Atripla were the foundation of Gilead's TDF franchise. As a result, Teva's challenges to Gilead's patents were a major threat to Gilead's monopoly profits.  Gilead defused that threat by entering into anti-competitive settlement

agreements with Teva that significantly delayed the market entry of generic TDF-based products, including generic Viread, Truvada, and Atripla.

### 1. Viread (TDF)

#### a. Viread was a Significant Source of Revenue for Gilead

74.    Viread is an NRTI indicated for the treatment of HIV infection in adults and pediatric patients two years of age or older.  Viread is also indicated for the treatment of chronic Hepatitis B in adults and patients 12 years of age or older.  The FDA approved Viread in October of 2001.

75.    Viread (TDF) is a prodrug formulation of tenofovir.  Prodrugs are pharmacologically inactive compounds that, once administered, undergo a conversion by the body's metabolic processes to become an active pharmacological agent.

76.    Tenofovir is and for many years has been one of the most common NRTI drugs used in the U.S. for antiretroviral therapy.  Gilead did not invent tenofovir.[5] Tenofovir was first invented and patented in the 1980s by Czech scientists.  The patents covering the API for tenofovir have long since expired.

77.    Gilead created Viread as a prodrug formulation of tenofovir that could be absorbed through the patient's intestine.  Gilead was never issued a patent based on the

---

[5] Gilead entered into agreements with the Institute of Organic Chemistry and Biochemistry of the Academy of Sciences of the Czech Republic and Rega Stichting (IOCB/REGA), the institutions who discovered the nucleotide compound tenofovir, for an exclusive right to manufacture, use and sell tenofovir subject to undisclosed "minimum royalty payments."  The agreement was amended in 2000 for a reduced royalty payment in exchange for an up-front payment from Gilead.  *See* Gilead Sciences, Inc., 2006 Annual Report (Form 10-K) (Feb. 27, 2007), *available at* https://www.sec.gov/Archives/edgar/data/0000882095/000119312507041203/d10k.htm.

parent molecule tenofovir.  Instead, Gilead's patents pertain to converting tenofovir into the prodrug TDF that could be absorbed through the patient's intestine.  The process for converting such compounds into prodrugs would have been obvious to those reasonably trained in the field.  Prodrugs were not new or novel at the time Gilead obtained its patents.

78.    Viread has been an enormously successful drug.  After launching in late 2001,[6] Viread quickly became a blockbuster drug for Gilead.  In 2003, Gilead earned $566.5 million in sales and royalty revenues from Viread.  In 2004, that number jumped to $782.9 million.[7]  After many years of stable sales of approximately $650-$950 million per year, Viread crossed the $1 billion mark in 2014.  Viread was a $1 billion per year drug to Gilead thereafter through 2017.  Teva launched generic Viread on December 15, 2017.

---

[6] The FDA approved Gilead's NDA 21356 for Viread (300mg) on October 26, 2001. Gilead submitted limited clinical data supporting approval and had not completed Phase III clinical studies at the time.

[7] In its annual report for 2006, Gilead noted "[s]ubstantially all of our revenues are derived from sales of a limited number of products.  If we are unable to maintain or continue increasing sales of our HIV products, our results of operations may be adversely affected . . . . We are currently dependent on sales of our HIV products, especially Truvada and Viread, to support our existing operations."  Gilead Sciences, Inc., 2006 Annual Report (Form 10-K) (Feb. 27, 2007), *available at* https://www.sec.gov/Archives/edgar/data/0000882095/000119312507041203/d10k.htm.

b.    **Gilead's Viread Hatch-Waxman Exclusivities and
Weak, Evergreened, and Ancillary Patent Portfolio**

79.    Gilead's Viread patent portfolio includes U.S. Patent Nos. 5,922,695 (the

"'695 Patent"); 5,977,089 (the "'089 Patent"); and 6,043,230 (the "'230 Patent").  These

three patents all derive from the same patent application and cover Gilead's tenofovir

disoproxil prodrug.  U.S. Patent No. 5,935,946 (the "'946 Patent") claims the fumarate

salt of tenofovir disoproxil.  Collectively, the four patents are referred to herein as the

"TDF Patents."  Gilead obtained patent and pediatric exclusivity up to and including

January 25, 2018 on the four Viread TDF Patents listed in the FDA Orange Book.

80.    As noted, Gilead did not invent tenofovir.  Instead of innovating, Gilead

relies heavily on licenses to intellectual property from others' prior inventions and

research.  Tenofovir was invented by Czech institutions, from whom Gilead obtained an

exclusive license.  In 1991 and 1992, Gilead entered into agreement with the Czech

institutions for the exclusive right to manufacture, use and sell tenofovir in exchange for

the payment of a percentage of net revenues received "subject to minimum royalty

payments."[8]  In 2000, in anticipation of Viread's launch, the agreements were amended to

provide for a reduced royalty rate on future sales of products incorporating tenofovir in

return for a modest upfront payment from Gilead.

81.    Patents are intended to encourage innovation by offering a monopoly

period for inventions that are novel, useful, and non-obvious.  However, the reality is that

---

[8] Gilead Sciences, Inc., 2005 Annual Report (Form 10-K) (Feb. 28, 2006), *available at*
https://www.sec.gov/Archives/edgar/data/882095/000119312506045128/d10k.htm.

a large number of issued patents should have been rejected. A 2003 report by the Federal Trade Commission found that the average patent application gets approximately 15-20 hours of review time by the U.S. Patent and Trademark Office's ("PTO") assigned examiner. Despite the PTO receiving hundreds of thousands of patent applications each year, approximately eighty-five percent (85%) of patent applications ultimately result in an issued patent.

82.     Brand pharmaceutical companies seeking to take advantage of the PTO's limited resources have increasingly applied a patent procurement strategy known as "evergreening." "Evergreened" patents are patents not on the API, but instead are non-API patents on some ancillary aspect of the drug, such as its delivery method or release mechanism. These "evergreened" patents—if litigated to judgment—have a high rate of being found invalid or not infringed.

83.     Because the API tenofovir was off-patent, the Viread TDF Patent portfolio covers only Gilead's prodrug formulation, tenofovir disoproxil and its fumarate salt. These ancillary patents were considered weak and likely to be invalidated.

84.     The Viread NCE exclusivity expired on October 26, 2006. As a result, any 30-month stay blocking FDA approval of competing generics could have expired as early as April 26, 2009, and if a generic manufacturer had brought a successful patent challenge (or launched "at risk"), it could have launched a generic version of TDF as early as 2009. Even in the best of circumstances for Gilead, the Orange Book listed patents for Viread expired on their own terms by January 2018.

### c. Multiple Generic Challenges to Viread Patents

85.     On or about July 1, 2009, Teva filed a substantially complete ANDA with the FDA to manufacture and sell a generic formulation of Viread 300 mg tablets.  The 300 mg strength of Viread constitutes the lion's share of all Viread sales.[9]

86.     Teva's ANDA included a Paragraph IV certification as to all four TDF Patents—a declaration by Teva that it believed the patents covering the registered listed drug were either invalid or not infringed by the ANDA product.  Upon service of Teva's Paragraph IV certification, Gilead elected to initiate Hatch-Waxman patent litigation by filing a patent infringement lawsuit within forty-five (45) days.  Gilead's filing of the lawsuit triggered a stay preventing the FDA from approving Teva's ANDA until the earlier of thirty (30) months has elapsed or the issuance of a "court decision" finding the patents at issue invalid or not infringed by the ANDA drug.

87.     Teva's 300 mg ANDA, as the first-filed ANDA, entitled Teva to the lucrative 180-day exclusivity period.  The 180-day exclusivity is a statutory incentive set forth in the Hatch-Waxman generic drug approval provisions, 21 U.S.C. § 355(j), for generic pharmaceutical companies to challenge brand manufacturers' patents.  The first filer's ANDA—once approved and if containing a Paragraph IV certification—entitles the first filer to 180 days of generic marketing exclusivity during which the FDA cannot approve other generic companies' later-filed ANDAs.  As frequently noted by generic

---

[9] Aurobindo was the first to file an ANDA for 150 mg, 200 mg and 250 mg strengths. Aurobindo received FDA approval for its ANDA on January 18, 2018.

pharmaceutical industry trade groups, the "vast majority" of generic drug profits occur during the 180-day exclusivity period.

88.     As set forth in the Hatch-Waxman Act, the 180-day exclusivity commences upon a "first commercial marketing" by the 180-day exclusivity holder (which applies to both ANDA and authorized generic launches) or upon a "court decision" finding the patents invalid, unenforceable, or not infringed.

89.     Knowing its patents were weak and likely to be invalidated, Gilead filed baseless patent infringement litigation against Teva and other generic challengers of the TDF Patents.  Gilead then entered into settlement agreements with challengers before any final court decision rendering the TDF Patents invalid and/or not infringed was issued. Gilead's goal was simple: to delay generic competition for its billion dollar a year blockbuster drug as long as possible.

90.     Shortly after Gilead's Viread TDF Patents expired in January 2018, at least eight ANDAs for 300 mg Viread were finally approved by the FDA.  Many had received tentative approval years earlier.[10]

---

[10] ANDA filers include Aurobindo Pharma Ltd., Casi Pharms Inc., Cipla Ltd., Hetero Labs Ltd. III, Macleods Pharms Ltd., Qilu Pharmaceuticals, Strides Pharma, and Teva Pharmaceuticals USA.

**d.    Gilead and Teva Settled the Viread Patent Infringement Litigation the Day Before Trial on Terms Outwardly and Highly Favorable to Gilead**

91.    In response to Teva's ANDA containing a Paragraph IV certification,

Gilead commenced patent litigation against Teva, *Gilead Sciences, Inc. v. Teva*

*Pharmaceuticals USA Inc.*, No. 1:10-cv-1796 (S.D.N.Y., filed March 5, 2010).

92.    The issue presented was a relatively simple obviousness patent analysis.

As characterized by Teva in its pretrial memorandum:

> This is a straightforward obviousness case.  Three of the patents in suit are directed to a prodrug of the known drug tenofovir (PMPA).  The prior art made clear that PMPA is a highly potent anti-HIV drug with poor oral bioavailability. The prior art also disclosed improving PMPA's bioavailability by making a prodrug of it. The particular prodrug disclosed in the prior art, called bis(POM)PMPA, was known to exhibit a manageable but undesirable side effect, whose cause was well understood.
>
> ***The person of ordinary skill in the art ("POSA") would therefore have sought an alternative prodrug form*** that would not exhibit that side effect, and would have selected the carbonate prodrug (bis(POC)PMPA) claimed in three of the patents in suit.
>
> The fourth patent relates to a fumarate salt of the bis(POC)PMPA prodrug claimed in the other three patents. As in *Pfizer, Inc. v. Apotex, Inc.,* 480 F.3d 1348, 1362 (Fed. Cir. 2007), the prior art disclosed salts of bis(POC)PMPA and identified a motivation to make others, including the fumarate salt. Just as in *Pfizer v. Apotex*, the ***selection of the fumarate salt from the limited number of available pharmaceutically acceptable salts would have been routine***.

*Gilead Sciences v. Teva Pharm. USA*, No. 1:10-cv-1796 (Dkt. No. 112, at 1 (filed Jan. 28,

2013)) (emphasis added).

93.     The court set a bench trial for February 20, 2013.  Teva had agreed not to launch at risk until June 1, 2013 at the latest.  Accordingly, Teva could have launched its generic at any point the court found Gilead's patents invalid, not infringed, or unenforceable, or on June 1, 2013 if the court had not issued its judgment.

94.     An outcome in Teva's favor would have been devastating to Gilead, costing Gilead billions of dollars of Viread revenues and resulting in pricing pressure for other TDF-based FDC medications.  And Teva had the litigation advantage given the weakness of Gilead's patents.

95.     The day before trial, February 19, 2013, the parties notified the court they had reached a settlement in principle.  Gilead's announcement—issued the same day—stated that the parties had resolved Gilead's claims as to the TDF Patents *not only for* Viread, *but also for* Teva's generic challenges to Gilead's Truvada and Atripla products as discussed herein.  In other words, Gilead's settlement with Teva extended beyond the specific TDF Patent dispute then between them, successfully delaying, impairing and/or suppressing generic competition for three of its blockbuster drugs in one fell swoop.

96.     Under the terms of the settlement, Teva would be allowed to launch its generic Viread, but not until December 15, 2017, more than 4.5 years later and only six weeks before the expiration of the Viread Orange Book-listed patents.  Gilead thus had bought itself another 4.5 years of exclusivity and supra-competitive pricing and profits for Viread.

**e.    The Parties Were Forced to Disclose to the Court the Existence of a "No Authorized Generic" Agreement After the Federal Trade Commission Objected to the Settlement Based on Antitrust Grounds**

97.     Pursuant to the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("the Medicare Modernization Act"), the parties to such patent litigation settlements are required to disclose the terms of the settlements to the Federal Trade Commission and the U.S. Department of Justice ("US DOJ"), who are afforded forty-five (45) days to review the terms of such settlements.

98.     On or about June 28, 2013, the Federal Trade Commission sent Gilead and Teva a letter objecting to and/or expressing concerns relating to the terms of the settlement agreement, which prompted the parties to request that the court extend the automatic dismissal deadline for the case. *See Gilead Sciences v. Teva Pharm. USA*, No. 1:10-cv-1796 (Dkt. No. 132 (filed June 28, 2013)).

99.     As a result, the court ordered a telephonic status conference for August 29, 2013.  At the status conference, Gilead described the Federal Trade Commission's objection to the court in response to the court's question about the "offending provision" of the agreement:

> **THE COURT**: OK.  That sounds pretty good.  Maybe the upside is I don't have to do a darn thing.  All right.  Do you mind my asking what is the offending provision?
>
> **[GILEAD COUNSEL OF RECORD]**: Not at all, your Honor.  Just a little bit of background, if I may.  The Federal Trade Commission has historically taken issue with settlements between brand companies and generics when those settlements have what are called reverse payments in them where the brand name company pays a sum of money to the generic company, allegedly in exchange for the

37

generic company's agreement to stay off the market longer than the generic company might have otherwise done so.

Not too long ago, as your Honor may be aware, the Supreme Court addressed such provisions in a very split court five-three and they found that the such provisions could potentially violate antitrust laws that had to be evaluated under the rule of reason.  That has emboldened the FTC and has breathed new life into its enforcement efforts.

So now they have reached out in our agreement, and, as I understand it, in some others, to challenge the agreements even though there is no reverse payment provision.  No money was to change hands under our agreement.  ***There was, however, a provision in which Gilead agreed that if it were to independently and unilaterally determine that it would launch a generic, an authorized generic of its own, it would do so but only if it gave Teva six weeks head start on the Gilead authorized generic.   This so-called, in the FTC's view, "no authorized generic clause," they have now tried to analogize, in our case and others, to a reverse payment.***  That song, quite frankly, has never had too many folks singing in its choir.

*Gilead Sciences v. Teva Pharm. USA*, No. 1:10-cv-1796 (Dkt. No. 134, at 4:17-5:21

(Aug. 29, 2013)) (emphasis added).

100.    Gilead's counsel represented that "[b]oth parties subsequently ha[d]

communicated with the Federal Trade Commission in an attempt to dissuade it of its

purported concerns," but that "[t]hose efforts proved unsuccessful, and the Commission

reiterated its concern" regarding the agreement.

101.    Since the August 29, 2013 hearing, numerous courts have agreed with the

Federal Trade Commission and found that "no authorized generic" (or "no-AG") clauses

can and indeed do constitute anticompetitive reverse payments under many

circumstances.

38

102.    Gilead's counsel continued by assuring the court that the parties had simply

removed the no-AG agreement from the settlement:

> **[GILEAD COUNSEL OF RECORD]:** [A]s of late yesterday
> afternoon, the parties have determined that they will drop the
> "offending" provision from the agreement.  So we simply now have to
> prepare and execute a simple amendment to the underlying settlement
> agreement, send that down to the Federal Trade Commission, and then
> your Honor will be able to dismiss the case.
> …
> **[GILEAD COUNSEL OF RECORD]:** Fortunately, for all
> concerned, we have resolved it, but we have eliminated the so-called
> "no AG clause" from the agreement so it is truly inconceivable to us
> that the Federal Trade Commission can have any other complaints ...."

*Id*. at 3:23-4:3, 6:5-9.

103.    Gilead's counsel said no-AG language was removed from the written

agreement, but at no point did Gilead's counsel represent that Gilead and Teva no longer

*had* any agreement preventing Gilead from launching an AG for six weeks, solidifying an

exclusive and favorable launch for Teva, or that any consideration was given for the

supposed change in the terms of the agreement, which would have been significant to the

parties.

### f.    Teva Would Not Have Agreed to Simply Give Up Millions of Dollars of Revenue, As Was Represented to the Court

104.    The economics that govern generic exclusivity periods for  blockbuster

drugs like Viread when no competing authorized generics are present make it highly

implausible that Gilead and Teva would have simply dropped their no-AG clause from

their settlement agreement, without maintaining some agreement to still honor it or

conduct themselves to effectuate its purpose.

105.    According to the Federal Trade Commission, in a scenario without a competing authorized generic, the first-filer generic immediately gains about 30% of the market within days of launching its product, and by the end of the first month has attained nearly 55% of the total molecule market.  The greater the market share the first-filer is able to secure also results in permanent long-term advantages, as the first-filer usually retains the majority of its exclusive market share even after other generic manufacturers enter the market.  The following is a chart prepared by the Federal Trade Commission showing molecule market shares without an authorized generic over the course of the 180-day exclusivity period.[11]



Figure 6-4: Wholesale Expenditure Shares in Markets Without an AG

---

[11] Federal Trade Commission, *Authorized Generics Drugs: Short-Term Effects and Long-Term Impact* at 105 (Aug. 2011).

105.    Applying these observed market dynamics to this case, Viread was earnning Gilead annual revenues of approximately $1 billion before going generic (and therefore would have earned Gilead $115 million during any 6-week period). Teva, as the first-filer generic (which, upon information and belief, launched at an approximate 10% discount to the brand), would have expected to claim more than half of that revenue during its 6-week exclusivity period with no AG present, and then a significantly higher portion of the overall market in the months that followed that period.

106.    A much less profitable scenario would have unfolded if the brand company—Gilead—had launched a competing authorized generic. According to the Federal Trade Commission, in such a situation, Teva could expect to obtain only approximately 30% of the market during its initial 6 weeks on the market, and would not reach a much higher market share thereafter.

107.    Greater price erosion also cuts into the first filer's revenues when an authorized generic is present. In the above $1 billion drug example, instead of launching at a 10% discount to the brand and making over $50 million in revenues during the 6-week exclusivity period, the first filer must launch at a greater discount to compete with the authorized generic. Assuming Teva launched at a 25% discount to the brand and maintained an average 30% market share during the 6-week exclusivity period, Teva would only earn revenues of approximately $28 million during the 6-week exclusivity period. Gilead's decision to launch an AG would therefore cost Teva over $20 million in revenues during the 6-week exclusivity period and additional hundreds of millions of dollars beyond that period, because Teva's market share would never recover.

41

108.    It is inconceivable that Teva not only provided Gilead with close to its best possible litigation outcome with regards to the negotiated generic entry date (only one month prior to patent expiry), and also agreed to simply drop the most important and valuable provision of the settlement agreement—worth tens of millions of dollars to Teva—without any other changes to the agreement or consideration provided.  It is much more likely that Gilead and Teva simply dropped the no-AG clause from the formal patent settlement agreement for optics, but continued to honor the clause in purpose and effect—evidenced by, among other things, the fact that Gilead never launched an AG version of Viread to compete with Teva's generic.

109.    The existence of a no-AG agreement is further supported by Teva's press release announcing its "exclusive" generic Viread launch.[12]  Although the no-AG language was excised from the settlement agreement itself, the existence of such an agreement between Gilead and Teva continued and was indeed honored by Gilead when it did not launch a competing AG in December 2017.

110.    Gilead's decision not to launch a competing AG defies rational business logic, as such a move could have offset the expected generic erosion.  Moreover, a "no-AG agreement" runs contrary to Gilead's decision to recognize such profits and launch AGs

---

[12] As noted by Teva Executive Vice President Brendan O'Grady, "The launch of generic Viread is an important addition to [Teva's] portfolio; but, more importantly, it brings an effective, affordable treatment option to these patients in an area that's lacking."  *See* Teva Pharmaceutical Industries, Ltd., *Teva Announces Exclusive Launch of GenericViread® in the United States,* (Dec. 15, 2017), *available at* https://www.businesswire.com/news/home/20171215005157/en/Teva-Announces-Exclusive-Launch-Generic-Viread%C2%AE-United.

with respect to multiple other products in its portfolio, including its blockbuster hepatitis C drugs Harvoni and Epclusa, through its subsidiary Asegua Therapeutics.[13]  Yet Gilead never launched a Viread AG.

111.    The parties' intentions for entering the settlement agreement were clear—in exchange for delayed generic entry, Teva would be granted exclusive entries into the market without competition from a Gilead AG.

112.    Indeed, when Teva finally did launch its generic Viread (and generic Truvada and Atripla) equivalents, it quickly began to capture market share.

> ### g.    Defendants Improvised with Unfair and Anti-Competitive Most Favored Entry Provisions That Achieved the Same Objective

113.    Facing Federal Trade Commission scrutiny and an investigation into potential antitrust issues, Gilead and Teva removed the "offending" language from the Viread settlement agreement but conspired to make certain the agreements achieved the same objective—to delay generic entry in exchange for Teva's guaranteed, truly exclusive generic entry.

114.    To achieve this objective, Gilead included "most-favored entry" ("MFE") and "most-favored-entry-plus" ("MFEP") provisions in its patent settlements with Teva and other generic manufacturers.  Gilead used these clauses to entice Teva to delay entry of its

---

[13] Gilead Sciences, Inc., 2019 Annual Report (Form 10-K) (Feb. 25, 2020), *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/882095/000088209520000006/a2019form10-k.htm.

generic version of Viread into the market in return for assurances that no other generic manufacturer would enter the TDF market before Teva.

115.   Agreements with MFE clauses primarily benefit first-filers.  MFE clauses arise when the brand manufacturer and the first generic ANDA filer settle patent infringement litigation, with the generic manufacturer agreeing to delay entering the market until a certain specified date in the future.  MFE clauses provide that if any subsequent generic ANDA filer ("second-filers") succeed in entering the market, before the agreed-upon date for the first-filer, the first-filer's entrance will be accelerated and it may enter at the same time as second-filers.  MFEs can delay generic entry by reducing a second-filer's incentive to try to enter the market before the first-filer.  In other words, if second-filer(s) are aware that they will face immediate competition from a first-filer, that the first-filer is guaranteed entry on the same date as the second-filer even if a second-filer is able to successfully prove patent invalidity or non-infringement, the second-filer is less likely to pursue costly patent infringement litigation against the brand—knowing its entry will not be exclusive—that it will face generic competition immediately from the first-filer pursuant to the MFE.  This is largely because a second-filer entry into the market concurrently with a first-filer means reduced market share and lower pricing for both generics.

116.   An MFEP provides that a brand manufacturer will not grant a license to any second-filer to enter the market until a defined period of time after the first-filer enters. For example, MFEP clauses may provide that a brand manufacturer will not grant a license to any second-filer(s) to enter the market until a set time after the first-filer enters.

44

Such MFEP clauses dramatically reduce a second-filer's incentive to try and enter the market before the first-filer, because they ensure the first-filer's exclusive entry for a set period of time.

117.    Absent an MFEP, a second-filer could use its challenge to the patents as leverage to negotiate from the brand manufacturer a license to enter the market before the first-filer.  This is particularly salient where the first-filer has forfeited its 180-day exclusivity by failing to get tentative FDA approval within 30 months.  21 U.S.C. 355 § (j)(5)(D)(i)(I)(aa)(BB).  The second-filer could thereby enjoy a substantial period of de facto exclusivity in the generic sector of the market.  The MFEP would eliminate that possibility by ensuring that the second-filer could not successfully negotiate for an earlier licensed entry date.

118.    In short, the Hatch-Waxman Amendments leave open at least two pathways for second-filers to enter the market with a generic before a first-filer who has agreed to delay its generic entry into the market.  The second-filer could win the patent litigation and trigger forfeiture of the first-filer's statutory exclusivity when it fails to enter the market within 75 days of the court decision; and the second-filer could negotiate an earlier entry date from the brand manufacturer and enter the market if the first-filer has forfeited statutory exclusivity by having failed to get FDA approval within 30 months. The use of MFE and MFEP clauses by parties like Gilead can potentially close those two pathways to earlier generic entry.  This is particularly disconcerting here, where Congress's legislative intent clearly calls for expedited review and approval of critical

antiretroviral medications for the treatment of HIV and where challenging weak patents could bring such products to the market more quickly.

119.    The anticompetitive effects of MFEs and MFEPs may be compounded by increasing the number of generic manufacturers to which the clauses apply.  When a second-filer is deciding whether to initiate or continue a patent challenge, knowing that the brand manufacturer has already granted an MFE to the first-filer and offered to grant one to the second-filer, the second-filer can reasonably conclude that the brand manufacturer will likely also grant an MFE to subsequent generic manufacturers.

120.    In these circumstances, the second-filer faces the prospect that, even if it expends substantial resources to win the patent case, its "victory" would trigger simultaneous entry into the market by the first-filer, possibly an "authorized generic" marketed by the brand manufacturer, and possibly additional generics.  It is well-established that simultaneous entry of multiple manufacturers would quickly compete prices down to near marginal cost.

121.    MFEs and MFEPs can thus be used to prevent or significantly deter another generic manufacturer from profitably using its patent challenge to get earlier entry than the first-filer.  In short, MFEs and MFEPs often deter second-filers from pursuing earlier entry and reducing costs of the product.

122.    Gilead used MFEs and MFEPs to delay the onset of generic competition to Viread.  The agreements set a date for initial generic entry and provided that the first-filer, Teva, could enter sooner should a second-filer gain entry into the market by, for example, proving the TDF Patents invalid and/or not infringed.  The MFEP clauses

compounded the anticompetitive effects of these provisions by promising that Gilead would not authorize further generic entry for a defined period after the initial entry.

123.    These anticompetitive MFE and MFEP clauses proved to be effective tools for Gilead.  All generic manufacturers agreed to stay out of the market for the period of time that Gilead granted to Teva in the MFEP, and in exchange Teva agreed to delay entry into the market until December 15, 2017.

124.    From March 2010 to February 2013 (when Gilead enticed Teva into the TDF Patent settlement), six more generic-drug manufacturers—Lupin, Cipla, Hetero, Aurobindo, Strides Pharma, and Macleods Pharmaceuticals—filed ANDAs seeking FDA approval to sell generic Viread.  The first two of those six manufacturers included Paragraph IV certifications with respect to the TDF Patents.  Gilead and Teva fully understood that the other four of those six intended to enter the market as soon as possible and would amend their ANDAs to include Paragraph IV certifications (as is common in the industry) if it appeared that they had an opportunity for a period of de facto exclusivity.

125.    These competitors posed a significant threat to Teva.  Absent the MFEs and MFEP, the FD&C Act's forfeiture provisions created the prospect that, if Teva agreed to a long delay in entry, without the protection of MFEs, a second-filer would: (a) obtain a judgment of invalidity or noninfringement and enter the market years before Teva; or (b) use the leverage of its patent challenge to negotiate a better licensed-entry date from Gilead.  Without the MFE and MFEP clauses, Teva faced a substantial risk that it would be stuck on the sidelines while second-filers entered the market years in advance and reaped the corresponding gains of being the first to sell generic Viread.

126.   Gilead enticed Teva to enter into the settlement for Viread in part by using MFE and MFEP clauses to forestall generic competition to Teva until after it entered and gained a foothold in the market.  This reduction in generic competition was enormously valuable to Teva.  For every week that Teva was on the market as the only generic manufacturer of Viread, it could expect to sell all of its units at about 90% of the price of the branded drug.  Entry of multiple generics would swiftly deteriorate Teva's unit sales and the profits per sale, and significantly lower brand pricing.

127.   When Teva exclusively entered the Viread market in December of 2017, it expected to earn substantially greater sales than if it had entered the market with seven other generics on day one.  Viread had generated over $500 million in sales for Gilead during 2017 and generic manufacturers could expect to take 80% of Viread's unit sales after entry.  As the sole generic on the market, selling at 90% of the price of the branded drug, Teva could potentially expect to make approximately $7 million per week more than if it was one of seven generics on the market, wherein it could expect to make less than $300,000 per week of sales.  Gilead's efforts to forestall generic competition therefore increased Teva's sales by millions of dollars every week in which Teva was the only generic Viread seller, and by many tens of millions during the first six weeks after Teva launched its generic Viread.

128.   Moreover, Teva's competitive advantage would not be limited to just the period when no other manufacturer was selling the product.  With a date certain, single-entrant launch date, Teva could ramp up its production and negotiate contracts with its customers to effectively infiltrate the distribution channel with product before the second-

filers entered the market, and lock in high prices with long-term sales contracts. The difference between the single-generic price and the price with multiple generic competitors would translate into a significant cost to purchasers and payors.

129.    To delay entry of generic Viread, Gilead included MFE clauses in its settlement agreements with Teva and other generic manufacturers. Those MFE clauses persuaded Teva to agree to delay entry, and they prompted all of the second-filers to agree to delay entry until at least six weeks after Teva's entrance into the Viread market.

130.    The first MFE appeared on November 27, 2012 in an interim agreement between Gilead and Teva, in which Teva agreed that it would not enter the market with Viread or Truvada while the TDF patent litigation was pending, until the earlier of (i) various events in the patent litigation (*e.g.*, a finding of invalidity), or (ii) a second-filer entered the market. Gilead and Teva put this MFE in the public record, so all of the second-filers knew that any final agreement between Gilead and Teva very likely included an MFE.

131.    In February 2013, Gilead and Teva agreed in principle to settle their litigation over the TDF Patents, and they finalized the agreement in April 2013. Under the agreement, Teva agreed to delay marketing its generic Viread and any other TDF-based HIV medication until December 15, 2017.

132.    The MFE and MFEP allowed Gilead to extract an exceedingly late entry date—just six weeks before the end of the patent term in mid-January 2018. The MFE provided that, if any second-filer entered the market before December 15, 2017, Teva's entry date would be moved up accordingly. The MFEP further provided that Gilead would not grant any other manufacturer a license to enter the market with generic Viread until at

least six weeks after Teva's agreed entry date.  This also provided Teva with an important head-start to securing contracts and establishing manufacturing and distribution for generic Viread (as well as potentially lucrative deals), especially given the fact that Gilead was at the time marketing several other TDF-based HIV medications.

133.    The MFE and MFEP allowed Gilead to obtain a later entry date than Teva otherwise would have agreed to.  Without the clauses, Teva faced the prospect of simultaneous entry by as many as six other generic manufacturers.  With the clauses, Teva was nearly guaranteed no generic manufacturer would enter before it.

134.    When agreeing to the delayed December 15, 2017 entry date, Teva knew that: (1) Gilead was willing to include the anticompetitive MFEs in settlement agreements with second-filers; (2) it was in Gilead's financial interest to include such clauses in agreements with all second-filers; (3) the second-filers knew that the Gilead/Teva agreement included an MFE; (4) given the MFE and MFEP, it was not in any second-filer's interest to incur the costs of patent litigation to try to enter the market before Teva; and (5) the MFEs' deterrent effect would grow with every additional one that Gilead included in another settlement.

135.    Upon information and belief, Gilead advised the second-filers of the existence of the MFE and MFEP in the Gilead/Teva agreement and/or second-filers were aware of the MFE and MFEP.

136.    In entering into this settlement (or series of settlements), Teva was assured that the MFE and MFEP would protect it from competition from any other generic

manufacturer until the end of the TDF Patent terms on January 26, 2018—six weeks after Teva entered.

137.    By the time that Gilead and Teva finalized their agreement in April 2013, Gilead had filed patent infringement lawsuits against Lupin and Cipla, both of which had provided Paragraph IV certifications with respect to the TDF Patents.  In May 2014, Lupin amended its ANDA to certify that it was not seeking approval to market generic Viread until the TDF Patents expired in January 2018.  In July 2014, Cipla similarly settled its litigations with Gilead, with respect to the patents covering Viread (TDF), Emtriva (FTC), and Truvada (TDF/FTC).  Under the settlement, Cipla agreed not to launch a generic Viread until six weeks after Teva.

138.    Just as Gilead intended, the MFE and MFEP in the Teva agreement and the MFE in the Cipla agreement caused the other ANDA filers—Hetero, Aurobindo, Strides, and Macleods—to not amend their ANDAs to include Paragraph IV certifications. Absent Gilead's anticompetitive conduct, at least Hetero and Aurobindo would have done so, as those manufacturers made Paragraph IV certifications with respect to Truvada.

139.    As Gilead and Teva had planned, starting on December 15, 2017 and during the six weeks when it had the only generic Viread on the market, Teva exploited its exclusivity and saturated the supply chain, selling at least 14 weeks' supply of generic product and locking in high prices through long-term sales contracts.  Thus, Teva potentially made over $100 million more than it would have made absent the MFE and MFEP.

140.     On January 26, 2018, six weeks to the day after Teva entered the market, five additional generic manufacturers (Cipla, Hetero, Aurobindo, Strides, and Macleods) received final FDA approval, and four of them immediately began marketing their generic Viread.

141.     The MFEs and MFEP therefore delayed the market entry of generic Viread, and protected more than $2 billion in branded sales of Viread for Gilead, all at the expense of purchasers and payors.  They also secured for Teva the opportunity to make upward of $100 million more than what it otherwise would have earned without the MFEs and MFEP.  Without the MFEs and MFEP, Teva and the second-filers would have entered the market much sooner than they actually did.

## 2.  Truvada (TDF/FTC) and Atripla (TDF/FTC/EFV)

142.     Shortly after Gilead and Teva's Viread patent settlement agreements, Gilead entered into similar anticompetitive agreements with Teva to delay the entry of generic competition for Truvada and Atripla.  These agreements also unlawfully impaired generic competition.  Until recently, Teva sold the only generic versions of Truvada and Atripla.  Additional generic manufacturers recently entered both markets, causing prices to fall sharply.

143.     As with Viread, generic erosion of Truvada and Atripla sales would have occurred swiftly.  Introduction of generic versions of Truvada and Atripla could drastically reduce pricing and make these crucial HIV medications more affordable and accessible to those living with HIV.  Reduced pricing to Truvada for PrEP would greatly benefit efforts to end the public health AIDS/HIV epidemic.  Defendants' unlawful

52

efforts to delay the launch of generic Truvada and Atripla substantially harmed purchasers of and payors for both drugs.

### a.   Truvada is a Significant Source of Revenue for Gilead

144.    Truvada is of the NTRI drug class and is a FDC antiretroviral medication combining two previously approved HIV medications in a single pill: 300 mg TDF and 200 mg FTC.  For more than seven years, beginning in 2012, Truvada was the only FDA-approved drug for pre-exposure prophylaxis ("PrEP")— the most effective method of preventing HIV infection in HIV-negative individuals.  Presently, Truvada is one of only two FDA-approved drugs for PrEP, the second being Descovy, another Gilead drug, which was approved in October 2019.[14]

145.    In late March 2004, Gilead submitted its Truvada NDA as a "priority" submission of "Type 4 – New Combination."  It was approved by the FDA a few months later, on August 2, 2004, for use in combination antiretroviral treatments for HIV infection in adults.

146.    Unlike typical NDA submissions, which require lengthy and costly clinical trials, investigation and research, Gilead's Truvada NDA was approved based on a mere showing that Truvada was bioequivalent to its separate components (TDF and FTC). This is largely because Truvada is a simple combination of previously FDA approved medications already shown to be safe and effective.  Gilead's NDA approval for Truvada

---

[14] *See* U.S. FDA, *FDA Approves Second Drug to Prevent HIV Infection as Part of Ongoing Efforts to End the HIV Epidemic*, Oct. 3, 2019, *available at* https://www.fda.gov/news-events/press-announcements/fda-approves-second-drug-prevent-hiv-infection-part-ongoing-efforts-end-hiv-epidemic.

relied on a single pharmacokinetic study, a previously submitted drug-drug interaction study and dissolution data[15]—akin to the abbreviated approval process and requirements for generic manufacturers to market versions of branded products.

147.    Truvada quickly became a blockbuster drug for Gilead, and it has been one of Gilead's top-selling HIV products, historically accounting for approximately one-quarter of its HIV sales and almost 12% of its total sales.  Within two years of its launch in 2004, Truvada became a billion-dollar earner for Gilead.

148.    In 2012, the FDA approved Truvada for PrEP indication.  The FDA's approval for PrEP was largely based on government and non-profit-funded studies and research, rather than investment by Gilead.  However, Gilead reaped a windfall as a result.

149.    Following the approval of Truvada for PrEP, sales skyrocketed.  In 2012, there were approximately 10,000 PrEP users; by 2014 that had tripled to over 30,000 users; by 2016 there were almost 100,000 users; and by 2019, before the launch of generic Truvada, there were over 225,000 PrEP users.[16]  Because Truvada was the only drug

---

[15] The previously submitted drug-drug interaction study (FTC-114) was an open-label, randomized, three-way crossover study that evaluated steady-state PK of TDF and FTC when administered alone and in combination in healthy volunteers. The study was originally submitted and reviewed with the EMTRIVA NDA 21-500, which was approved in July 2003.  *See* Center for Drug Evaluation and Research, *Clinical Pharmacology and Biopharmaceutics Review(s)*, Application Number 21-752, at 2, *available at* https://www.accessdata.fda.gov/drugsatfda docs/nda/2004/021752s000 Truvada BioPharmr.pdf.

[16] AIDSVu, *Local Data: United States*, *available at* https://aidsvu.org/local-data/united-states/.

indicated for PrEP until October 2019 (when Gilead's Descovy was approved), Gilead's prescription base expanded dramatically.

150.    Without generic competition in the U.S. market until only recently, Gilead has been able to elevate prices year after year, consistently earning in excess of $2 billion annually for Truvada sales.

### b.  Atripla is a Significant Source of Revenue for Gilead

151.    Atripla is an FDC antiretroviral medication combining three previously approved and manufactured HIV medications in a single pill: 300 mg TDF, 200 mg FTC and 600 mg EFV.

152.    Atripla was approved roughly two years after Truvada, on July 12, 2006, for use alone or in combination antiretroviral treatment of HIV infection in adults.  Similar to Gilead's Truvada NDA, Gilead was not required to conduct lengthy clinical trials and investigations to support its Atripla NDA, because the three subcomponents (TDF/FTC/EFV) were not new or novel and had previously been tested and proven safe and effective on their own.  For approval of its Atripla NDA, Gilead merely had to conduct bioequivalence testing.  Approximately three months after Gilead's initial submission, the FDA approved Atripla largely based on the same requirements for approval of a generic under an ANDA review.

153.    Like Truvada, Atripla became a top earner for Gilead.  Within two years of its approval in 2006, sales reached approximately $1.5 billion.  For a decade thereafter, and without generic competition in the U.S. market until only recently, Atripla sales have

consistently been at or above \$1 billion.  Indeed, like Truvada and Viread, Atripla has been

a significant source of revenue for Gilead.

> **c.**    **Gilead's Truvada and Atripla Hatch-Waxman Exclusivities and Weak, Evergreened and Ancillary Patent Portfolios**

154.    Gilead's TDF and FTC patent portfolios consist of weak, evergreened and

ancillary patents and heavily rely on prior innovations.  None of the API components in

Truvada (TDF/FTC) or Atripla (TDF/FTC/EFV) are new or novel.  Each API component

was discovered decades earlier and marketed in the U.S. as a branded product for years.

155.    The Orange Book listed patents for Truvada and Atripla covering the FTC

component include the 6,642,245 ("the '245 patent") and 6,703,396 ("the '396 patent")

(collectively "the FTC Enantiomer Patents").  Truvada and Atripla were also covered by

the TDF Patents (the '695 patent, the '089 patent, the '230 patent, and the '946 patent),

which expired in January of 2018 and are discussed above.  As discussed below, the third

subcomponent in Atripla, EFV, was covered by BMS patents, which expired in July and

August of 2018.

156.    In addition to patents covering the sub-components of Truvada and Atripla,

Gilead sought and obtained obvious and non-novel methods of use and treatment and

formulation-related patents in an attempt to stave off generic competition.  These later-

listed Orange Book patents, issued after Gilead began filing baseless patent infringement

cases against potential generic rivals, do not cover API but concern "method of use,"

"dosing," and/or "formulation," are considered weak and ancillary and would have likely

been found invalid.  These patents include U.S. Patent Nos. 8,592,397 ("the '397 patent"),

8,716,264 ("the '264 patent"), and 9,457,036 ("the '036 patent") (collectively "Later-Listed Atripla Patents").

157.   The patents allegedly protecting the Truvada and Atripla FDCs are not innovative, novel or new.  Simply combining drugs in fixed-dosage form would have been obvious to a person skilled in the art at the time of development of Truvada and Atripla.

158.   In lieu of innovating itself, Gilead acquired the majority of the core intellectual property allegedly protecting Truvada and Atripla by obtaining exclusive licenses and assignments from others' prior inventions and research to support its HIV product franchises.  From 2004 to 2017, Gilead made tens of billions of dollars from HIV medications while introducing only a single new pharmaceutical compound.

159.   Tenofovir, as noted above, was not invented by Gilead but by Czech institutions in the 1980s.  Gilead obtained an exclusive license to manufacture and use same in 1991 and 1992 in exchange for "minimum royalty payments."  In 2000, in anticipation of launching Viread, Gilead amended its agreement with the Czech institutions and inventors of tenofovir, to reduce future royalty rates for tenofovir-containing products. In 2004, Gilead again amended the agreements with the inventors of tenofovir to include Truvada and any future fixed-dose combination products that contain the licensed technology (i.e., in anticipation of Atripla).  At the same time, the Czech institutions, understanding the need for accessible and affordable medications to end the HIV epidemic, agreed to waive any right to royalty payments for Viread or Truvada in developing countries where products are sold at or near cost.

160.    Similarly, Gilead's patents allegedly covering the FTC component in Truvada and Atripla depend heavily on and/or are derived from research and patents issued earlier to Emory University.  Funding for many of the FTC-related studies was provided in part through National Institutes of Health grants.  Purified forms of FTC for use in HIV and Hepatitis B treatments were invented and patented, not by Gilead, but by Emory University.  In 1996, Triangle Pharmaceuticals, Inc. ("Triangle Pharma") obtained an exclusive worldwide license to all of Emory's rights for FTC.  Gilead acquired Triangle Pharma and the rights to Emory's FTC intellectual property in January 2003.

161.    Gilead's branded standalone FTC, marketed as Emtriva, acknowledges Emory University's substantial contribution to the use of FTC for HIV treatment, as the "Em" in "Emtriva" stands for Emory University.[17]

162.    Indeed, the heavy lifting in terms of research and development of FTC as an effective treatment for HIV was done prior to Gilead obtaining its '245 and '396 patents. Acquiring Emory's patent rights and research allowed Gilead to rush standalone FTC and Truvada to the market on an extremely expedited timeline.  After acquiring an exclusive license to FTC in January 2003, roughly six months later in July 2003, standalone FTC was approved.  Less than a year later, Gilead filed its NDA for Truvada in March of 2004, which the FDA approved in August of 2004 (just four months after Gilead's initial submission).

---

[17] M. Terrazas, *Drug Royalty Sale Fuels Emory Research*, EMORY REPORT Vol. 57, No. 36 (Aug. 1, 2005).

163.    In July 2005, after launching Truvada, but before Atripla launched, Gilead made arrangements to purchase Emory's royalty interest for FTC intellectual property in order to eliminate its obligation to pay royalties on FTC to Emory.  Emory (a leader at the forefront of HIV research for decades) assigned its patent rights to Gilead in 2005 in exchange for a modest lump-sum payment from Gilead.[18]

164.    The relevant NCE exclusivities for Truvada and Atripla expired on July 2, 2008,[19] so any 30-month stay blocking FDA approval of competing generics could have expired as early as January 2, 2011.  As a result, a generic manufacturer bringing a successful patent challenge against Truvada or Atripla could have launched generic versions of Truvada or Atripla as early as 2011.  Even in the best of circumstances for Gilead, the Orange Book listed patents would expire by their own terms in January of 2018 for TDF and in September of 2021 for FTC.

### d.  Multiple Generic Challenges to Truvada and Atripla

165.    On or about September 26, 2008, Teva filed substantially complete ANDAs with the FDA to manufacture and sell generic formulations of Truvada and Atripla.

166.    Teva's Truvada ANDA included a "Paragraph IV certification" as to the FTC Enantiomer Patents asserting the patents were either invalid or not infringed by its

---

[18] *Id.* (Emory itself publicly recognized as early as 2005 that "[b]y 2021, the total revenue for FTC could well have reached more than $540 million . . .").

[19] *See* FDA Review of Atripla ANDA No. 021937, *Administrative Document(s) & Correspondence*, *available at* https://www.accessdata.fda.gov/drugsatfda docs/nda/2006/021937s000 AdminCorres.pdf.

Truvada ANDA product.  The '245 patent and '396 patent were set to expire on May 4, 2021 and September 9, 2021, respectively.

167.    Teva's Atripla ANDA also included a "Paragraph IV certification" as to Gilead's FTC Enantiomer Patents as well as its four TDF Patents and as to BMS's EFV Patents, asserting the patents were either invalid, unenforceable or not infringed by Teva's Atripla ANDA product.

168.    Like Teva's ANDA for Viread, Teva's ANDAs for Truvada and Atripla were each the first substantially complete applications to be filed, entitling Teva to statutory ANDA exclusivity.  As set forth in the Hatch-Waxman Act, the 180-day exclusivity commences upon a "first commercial marketing" by the first-filer ANDA holder (which applies to both ANDA and authorized generic launches) or upon a "court decision" finding the patents invalid, unenforceable, or not infringed.

169.    Upon service of Teva's Paragraph IV certifications, Gilead elected to initiate Hatch-Waxman patent litigation by filing patent infringement lawsuits within forty-five (45) days.  Gilead's filing of the lawsuit triggered a stay preventing the FDA from approving Teva's ANDAs for Truvada and Atripla until the earlier of thirty (30) months has elapsed or the issuance of a "court decision" finding the patents at issue invalid or not infringed by the ANDA drugs.

170.    Gilead filed suit against Teva on December 12, 2008, alleging Teva's generic Truvada would infringe on Gilead's FTC Enantiomer Patents.  On September 25, 2009, Gilead amended its patent infringement complaint, adding allegations that Teva's generic Atripla would infringe its FTC Enantiomer Patents.  The cases were consolidated and

60

patent infringement issues relating to the FTC Enantiomer Patents were litigated in *Gilead Sciences, Inc., et al. v. Teva Pharms. USA*, Case No. 08-cv-10838 (S.D.N.Y.).

171.    Gilead filed its Truvada and Atripla patent infringement lawsuits knowing the patents were weak, without regard to the merits, and fully anticipating that generic manufacturers would bring successful patent challenges and imminent generic competition. When it filed in December of 2008, Gilead knew there was a substantial probability that it would lose the patent infringement litigation to first-filer Teva given the weakness of its patents.  As Gilead reported in its 2008 Form 10-K:

> Teva alleges that two of the patents associated with emtricitabine, owned by Emory University and licensed exclusively to [Gilead], are invalid, unenforceable and/or will not be infringed by Teva's manufacture, use or sale of a generic version of Truvada.  In December 2008, we filed a lawsuit in U.S. District Court in New York against Teva for infringement of the two emtricitabine patents.  We cannot predict the ultimate outcome of the action, and we may spend significant resources defending these patents.  If we are unsuccessful in the lawsuit, ***some or all of our original claims in the patents may be narrowed or invalidated, and the patent protection for Truvada in the United States would be shortened to expire in 2017 instead of 2021***.[20]

172.    Following various amendments and pretrial proceedings in Gilead's patent litigation against Teva, only the FTC Enantiomer Patents, as they related to both Truvada and Atripla, were left for trial.

173.    When a compound's three-dimensional structure is not superimposable upon a compound that is its mirror image (like a left and right hand), these two compounds are

---

[20] Gilead Sciences, Inc., 2008 Annual Report (Form 10-K) (Feb. 20, 2009), *available at* https://www.sec.gov/Archives/edgar/data/0000882095/000119312509040769/d10k.htm (emphasis added).

referred to as "enantiomers."  Such a compound is referred to as "chiral," a word derived from the Greek word for "hand."

174.    When a chiral compound is synthesized, it is often the case that both of its enantiomers are present in equal proportions.  This is referred to as a "racemic mixture" or a "racemate."  Through various techniques, the racemic mixture can be treated so that one enantiomer exists in a larger proportion than the other.  This process is referred to as "enantioenrichment."  If only one enantiomer of the compound is present, the compound is considered "enantiomerically pure."

175.    Emtricitabine (FTC) is the (–)-ß-FTC enantiomer of a compound whose name is commonly abbreviated as ß-FTC.  The other enantiomer is (+)-ß-FTC.

176.    Gilead had rights in Emory's initial, expired FTC patents, which claim ß-FTC (Patent No. 5,814,639, or the "'639 Patent") and the use of ß-FTC to treat HIV (Patent No. 5,210,085, or the "'085 Patent").  These patents covered ß-FTC broadly; they did not limit their claims to a particular enantiomer.  The '085 Patent expired in 2010, and the '639 Patent expired on September 29, 2015.

177.    Gilead's FTC Enantiomer Patents are narrower.  The '396 Patent claims (–)-ß-FTC (that is, emtricitabine), and the '245 Patent claims the use of (–)-ß-FTC to treat HIV.  The '245 Patent expired on November 4, 2020, and was subject to a pediatric exclusivity period of six months beyond its statutory expiration date, which ended recently on May 4, 2021.  (A drug manufacturer who undertakes pediatric studies for a drug can be entitled to an additional six months of exclusive marketing beyond the expiration of any patents covering the drug.)  The '396 Patent expired on March 9, 2021, and was subject to

a pediatric exclusivity period of six months beyond its statutory expiration date, which ended recently on September 9, 2021.

178.    A bench trial was held on four days between October 8, 2013 and October 28, 2013. Teva's principal argument was that the FTC Enantiomer Patents were invalid for obviousness-type double patenting because (-)-enantiomer "species" patents were anticipated by earlier-expiring "genus" patents, which claimed all enantiomeric forms of the FTC compound, and that the claimed (-)-enantiomer was disclosed as part of the genus patents' claims. Obviousness-type double patenting can mean that claims in a later patent are "obvious over" claims in an earlier patent. It can also mean that claims in a later patent are "anticipated by" claims in an earlier patent. Teva pursued both sub-theories— obviousness and anticipation—in its pretrial briefing.

179.    For example, Teva asserted that Gilead's FTC Enantiomer Patents, which resulted from Gilead's exclusive license to Emory's previously-issued patents and discovery of the FTC API, were invalid and an improper attempt to extend Gilead's monopoly (and attendant monopoly profits) beyond the scope of the previously-issued patents. As explained in Teva's Pretrial Memorandum, Gilead was trying to parlay Emory's earlier invention and the associated patent rights it acquired from Emory to justify obtaining additional patents (and exclusivities) for uses that were not novel or new, and would have been obvious to a person skilled in the art at the time. The claims disclosed in Emory's initial FTC patents (the '639 and '085 patents) relating to the discovery of FTC for HIV treatment rendered Gilead's later-obtained FTC Enantiomer Patents (the '245 and '396 patents) invalid as obvious and/or anticipated.

63

What is relevant is that [Gilead et al.] are entitled only to a single patent term for emtricitabine, irrespective of the value or properties of that drug.  Plaintiffs received the complete protection the law allows when they received the '639 and '085 patents, which claim emtricitabine and its only use.  *[Gilead et al.] are not entitled to an extra six-year monopoly simply for recycling those patents and again claiming emtricitabine and that use*.  Upon the expiration of the '639 and '085 patents, the population that suffers from AIDS is entitled to obtain that drug, and the generic drug industry is entitled to offer it to that population, at a non-monopoly price.  That is the promise of the Hatch-Waxman Act, Congress's expression of the public policy that favors the introduction and distribution of generic drugs not protected by valid patents.[21]

180.    The anticipation theory gave Teva a clear path to victory in the litigation.  To prevail on anticipation arguments, Teva needed to show, at most, that when presented with the chemical structure of ß-FTC, a person of ordinary skill in the art would visualize the (–)-ß-FTC enantiomer, and that such a person could obtain (–)-ß-FTC without undue experimentation.  The first requirement was undisputedly met, and Teva conclusively proved the second requirement at trial.

181.    On the first issue—whether a person of ordinary skill in the art would visualize (–)-ß-FTC—the court expressed significant skepticism about Gilead's arguments, describing them as "illogical."  Gilead did not dispute that a person of ordinary skill in the art would visualize (–)-ß-FTC when presented with the chemical structure of ß-FTC, but argued that because pure (–)-ß-FTC was one of an infinite number of potential ratios of (–)-ß-FTC and its enantiomer (+)-ß-FTC, a person of ordinary skill in the art would see (–)-ß-

---

[21] *Gilead Sciences, Inc., et al. v. Teva Pharmaceuticals USA, Inc., et al.,* Case No. 08-cv-10838 (RJS) (S.D.N.Y), Defendants' Memorandum in Opposition to Plaintiffs' Pre-Trial Memorandum (Dkt. 152 (filed Sept. 23, 2013)) (emphasis added).

FTC as one point of an infinite spectrum, rather than something that could be readily

identified.  When Gilead laid out that position in its opening statement, the court

responded:

> That's just a mathematical proposition, right?  I mean if there's billions or millions, hundreds of millions of molecules, then I guess you might have one or two and then the balance all one and then everything in between. **It's hard for me to see why that's a compelling argument, but we'll come to that.**[22]

Gilead's counsel tried to explain further, but the court interrupted again:

> That's a mathematical proposition that basically there is infinity between point A and point B, so there will be an infinite number of stops along that chain.  But I don't think -- it seems to me that's not really scientific argument that there are an infinite number of ratios that a scientist of ordinary skill in the art would be looking to experiment to see whether a ratio of 49.6 percent was better than a ratio of 49.7 percent, which might be better or worse than 47.2 percent.  **That just strikes me as illogical.**[23]

Gilead's counsel tried yet again, stating that "a person of ordinary skill in the art would

not understand what ratio would be the ratio that might make the best compound."  The

court remained unconvinced:

> It would seem a person of ordinary skill in the art even in 1990 would look to separate into the pure forms to see what the efficacy of each was.  And, presumably, that would be the starting point rather than start at points in the middle and then start, you know, bit by bit going to either end.  So maybe in 1990 they weren't that smart, but **it seems to me that that's what a person would logically do**.[24]

182.    This exchange was highly damaging to Gilead because it showed that the

court would not agree with Gilead's "infinite mixtures" theory unless trial testimony

showed that a person of ordinary skill in the art would have been overwhelmed with those

---

[22] *Gilead Sciences, Inc., et al. v. Teva Pharmaceuticals USA, Inc., et al.,* Case No. 08-cv-10838 (RJS) (S.D.N.Y), Trial Transcript at 42:23-43:3.

[23] *Id.* at 43:22-44:5.

[24] *Id.* at 44:14-44:20.

"infinite mixtures," rather than simply looking to separate ß-FTC into its enantiomers, (–)-ß-FTC and (+)-ß-FTC.  No trial testimony supported such a proposition.  Witnesses for Gilead and Teva both testified that a person of ordinary skill in the art would have readily visualized (–)-FTC after seeing the structure of ß-FTC, and that separating and testing enantiomers was a common practice.  Teva also presented evidence that the FDA encouraged scientists to separate and test enantiomers of chiral compounds, and that the inventors of ß-FTC had separated the enantiomers of analogous drugs.  Teva likely would have prevailed on this element of its anticipation sub-theory.

183.    On the second issue concerning anticipation—whether a person of skill in the art could obtain (–)-ß-FTC without undue experimentation—Teva presented strong evidence contradicting Gilead's narrative.  Gilead had claimed that separating the enantiomers of ß-FTC required substantial time and ingenuity.  For example, in its Pretrial Memorandum, Gilead claimed that "the inventors themselves attempted five of those methods [of separation] during their research (all but one of which failed) before settling on enzymatic resolution."  But at trial, one of the inventors admitted that enzymatic resolution was the first method he tried, and that he was able to separate the enantiomers with the very first enzyme he tried.  The evidence further showed that enzymatic resolution was a commonly used method at the time, and the inventor was sure enough that it would work that he listed it as a method for separation in the patent application for ß-FTC before even trying it.  Gilead also claimed before trial that the company BioChem took more than a year to separate the enantiomers of BCH-189, a compound similar to ß-FTC.  That was incorrect.  At trial, a BioChem technician with no previous experience in separating

66

enantiomers testified that she was able to do so for BCH-189 in "less than 15 days of laboratory time." Based on the evidence at trial, and the judge's initial view of Gilead's "infinite mixtures" argument, Gilead was very likely to lose.

184.    Gilead's arguments against obviousness did not fare any better. Here, the parties disputed whether in light of the patents for ß-FTC and its use, it would be obvious to a person of ordinary skill in the art to try to obtain (–)-ß-FTC, and whether doing so would involve undue experimentation. Teva likely would have prevailed based on the testimony and evidence described above, but Gilead claimed that a person of ordinary skill in the art would not have been motivated to obtain (–)-ß-FTC. This was highly implausible because in 1987, three years before (–)-ß-FTC was obtained, the FDA issued guidance stating that stereoisomers—molecules with the same atoms but with a different three-dimensional structure, a category that includes enantiomers—should be separated for study and testing:

> When the NDS [new drug substance] is asymmetric (e.g., contains one or more chiral centers, or has cis-trans or other types of isomers), ***the sponsor should ideally*** (and prior to the submission of an IND [investigational new drug]) ***have either separated the various potential stereoisomers of the NDS*** or synthesized them independently. Physical/chemical information about each stereoisomer should be provided (in detail), or may be requested. Individual stereoisomers may need to be studied for pharmacological and toxicological properties (and/or for safety and efficacy).

The trial evidence also showed that the separation and study of enantiomers was a regular practice as early as the 1970s, and Gilead's own expert and fact witnesses agreed that a person of ordinary skill in the art would have tested both (–)-ß-FTC and (+)-ß-FTC before rejecting either as candidates for development.

185.    The presentation of evidence in the Teva emtricitabine suit ended on October 28, 2013.  At that point, Teva had a strong likelihood of succeeding on both sub-theories of obviousness-type double patenting.  The court ordered the parties to give summations on February 14, 2014.  The day before those summations, the parties informed the Court that they had reached a settlement in principle.

186.    Other generic manufacturers, well aware of the inherent weaknesses of Gilead's patents, similarly challenged Gilead's Truvada and Atripla patents.  In response, Gilead filed baseless patent infringement lawsuits against generic challengers.

187.    The FDA granted final approval to Teva's Truvada ANDA on June 8, 2017. To date, eight other ANDA filers have received final approval to launch generic Truvada and have done so.  The FDA approved Teva's Atripla ANDA on November 9, 2018, and at least three other ANDA filers have received final approval to launch a generic version of Atripla.

> **e.    Gilead and Teva Settled the Truvada and Atripla Patent Infringement Litigations on Terms Outwardly and Highly Favorable to Gilead, Before a Trial Court Decision**

188.    Gilead and Teva settled the FTC Enantiomer Patent case in February 2014, the day before they were scheduled to give closing arguments.  That settlement agreement came shortly after their settlement agreement in mid-2013 resolving TDF Patent infringement litigation as to Viread, Truvada and Atripla, and shortly before Gilead's July 2014 settlement with Cipla, which resolved patent litigations involving both the TDF and FTC Enantiomer Patents.

189.    Having successfully entered into a TDF Patent settlement agreement that included MFE and MFEP provisions, Gilead and Teva negotiated a FTC Enantiomer Patent settlement with MFE and MFEP clauses guaranteeing a future date certain for Teva's generic entry for Truvada and Atripla in exchange for assurances that no generic manufacturer would enter the market prior to Teva.  Similar to the MFEs Gilead used to delay the onset of generic competition for Viread, Gilead's settlement agreements resolving patent infringement litigation for Truvada and Atripla included provisions manipulating and impairing generic entry.

190.    The MFE-containing agreements set a date certain for Teva's initial generic entry and further provided that Teva, as the first-filer, could enter sooner should a second-filer gain entry into the market by, for example, proving that Gilead patents were invalid.

191.    Gilead compounded the anti-competitive effects of these MFEs by granting Teva MFEPs, promising that Gilead would not authorize further generic entry for a defined period after Teva's initial entry and delaying other generics from entering the market for an additional 6 months after Teva's most favorable initial entry position.

192.    In sum, Teva agreed to delay its generic versions of Truvada and Atripla for years in exchange for de facto six (6) months of exclusivity, free from competition.  This exclusivity and entry position were of significant value.

193.    The MFE and MFEP clauses in the Truvada and Atripla settlement agreements were extremely effective at delaying and suppressing generic competition. Each generic manufacturer in turn agreed to stay out of the market for the period of time that Gilead granted to Teva in the MFEPs with respect to TDF and FTC Enantiomer

Patents, and in exchange Teva agreed to delay entry of its generic Truvada and Atripla products into the market until September 30, 2020, just one year before expiration of the FTC Patents.

194.    After Gilead and Teva entered into a settlement agreement securing the absence of generic competition for Truvada and Atripla until September 30, 2020, Gilead struck another fraudulent deal with Cipla.  The unfair and deceptive settlement agreement with Cipla contained MFEs and additional anti-competitive provisions creating yet another roadblock to generic entry of Truvada and Atripla.  Upon information and belief, Cipla agreed to substantially delay the launch of its generic stand-alone FTC product until August of 2020 (approximately one month prior to the agreed-upon date certain for generic entry of Truvada and Atripla) in exchange for undisclosed payments and assurances of exclusivities with respect to Gilead's HIV medications, despite Cipla having received final FDA approval for its generic FTC since July of 2018.  The terms of the settlement agreement were never disclosed.

>    **f.    Teva Would Not Have Agreed to Give Up Millions of Dollars of Revenue Absent The Anticompetitive Most Favored Entry Clauses**

194.    The settlement agreement between Gilead and Teva—whereby Teva agreed to substantially delay the launch of generic Truvada and Atripla until September of 2020, one year before the expiration of the FTC Enantiomer Patents, in exchange for guarantees that it would be the first generic on the market, with exclusive or limited competition for 180 days, despite having forfeited and/or Teva's ANDA exclusivities being uncertain— has delayed and suppressed generic competition for Truvada and Atripla.

195.    The '396 patent (the later of the two FTC Enantiomer Patents) did not expire (with pediatric exclusivity) until September 9, 2021.  As with Viread, a number of second-filers had lined up behind first-filer Teva challenging Gilead's FTC Enantiomer Patents.  At the time of Teva's and Gilead's February 2014 settlement, Gilead had filed multiple patent infringement lawsuits relating to the FTC Enantiomer Patents against Cipla, Lupin, Mylan, Aurobindo, Hetero, and Amneal, almost all of which had provided Paragraph IV certifications with respect to Truvada.  And Gilead had filed a patent infringement lawsuit against other generic manufacturers, including Lupin, that had provided Paragraph IV certifications with respect to Atripla.

196.    Teva and these second-filers faced the same economic dynamics as in Viread: Teva receiving MFEs and MFEPs would dissuade the second-filers from continuing to litigate and would provide Teva a period of exclusivity.  Moreover, Teva had forfeited its 180-day ANDA exclusivity with respect to Truvada, and may have forfeited it with respect to Atripla, by having failed to obtain tentative FDA approval within 30 months of submitting its application.  21 U.S.C. 355 § (j)(5)(D)(i)(I)(aa)(BB).

197.    Under the February 2014 settlement agreement, Teva was not permitted to launch a generic version of Truvada or Atripla until September 30, 2020.[25]  Gilead was able to extract such a late entry date—one year before the end of the patent term—and to

_____

[25] *See* Gilead Sciences, Inc. 2019 Annual Report (Form 10-K) (Feb. 20, 2020), *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/882095/000088209520000006/ a2019form10-k.htm ("Pursuant to a settlement agreement relating to patents that protect Truvada and Atripla, Teva Pharmaceuticals is permitted to launch generic fixed-dose combinations of FTC and TDF and generic fixed-dose combinations of FTC, TDF, and [EFV] in the [U.S.] on September 30, 2020.").

induce Teva to delay entry of its generic versions of Truvada and Atripla by including MFE and MFEP provisions in its patent infringement settlement agreements, which provided Teva with a guarantee that no generic manufacturer would enter before it.

198.    The MFEPs ensured that Gilead would not grant a license to any other manufacturer to enter the market with generic Truvada or generic Atripla until at least six months after Teva's agreed entry date.  This is of particular import to Teva because Teva had forfeited its eligibility for the 180-day statutory exclusivity period, or at minimum was uncertain about its eligibility.[26]  The MFEs and MFEPs provided Teva with assurances of 180-day exclusivities when it was not necessarily granted exclusivities as of right. Ensuring Teva's then unknown and uncertain 180-day exclusivity period in exchange for delaying entry of its generics made the deal more lucrative and attractive for Teva to accept.

199.    The MFEs further provided that, if any second-filer entered the market before Teva's agreed entry date, Teva's permitted entry would be moved up accordingly. No generic Truvada or Atripla would enter the market prior to Teva.

200.    Upon information and belief, Gilead advised the second-filers of the existence of the MFEs and MFEPs in the Gilead/Teva agreement.

---

[26] FDA Letter to Teva Pharmaceuticals USA, Inc. re ANDA 090894 Approval (June 8, 2017), *available at* https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2017/090894Orig1s000Ltr.pdf (FDA "is not. . .making a formal determination at this time of TEVA's eligibility for 180-day generic drug exclusivity" as Teva failed to market within 30 months of submission of its ANDA).

201.    Gilead succeeded in delaying entry of generic Truvada and Atripla just as it did with respect to Viread.  Gilead settled the FTC Enantiomer Patent litigations with Cipla in May 2014; with Lupin in September 2014; with Mylan in October 2015; with Aurobindo in September 2016; with Hetero in August 2016; and with Amneal in April 2017.  Gilead included an MFE in each of those settlement agreements, and all of the manufacturers agreed to delay entering the market until six months after Teva's entry.

202.    On March 30, 2021, six months after Teva's launch of generic Truvada, Aurobindo launched generic Truvada and Atripla products.  Amneal and Lupin have subsequently also launched generic Truvada products.

203.    The reduction in generic competition provided by the MFE and MFEP provisions had enormous value to Teva.  At the time of settlement in 2014, annual combined U.S. sales for Atripla and Truvada were approximately $4 billion.  For every week that Teva was on the market as the only generic manufacturer of Truvada and/or Atripla, it could expect to sell all of its units at about 90% of the price of brand.  Entry of multiple generics, however, would swiftly deteriorate Teva's unit sales and the profits per sale and significantly lower brand pricing.  Consistent with the economic dynamics regarding generic share capture and pricing described above, granting MFEs and six months of exclusive sales for generic Atripla and Truvada products was worth more than $1 billion to Teva.

204.    Moreover, Teva's competitive advantage would not be limited to just the period when no other manufacturer were selling the products.  With a date-certain, single-entrant launch date, Teva could ramp up its production and negotiate contracts

with its customers to effectively infiltrate the distribution channel with products before the second-filers entered the market, and lock in high prices with long-term sales contracts. The difference between the single-generic price and the price with multiple generic competitors would translate into a significant cost to purchasers and payors.

205.   Absent the MFEs and MFEPs, Teva and/or the second-filers would have entered the market much sooner than they did. The delay in generic entry protected more than $25 billion in Gilead's Truvada and Gilead/BMS's Atripla branded sales, at the expense of purchasers and payors.

### B.   Gilead Entered into Unlawful No-Generics Restraints with BMS and Janssen to Suppress Generic Competition

#### 1.   Gilead and BMS Combined their Drugs into Atripla and Shielded Gilead's Truvada from Generic Competition

206.   In December 2004, Gilead entered into an agreement with BMS to develop and commercialize Atripla ("Atripla Agreement"), an FDC combining Gilead's TDF and FTC (which Gilead sold separately as Viread and Emtriva, and had started selling together as Truvada earlier that year) and BMS's third agent EFV (which BMS sold as Sustiva). Gilead and BMS's Atripla Agreement included a "No-Generics Restraint," pursuant to which both parties agreed they would not develop, manufacture, or commercialize a version of Atripla that incorporated a generic version of any of its three components, which would have significantly reduced its price. By entering into that No-Generics Restraint and foreclosing potential generic competitors to Atripla, Gilead and BMS unreasonably restrained trade.

207.    In 2004, Gilead earned $563 million from U.S. sales of Viread ($437.5 million), Emtriva ($57.6 million), and Truvada ($67.9 million).  Those sales represented over 80% of Gilead's U.S. revenues in 2004.  Gilead also explained in its annual report that "[i]t is important to consider Viread, Enmtriva and Truvada collectively as future sales of these three products are intimately tied to one another."  Gilead also noted that "[a]s generic HIV products are introduced into the major markets, our ability to maintain pricing may be affected."[27]

208.    At the time, Gilead expected to encounter generic competition to Viread (TDF) as early as 2009, and to Emtriva (FTC) and Truvada (TDF/FTC) as early as 2011. (That prediction was borne out—as discussed above, Teva filed ANDAs for Viread, Truvada, and Atripla in 2008 and 2009.)  Gilead knew that its patents protecting those drugs were weak and susceptible to challenge by a generic manufacturer, and sought to combine TDF and FTC with EFV so that the resulting combination drug would be protected by BMS's patents for EFV, which were not due to expire until 2018.  Although it was possible that BMS's EFV patents would be challenged by a generic manufacturer, combining Gilead's patent protection for TDF and FTC with BMS's patent protection for EFV reduced the possibility that the combination drug would face generic competition.

209.    Gilead and BMS structured their collaboration as a joint venture that operated as Bristol-Myers Squibb & Gilead Sciences, LLC (n/k/a Gilead Sciences, LLC).

---

[27] *See* Gilead Sciences, Inc., 2004 Annual Report (Form 10-K) (Feb. 28, 2005), *available at*  https://www.sec.gov/Archives/edgar/data/0000882095/000110465905010858/a05-1830_110k.htm.

Gilead and BMS each granted the joint venture royalty-free licenses for the use of their respective technologies, and in turn were each granted a license to use intellectual property resulting from the collaboration.  Gilead and BMS agreed to provide the joint venture with TDF and FTC, in the case of Gilead, and with EFV, in the case of BMS.

210.    Gilead and BMS agreed that they would each only be permitted to develop, manufacture, and commercialize FDCs "other than the Combination Product," which the Agreement defined as "the fixed-dose co-formulated product developed pursuant to this Agreement containing, as its only active pharmaceutical ingredients per daily dose, 300 mg TDF, 200 mg FTC and 600 mg EFV."  As a result, Gilead could not develop an FDC combining branded TDF, FTC, and generic EFV, and BMS could not develop an FDC combining generic TDF and/or FTC and branded EFV.  This No-Generics Restraint continued after the expiration of the patents on TDF, FTC, and EFV, respectively.

211.    Either party could terminate the Atripla Agreement if a generic version of the other party's drug(s) became available.  Upon termination, the terminating party became the sole member of the joint venture, and was required to pay the non-terminating party royalty payments for three years.  Those royalty payments reflected a substantial penalty, which discouraged either party from terminating the Agreement in order to launch a competitor to Atripla using lower-priced generic components.

212.    The purpose and effect of the No-Generics Restraint in the Atripla Agreement was to ensure that Atripla would not face competition from an FDC containing generic components.  Under the agreement, BMS could not develop an FDC using combining generic TDF and/or FTC and branded EFV.  If BMS terminated the

agreement when generic TDF and/or FDC became available, it would have been required to pay Gilead royalty payments for three years.  Gilead was subject to the same restrictions.

213.   The price for Atripla was set by a Pricing Committee, made up of representatives from Gilead and BMS.  Gilead and BMS's economic interests in the joint venture were based on the share of the net selling price of Atripla compared to the net selling prices of Truvada and Atripla, respectively.

214.   Gilead and BMS aggressively promoted and marketed Atripla, and induced prescription switches from Viread, Emtriva, Truvada, and Sustiva to Atripla.  As discussed above, Atripla was commercially successful, and within two years of its launch in 2006 had sales over $1 billion each year.

215.   The parties' joint promotion of Atripla (and their overall Atripla Agreement) exploited the fact that physicians who have switched a patient from one HIV treatment to another are very reluctant to switch patients back, despite the availability of a lower-cost generic or comparable product.  As a result, HIV prescriptions are "sticky": physicians and patients are less likely than they would be in a fully competitive market to switch back to an earlier treatment.

216.   When Gilead and BMS sought to persuade physicians and patients to switch prescriptions from Viread, Emtriva, Truvada, or Sustiva to Atripla, they knew that those physicians and patients would be reluctant to switch back to their earlier treatments when generic versions of individual drugs became available.  For example, a physician switching a patient from a combination of Viread, Emtriva, and Sustiva to Atripla would

not be likely to switch back once generic Viread became available in December 2017.  As a result, Gilead and BMS could continue to charge supra-competitive prices for Atripla even after the launch of generic versions of Viread, Emtriva, Truvada, and/or Sustiva.

217.   The No-Generics Restraint made no independent economic sense.  Absent the restraint, competitors like BMS and Gilead would challenge each others' patents and incorporate generic or comparable components to produce a competitor to Atripla.  BMS could make a lower-priced version of Atripla consisting of generic TDF and FTC and branded EFV; Gilead, on the other hand, could make a lower-priced version of Atripla consisting of branded TDF and FTC and generic EFV.  It would be in each company's independent economic interest to market a competing drug as soon as possible.

218.   The No-Generics Restraints only benefitted Gilead and BMS by impairing competition.  Gilead was able to take advantage of BMS's patents protecting EFV, while at the same time ensuring that after Gilead lost patent protection for TDF and FTC—as a result of either a successful patent challenge or patent expiration—BMS would not be able to launch a partially-generic competitor to Atripla without terminating the Atripla Agreement and paying a substantial penalty.  BMS obtained the same benefits from Gilead.

219.   The No-Generics Restraint in the Atripla Agreement prohibited BMS from making a generic version of Atripla when generic TDF and generic FTC became available, but did *not* prohibit BMS from making a *comparable* version consisting of generic TDF, generic 3TC (instead of Gilead's FTC), and EFV. After generic TDF became available in December 2017, BMS licensed Mylan Pharmaceuticals to produce

78

that comparable version—sold as Symfi and Symfi Lo—which the FDA approved in March and February 2018, respectively.[28]   Mylan sold the Symfi products (comprised of generic TDF, generic 3TC, and EFV licensed from BMS) at a substantial discount to the price of branded Atripla.

220.   Even though Symfi and Symfi Lo are similar treatments to Atripla, they are not AB-rated, automatically substitutable drugs.  Therefore, for third party payors, including UHS, to encourage the usage of these clinically similar, but cheaper, products, they must make substantial outreach to prescribers to explain the benefits of writing new prescriptions for a Symfi product over Atripla.  Such efforts can help educate the physician community to change patients over to a new form of a similar, lower-cost drug, but the success of moving patients to entirely new prescriptions is limited when compared with the automatic switching at the pharmacy level between a brand and its

---

[28] BMS filed suit against Mylan Pharmaceuticals Inc. and its affiliates in August 2009, alleging that Mylan's ANDA for generic Sustiva infringed one of BMS's patents.  *See Bristol-Myers Squibb Co. v. Mylan Pharm. Inc.*, No. 1:09-cv-00651-LPS, Complaint (Dkt. No. 1 (D. Del., filed Aug. 28, 2009)).  On July 1, 2014, the parties entered into a Settlement and License Agreement, the terms of which have never been fully disclosed. *See Bristol-Myers Squibb Co. v. Mylan Pharm. Inc.*, No. 1:09-cv-00651-LPS, Final Consent Judgment Order at 1 (Dkt. No. 254 (D. Del., filed September 2, 2014)).  In its 2014 Annual Report, BMS reported that it had "successfully resolved all outstanding U.S. patent litigation relating to efavirenz and that loss of exclusivity in the U.S. for efavirenz is not expected to occur until December 2017."  Bristol-Myers Squibb Company, 2014 Annual Report (Form 10-K) (Feb. 2, 2015), *available at* https://www.sec.gov/Archives/edgar/data/0000014272/000001427215000055/bmy-20141231x10xk.htm.  Mylan launched generic Sustiva in February 2018.  On information and belief, the Settlement and License Agreement between BMS and Mylan delayed Mylan's launch of generic Sustiva until February 2018 and licensed Mylan to develop and make Symfi and Symfi Lo.

AB-rated generic.  If a partially-generic, AB-rated form of Atripla had been made available sooner, the cost savings to payors, like UHS, would have been substantial.

221.    Absent the No-Generics Restraint, an untainted competitor in BMS's position would have challenged Gilead's TDF Patents and/or FTC Enantiomer Patents and entered the market with a partially generic AB-rated version of Atripla even before the expiration of the FTC Enantiomer Patents in 2021.  BMS could have filed an ANDA for a partially generic AB-rated version of Atripla, with a Paragraph IV certification, as early as July 2006.  If Gilead timely sued BMS for patent infringement within 45 days of that filing, BMS could have entered the market as early as the expiration of the 30-month stay, in February 2009.

222.    Gilead terminated the Atripla Agreement in December 2017, citing the "launch of a generic version of Sustiva in the U.S."[29]  Gilead became the sole owner of the joint venture, which was renamed accordingly, and BMS lost its rights to commercialize Atripla.  Gilead continued to make royalty payments to BMS through 2020.

223.    Gilead's termination of the Agreement was consistent with its anticompetitive purpose.  Because a generic version of Sustiva had become available, BMS's EFV patents did not offer Gilead any continuing benefit in preventing generic competition.  Moreover, Gilead knew that it had delayed the launch of generic Viread

---

[29] Gilead Sciences, Inc., 2019 Annual Report (Form 10-K) (Feb. 18, 2020), *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/0000882095/000088209520000006/a2019form10-k.htm.

until December 15, 2017, and delayed the launch of generic Truvada until September 30, 2020, pursuant to its anticompetitive settlement agreements with Teva.  Gilead had no further need for the Atripla Agreement to forestall generic competition.

> **2.    Gilead and Janssen Combined their Drugs into Complera, and Shielded Gilead's Truvada from Generic Competition**

224.    In July 2009, Gilead entered into an agreement with Janssen to develop and commercialize Complera ("Complera Agreement"), an FDC combining Gilead's TDF and FTC (which Gilead sold separately as Viread and Emtriva, and together as Truvada) and Janssen's third agent RPV (which Janssen would later sell as Edurant). The Complera Agreement, like Gilead's Atripla Agreement with BMS, contained a "No-Generics Restraint," pursuant to which both parties agreed that they would not develop, manufacture, or commercialize a version of Complera that incorporated a generic version of any of its three components, which would have significantly reduced its price.  The Complera Agreement went further than the Atripla Agreement and also bars Janssen from developing, manufacturing, or commercializing a version of Complera using generic 3TC as a replacement for FTC—preventing the development of a drug that would be able to compete with Complera in the way that Symfi competed with Atripla.  By entering into that No-Generics Restraint and foreclosing potential generic competitors to Complera, Gilead and Janssen unreasonably restrained trade.

225.    The FDA approved Edurant, Janssen's standalone RPV product, in May 2011.

226.    Gilead submitted an NDA for Complera in February 2011.  The FDA approved Complera in August 2011.

227.    At the time the parties entered into the Agreement, Gilead was engaged in patent litigation against Teva in an attempt to stop or delay the launch of generic Truvada.  Accordingly, Gilead knew that it could encounter generic competition to Truvada as early as 2011, when Teva's 30-month stay expired.

228.    Gilead knew that its patents protecting TDF and FTC were weak and susceptible to challenge by a generic manufacturer, and sought to combine TDF and FTC with RPV so that the resulting combination drug would be protected by Janssen's patents for RPV, which are not due to expire until 2025.  Although it was possible that Janssen's RPV patents would be challenged by a generic manufacturer, combining Gilead's patent protection for TDF and FTC with Janssen's patent protection for RPV reduced the possibility that the combination drug would face generic competition.

229.    Gilead and Janssen each agreed that they would not "import, sell or offer to sell," and would cause their affiliates not to "import, sell or offer to sell" "the Combination Product other than pursuant to [the] Agreement," or "any other combination product that is a Derivative Combination Product[.]"  The Agreement defines the "Combination Product" as "the fixed-dose co-formulated product in oral dosage form containing, as its only APIs per single daily dose, 300 mg TDF, 200 mg FTC and 25 mg TMC278 [RPV]."  As a result, Gilead cannot develop an FDC combining branded TDF, FTC, and generic RPV, and Janssen cannot develop an FDC combining generic TDF and/or FTC and branded RPV.  Janssen further cannot develop an FDC combining

generic TDF, generic 3TC, and branded RPV.  This No-Generics Restraint continues after the expiration of the patents on TDF, FTC, and RPV, respectively.

230.    Janssen cannot terminate the Complera Agreement until the expiration of the last-to-expire patents covering RPV.

231.    Gilead is responsible for manufacturing Complera and distributing it in the United States.  Gilead sets the price of Complera, and the parties divide revenues based on the net selling prices of each party's component(s), subject to certain restrictions and adjustments.  The parties agreed that, in the U.S., the selling price of Complera would be the combined prices of Truvada (TDF/FTC) and Edurant (RPV) when sold separately.

232.    Through 2011, Gilead paid Janssen approximately $100 million in research and development expenses, the maximum amount provided for under the Complera Agreement.

233.    As with Atripla, Gilead encouraged physicians and patients to switch from Viread, Emtriva, and Truvada to Complera.  In doing so, Gilead knew that once switched, physicians and patients would be reluctant to switch back to their earlier treatments when generic versions of Viread, Emtriva, and Truvada became available.  As a result, Gilead could continue to charge supra-competitive prices for Complera even after the launch of generic versions of Viread, Emtriva, and/or Truvada.

234.    The No-Generics Restraint made no independent economic sense.  Absent the restraint, competitors like Janssen and Gilead would challenge each others' patents and incorporate generic or comparable components to produce a competitor to Complera. Janssen could make a lower-priced version of Complera consisting of generic TDF and

FTC and branded RPV, or generic TDF, generic 3TC, and branded RPV; Gilead, on the other hand, could make a lower-priced version of Complera consisting of branded TDF and FTC and generic RPV.  It would be in each company's independent economic interest to market a competing drug as soon as possible.

235.   The No-Generics Restraints only benefitted Gilead and Janssen by impairing competition.  Gilead was able to take advantage of Janssen's patents protecting RPV, while at the same time ensuring that after Gilead lost patent protection for TDF and FTC—as a result of either a successful patent challenge or patent expiration—Janssen would not be able to launch a partially-generic competitor to Complera until its RPV patents expired.

236.   When generic TDF became available in 2017, an untainted competitor in Janssen's position would have launched a product comparable to Complera, consisting of generic TDF, generic 3TC, and branded RPV.  Janssen could have sold that product at a substantially lower price than Complera, while earning the same or higher profits.  Janssen is barred from developing that product by the No-Generics Restraint in the Complera Agreement, which Janssen cannot terminate until 2025.

237.   Absent the No-Generics Restraint, an untainted competitor in Janssen's position also would have challenged Gilead's TDF Patents and/or FTC Enantiomer Patents and entered the market with a partially generic AB-rated version of Complera even before the expiration of the FTC Enantiomer Patents in 2021.  Janssen could have filed an ANDA for a partially generic AB-rated version of Complera, with a Paragraph IV certification, as early as August 2011.  If Gilead timely sued Janssen for patent

infringement within 45 days of that filing, Janssen could have entered the market as early as the expiration of the 30-month stay, in March 2014.  Janssen is barred from developing that product by the No-Generics Restraint in the Complera Agreement, which Janssen cannot terminate until 2025.

> **3.    Gilead and Janssen Combined their Drugs into Prezcobix, and Shielded Janssen's Prezista from Generic Competition**

238.    In June 2011, Gilead entered into a second agreement with Janssen, this time concerning Prezcobix ("Prezcobix Agreement"), an FDC combining Janssen's third agent DRV (which Janssen sold as Prezista) and Gilead's booster COBI (which Gilead would later sell as Tybost).  That Agreement, like the parties' Complera Agreement, contained a No-Generics Restraint.

239.    The FDA approved Prezista in June 2006.

240.    In October 2010, Janssen received notice that Mylan Pharmaceuticals had submitted an ANDA for generic Prezista with a Paragraph IV certification that Janssen's patents covering DRV were invalid and would not be infringed by Mylan's product.  As a result, Janssen could expect generic competition to Prezista as early as April 2013 if Mylan received FDA approval and launched at the end of its 30-month stay.

241.    Janssen sought to combine DRV with COBI so that the resulting combination drug would be protected by Gilead's patents for COBI, which are not due to expire until 2029.

242.    Gilead granted Janssen an exclusive license (exclusive even as to Gilead) to develop, commercialize, and manufacture a "Licensed Combination Product," which

the Agreement defines as a "Combination Product" containing COBI supplied by Gilead and developed, commercialized, or manufactured by Janssen.  The Agreement in turn defines a "Combination Product" as a "fixed-dose co-formulated product in oral dosage form containing, as its only APIs, [DRV] and COBI[.]"

243.   Gilead and Janssen each agreed that they would not "make, use, sell, have sold, offer for sale, or import," and would cause their affiliates not to "make, use, sell, have sold, offer for sale, or import," the "Combination Product," other than pursuant to the Agreement, or any "Other Combination Product."  The Agreement defines an "Other Combination Product" as "any fixed-dose, co-formulated product (other than the Combination Product) that contains [DRV] and COBI as its sole APIs."

244.   The two provisions above constitute a No-Generics Restraint, which continues after the expiration of the patents on DRV and COBI, respectively.  Under those terms of the Agreement, Gilead cannot develop an FDC consisting of generic DRV and branded COBI.

245.   The Prezcobix Agreement was initially due to expire on September 30, 2011, or a later date agreed upon by the parties, unless the parties reached an agreement to develop an FDC combining Gilead's TAF, FTC, and COBI, and Janssen's RPV (later named "Symtuza," and discussed further below).  On information and belief, the parties

agreed to extend that deadline until at least November 2011, when they executed an initial agreement concerning Symtuza.[30]

246.   Gilead cannot terminate the Prezcobix Agreement, as it pertains the United States, until the expiration of the last-to-expire patents covering COBI.

247.   The FDA approved Tybost, Gilead's standalone COBI product, in September 2014.

248.   Janssen submitted an NDA for Prezcobix in April 2014.  The FDA approved Prezcobix in January 2015.

249.   Janssen sets the price for Prezcobix in the United States, and pays a royalty to Gilead based on sales.  Janssen is responsible for manufacturing Prezcobix and distributing it in the United States.

250.   Janssen encouraged physicians and patients to switch from Prezista to Prezcobix.  In doing so, Janssen knew that once switched, physicians and patients would be reluctant to switch back to their earlier treatments when a generic version of Prezista became available.  As a result, Janssen could continue to charge supra-competitive prices for Prezcobix even after the launch of a generic version of Prezista.

251.   Generic DRV became available in the United States in December 2017.

252.   When generic DRV became available, an untainted competitor in Gilead's position would have launched a partially-generic AB-rated version of Prezcobix,

---

[30] Gilead Sciences, Inc., 2011 Annual Report (Form 10-K) (Feb. 10, 2012), *available at* https://www.sec.gov/Archives/edgar/data/0000882095/000119312512075335/d260199d1 0k.htm.

consisting of generic DRV and branded COBI.  Gilead could have sold that product at a substantially lower price than Prezcobix, while earning the same or higher profits.  Gilead is barred from developing that product by the No-Generics Restraint in the Prezcobix Agreement, which Gilead cannot terminate until 2029.

253.    Further, absent the No-Generics Restraint, an untainted competitor in Gilead's position would have challenged Janssen's patents related to RPV and entered the market with a partially generic AB-rated version of Prezcobix.

### 4. Gilead and BMS Combined their Drugs into Evotaz, and Shielded BMS's Reyataz from Generic Competition

254.    A few months after entering the Prezcobix Agreement with Janssen, Gilead struck a similar deal with BMS, again using COBI to shield a would-be competitor's drug from generic competition.

255.    In October 2011, Gilead and BMS entered into an agreement concerning Evotaz ("Evotaz Agreement"), an FDC combining BMS's third agent ATV (which BMS sold as Reyataz) and Gilead's booster COBI (which Gilead would later sell as Tybost). That Agreement, like Gilead's other agreements, contained a No-Generics Restraint.

256.    The FDA approved Reyataz in June 2003.

257.    In February 2010, BMS received notice that Teva had submitted an ANDA for generic Reyataz with a Paragraph IV certification that BMS's patents covering ATV were invalid and would not be infringed by Teva's product.  As a result, BMS could expect generic competition to Reyataz as early as August 2012 if Teva received FDA approval and launched at the end of its 30-month stay.

258.    BMS sought to combine ATV with COBI so that the resulting combination drug would be protected by Gilead's patents for COBI, which are not due to expire until 2029.

259.    Gilead granted BMS an exclusive license (exclusive even as to Gilead) to develop, commercialize, and manufacture a "Licensed Combination Product," which the Agreement defined as a "Combination Product" containing COBI supplied by Gilead and developed, commercialized, or manufactured by BMS.  The Agreement in turn defined a "Combination Product" as a "fixed-dose co-formulated product in oral dosage form containing, as its only APIs, [ATV] and COBI[.]"

260.    Gilead and BMS each agreed that they would not "make, use, sell, have sold, offer for sale, or import," and would cause their affiliates not to "make, use, sell, have sold, offer for sale, or import," the "Combination Product (including any Generic Combination Product)," other than pursuant to the Agreement, or any "Other Combination Product."  The Agreement defines a "Generic Combination Product" as a generic version of the "Combination Product," and defines an "Other Combination Product" as "any fixed-dose, co-formulated product (other than the Combination Product) that contains [ATV] and COBI as its sole APIs."

261.    The two provisions above constitute a No-Generics Restraint, which continues after the expiration of the patents on ATV and COBI, respectively.  Under those terms of the Agreement, Gilead cannot develop an FDC consisting of generic ATV and branded COBI.

262.    Gilead cannot terminate the Evotaz Agreement, as it pertains the United States, until the expiration of the last-to-expire patents covering COBI.

263.    BMS submitted an NDA for Evotaz in April 2014.  The FDA approved Evotaz in January 2015.

264.    BMS sets the price for Evotaz in the United States, and pays a royalty to Gilead based on sales.  BMS is responsible for manufacturing Evotaz and distributing it in the United States.

265.    BMS encouraged physicians and patients to switch from Reyataz to Evotaz. In doing so, Gilead knew that once switched, physicians and patients would be reluctant to switch back to their earlier treatments when a generic version of Reyataz became available.  As a result, BMS could continue to charge supra-competitive prices for Evotaz even after the launch of a generic version of Reyataz.

266.    Generic ATV became available in the United States in December 2017.

267.    When generic ATV became available, an untainted competitor in Gilead's position would have launched a partially-generic AB-rated version of Evotaz, consisting of generic ATV and branded COBI.  Gilead could have sold that product at a substantially lower price than Evotaz, while earning the same or higher profits.  Gilead is barred from developing that product by the No-Generics Restraint in the Evotaz Agreement, which Gilead cannot terminate until 2029.

268.    Further, absent the No-Generics Restraint, an untainted competitor in Gilead's position would have challenged BMS's patents related to ATV and entered the market with a partially generic AB-rated version of Evotaz.

90

### 5. Gilead and Janssen Extended Their Agreements to TAF-Based Treatments, Odefsey and Symtuza

269.    In December 2014, Gilead and Janssen entered into two agreements expanding their prior relationship to Gilead's new TAF platform.  In one agreement (the "Odefsey Agreement"), Gilead and Janssen amended and restated the Complera Agreement to address a new FDC, later named Odefsey, containing Gilead's TAF (instead of TDF), FTC, and Janssen's RPV.  In the second agreement (the "Symtuza Agreement"), Gilead and Janssen amended and restated their initial agreement concerning Symtuza, an FDC containing Gilead's TAF, FTC, and COBI, and Janssen's RPV.  The agreements were entered into on the same day, and on information and belief, were negotiated together.

270.    Gilead submitted an NDA for Odefsey in July 2015.  The FDA approved Odefsey in March 2016.

271.    Janssen submitted an NDA for Symtuza in September 2017.  The FDA approved Symtuza in July 2018.

272.    The Odefsey Agreement and the Symtuza Agreement both contain No-Generics Restraints.

273.    In the Odefsey Agreement, each party agreed that it "shall not, and shall cause its Affiliates not to, make, have made, use, sell, have sold, offer for sale, or import . . . (A) a Combination Product other than pursuant to this Agreement or (B) any Other Combination Product[.]"  The Agreement defines a "Combination Product" as each of Complera and "the fixed-dose co-formulated product in oral dosage form containing, as

its only APIs per single daily dose, TAF, FTC, and RPV[.]"  The Agreement defines an

"Other Combination Product" as "any fixed-dose, co-formulated combination product

(other than a Combination Product) in oral dosage form that contains, as its sole APIs, all

three (3) of (a) TAF or TDF, (b) FTC or 3TC, and (c) RPV."  Under that No-Generics

Restraint, Janssen cannot develop an FDC combining its branded RPV with generic TAF

or TDF and generic FTC or 3TC.  This No-Generics Restraint continues after the

expiration of the patents on TDF, TAF, FTC, 3TC, and RPV, respectively.  At the time

the parties entered into the Odefsey Agreement, generic 3TC was already available on the

market.

274.    In the Symtuza Agreement, each party agreed that it "shall not, and shall

cause its Affiliates not to, make, have made, use, sell, have sold, offer for sale, or import .

. . (A) the STR other than pursuant to this Agreement, (B) any Other STR, or (C) any

Other Restricted Product[.]"  The Agreement defines the "STR" as "a fixed-dose, co-

formulated product in oral dosage form containing, as its only four APIs per daily dose,

COBI, TAF, FTC and DRV[,]" defines an "Other STR" as "any fixed-dose, co-

formulated combination product in oral dosage form (other than the STR) that contains,

as its only four (4) APIs, (a) COBI or RTV, (b) TAF or TDF, (c) FTC or 3TC and (d)

DRV or a version of ATV sold by a Person other than BMS[,]" and defines "Other

Restricted Product" as "any fixed-dose, co-formulated product in oral dosage form that

contains, as its only three (3) APIs, (a) DRV or a generic version of ATV and (b) any two

of the following (i) COBI or RTV, (ii) TAF or TDF or (iii) FTC or 3TC."  Under that No-

Generics Restraint, Janssen cannot develop, among other drugs, (1) an FDC combining

its branded DRV with generic TAF or TDF, generic FTC or 3TC, or (2) an FDC combining its branded DRV with generic TAF or TDF, generic FTC or 3TC, and generic COBI or RTV.  This No-Generics Restraint continues after the expiration of the patents on TDF, TAF, FTC, 3TC, COBI, RTV, and DRV, respectively.  At the time the parties entered into the Symtuza Agreement, generic 3TC was already available on the market.

275.    The No-Generics Restraints in the Odefsey Agreement expressly broaden the parties' earlier No-Generics Restraint concerning Complera.  Under the No-Generics Restraint in the Odefsey Agreement, Janssen is expressly prohibited from developing an FDC combining generic TDF, 3TC, and branded RPV.

276.    The Odefsey Agreement expires on a product-by-product basis, at the later of (1) the expiration of the last of Janssen's patents providing exclusivity for the product or (2) the ten-year anniversary of marketing the product.

277.    The Symtuza Agreement expires on a product-by-product basis, at the later of (1) the expiration of the last of Gilead's patents providing exclusivity for the product or (2) the ten-year anniversary of marketing the product.

278.    Gilead and Janssen encouraged physicians and patients to switch from TDF-based treatments to Odefsey and Symtuza.  In doing so, Gilead and Janssen knew that once switched, physicians and patients would be reluctant to switch back to their earlier treatments when generic versions of Viread, Emtriva, and Truvada (and other components of Odefsey and Symtuza) became available.  As a result, Gilead and Janssen could continue to charge supra-competitive prices for Odefsey and Symtuza even after

the launch of generic versions of Viread, Emtriva, Truvada, and/or other components of Odefsey and Symtuza.

279.    Absent the No-Generics Restraints, competitors like Janssen and Gilead would challenge each others' patents and incorporate generic or comparable components to produce competitors to Odefsey and Symtuza.  Janssen also would have developed partially-generic competitors to Odefsey and Symtuza using generic TDF, generic FTC, generic 3TC, or generic RTV (which can be used in place of COBI as a booster) when those generic drugs became available.

280.    For example, absent the No-Generics Restraints, an untainted competitor in Janssen's position would have challenged Gilead's patents covering TAF and entered the market with a partially generic AB-rated version of Odefsey.  Odefsey's NCE exclusivity expired in March 2021.  An untainted competitor in Janssen's position would have challenged Gilead's patents one year before the expiration of that exclusivity and could enter the market as early as the expiration of the 30-month stay, in September 2022. Janssen is barred from developing that product by the No-Generics Restraint in the Odefsey Agreement, which Janssen cannot terminate until 2026.

281.    For another example, generic RTV became available on the market in September 2018.  Ritonavir ("RTV") is similar to COBI and can be used in place of COBI in an FDC.  An untainted competitor in Janssen's position would have launched a product comparable to Symtuza, consisting of generic TDF, generic 3TC, generic RTV, and branded DRV.  Janssen could have sold that product at a substantially lower price than Symtuza, while earning the same or higher profits.  Janssen is barred from

developing that product by the No-Generics Restraint in the Symtuza Agreement, which

Janssen cannot terminate until 2026.

### C. Gilead Delayed the Launch of TAF as Part of Its Anticompetitive Scheme to Keep Gilead Drug Prices Artificially High

282. As part of its anticompetitive scheme, and in conjunction with the

agreements it entered to protect its TDF-based product line from generic competition,

Gilead deliberately delayed its development and introduction of safer and more effective

TAF-based medications.  Only when it saw imminent generic competition for Truvada on

the horizon, Gilead pivoted, launching aggressive marketing schemes aimed at switching

the prescription base from TDF-based drugs, including Truvada, to patent-protected and

higher-priced TAF-based drugs, including Genvoya, Odefsey, Descovy, Biktarvy, and

Symtuza.  The timing for this was critical, because Gilead needed to switch physicians

and patients from Truvada to TAF-based drugs prior to the anticipated launch of Teva's

generic Truvada in September 2020.  To accomplish this switch, Gilead enlisted a robust

sales force to promote TAF-based drugs, delayed the launch of standalone TAF (which

could have been used with other cheaper component drugs), ultimately launched

standalone TAF at an unsafe dosage, and intentionally chose not to seek an HIV

indication on standalone TAF (to dissuade physicians from prescribing it off-label for use

with other HIV medications).  The goal of Gilead's scheme was to switch as many

prescriptions as possible from Truvada and other TDF-based drugs (which were facing a

patent cliff and generic erosion of pricing) to TAF-based treatments, before Gilead lost

the ability to charge supra-competitive prices for TDF-based drugs.

283.     Gilead's anticompetitive scheme was incredibly successful.  For example:

a.       In Gilead's Q2 2016 investor call, the company touted Genvoya, the first TAF-based drug to launch (in November 2015) as "the most successful HIV launch since the introduction of Atripla."  Gilead stated that almost 40 percent of Genvoya prescriptions were switches from Stribild, Genvoya's TDF-based predecessor, and 70 percent of all prescriptions were switches from Gilead drugs.[31]

b.       According to Gilead's Q3 2016 investor call, "[t]he uptick in Genvoya, Odefsey, and Descovy have largely been driven by the switch from Gilead's old STRs[.]"[32]

c.       In Gilead's Q4 2016 investor call, the company stated that as of the end of 2016, "TAF-based regimens made up 37% of Gilead's HIV prescription volume," and that "[m]ost patients on these products switch from Gilead's older regimens[.]"[33]

d.       In Gilead's Q1 2017 investor call, the company reported "quarter-on-quarter growth of 47%" for its TAF portfolio, which it stated "continued to drive the year-on-year growth of the Gilead HIV franchise."  The company stated that its "TAF-based regimens now represent 42% of total Gilead HIV prescription volume just 17

---

[31] Gilead Sciences Q2 2016 Earnings Call, *available at* https://seekingalpha.com/article/3991335-gilead-sciences-gild-john-f-milligan-on-q2-2016-results-earnings-call-transcript.

[32] Gilead Sciences Q3 2016 Earnings Call, *available at* https://seekingalpha.com/article/4017946-gilead-sciences-gild-q3-2016-results-earnings-call-transcript.

[33] Gilead Sciences Q4 2016 Earnings Call, *available at* https://seekingalpha.com/article/4043634-gilead-sciences-gild-q4-2016-results-earnings-call-transcript.

months after the launch of Genvoya, and less than a year after the launches of Odefsey and Descovy."[34]

        e.      Gilead boasted about its better-than-expected success in switching 10% of Truvada patients to Descovy in just the first few months after Descovy's launch.[35]  By the end of Q2 2020, Gilead had reportedly switched 38% of Truvada PrEP patients to Descovy, and was well on its way to reaching its 40-45% switching goal. Gilead persisted in its profit-driven switching campaign even though studies suggested that Descovy offers no advantages over branded or generic Truvada.[36]

        f.      In Gilead's Q3 2020 investor call—reporting on the time period ending with Teva's launch of generic Truvada in September 2020—the company reported that 91% of Gilead's U.S. patients had "converted to TAF-based regimens." The company also told investors that it had beaten its 40-45% switching goal and had converted 46% of "clinically appropriate individuals at risk" from Truvada to Descovy. [37]

        g.      Gilead's delay in launching TAF, together with Gilead's other unlawful business practices—entering into anticompetitive reverse payment settlement

---

[34] Gilead Sciences Q1 2017 Earnings Call, *available at* https://seekingalpha.com/article/4068179-gilead-sciences-gild-q1-2017-results-earnings-call-transcript.

[35] *See, e.g.*, *Gilead's Truvada faces Teva generics assault amid Descovy switching campaign*, *available at* https://www.fiercepharma.com/manufacturing/gilead-sciences-truvada-will-face-teva-generic-challenger-amid-descovy-switching (Oct. 2, 2020).

[36] *See id.*

[37] Gilead Sciences Q3 2020 Earnings Call, *available at* https://seekingalpha.com/article/4382326-gilead-sciences-inc-gild-ceo-daniel-oday-on-q3-2020-results-earnings-call-transcript.

agreements and No-Generics Restraints agreements with BMS and Janssen—severely impaired competition and manipulated the markets for both TDF-based and TAF-based HIV medications, substantially increasing prices and reducing innovation.

### 1.    Gilead Intentionally Delayed the Introduction of TAF

284.    With a clear eye towards two separate exclusivity periods for TDF and TAF, Gilead knew it would earn higher total revenues by first protecting, and then transitioning, its TDF-based franchise to a newly introduced TAF-based franchise, just as generic competition on TDF was imminent.  Having struck the underlying deal, Gilead knew that Teva would launch generic Viread (TDF) in December 2017.  With that key insight and driven by greed, Gilead delayed the introduction of TAF, and its superior side effect profile, for several years until November 2015, when it launched Genvoya, the first of its TAF-based drugs.  By launching Genvoya then, Gilead gave itself just enough time to carry out its switching campaign from TDF-based to TAF-based drugs before generic Viread arrived.

285.    This delay was apparent, because *before* the FDA approved Viread (TDF) in 2001, Gilead had already discovered a second prodrug version of tenofovir, known as TAF.  TDF and TAF are both prodrugs of  tenofovir.  However, TAF offers the advantage of requiring a fraction of the dose TDF requires to achieve the same therapeutic effect.  The lowered plasma concentrations needed with TAF results in correspondingly reduced toxicities compared to TDF, making TAF safer to use.  Despite early awareness that TAF had superior safety, efficacy and side effect profiles, Gilead deliberately and strategically chose to delay development of TAF and withheld TAF-

based products from entering the market to bolster its unfair and anti-competitive business tactics and arrangements and to extend its ill-gotten TDF-based monopoly and profits.

286.   As early as 2002, Gilead had realized the benefits of TAF's smaller doses and lowered plasma concentrations compared to TDF.  Indeed, Gilead conducted clinical trials of TAF in humans in 2002, with the explicit goal, as articulated by Gilead's senior executive, of "deliver[ing] a more potent version of tenofovir that can be taken in lower doses, resulting in better antiviral activity and fewer side effects[.]"

287.   In 2003, Gilead reported to investors regarding TAF clinical trials that the "[i]nitial data look promising," and that Gilead was "excited" about TAF's prospects.  In January 2004 Gilead again reported to investors that the TAF results were "promising," and that it was "continuing the clinical development of [TAF] … based on favorable Phase I/II results."  In March 2004 Gilead reported that "[b]ased on data from our Phase 1/2 clinical trials of [TAF], we have begun developing a Phase 2 program for the treatment of HIV infection[.]"

288.   In May 2004, Gilead reported that TAF clinical studies had confirmed that TAF gets higher concentrations of tenofovir into the blood than does TDF, thus allowing the patient to take a far smaller dose, thereby significantly reducing the risk of adverse side effects.  Gilead represented to investors that smaller TAF doses could "give greater antiviral response. . .[s]o, the theory holds that you can target and treat HIV differently using these kinds of prodrug and targeting technologies."

99

289. Gilead continued to praise the advantages of TAF and its potential for HIV treatment for years to investors through at least June 2004, shortly before receiving FDA approval for Truvada in July of 2004. A few months later, on October 21, 2004, Gilead abruptly changed course, announcing that it had decided to shelve further development of promising TAF treatments. The announcement attributed the decision to "an internal business review."

290. It was not until Gilead was faced with multiple generic challenges to its TDF Patents that Gilead decided it was finally time to prepare for its TAF-based line extension. Gilead told investors in 2010 that "a new molecule" would replace its TDF-based sales and add "a great deal of longevity" to its HIV franchise. This "new molecule" was not new at all—it was the TAF prodrug that Gilead had identified a decade earlier, but that Gilead had been holding in reserve to maximize its profits.

291. Gilead's alleged business decision to abandon development of TAF in 2004 not-so-coincidentally came around the same time as Gilead's and BMS's collusive collaboration and agreement to develop and market TDF-based Atripla, while agreeing that the parties would not develop partially-generic competitors to Atripla. In fact, Gilead had concluded that it could use the unlawful No-Generics Restraints provisions and marketing of Atripla to shield its TDF-based HIV medications and franchise from competition for years. With the BMS deal in place, Gilead could safely shelve its TAF project to use much later as part of its strategy to switch patients to TAF-based products once generic competition to its TDF-based drugs became imminent. And Gilead was

100

able to further delay the potential for such generic competition, as well as the introduction of TAF, through its unlawful patent settlement agreements as alleged herein.

292.    On December 17, 2004, Gilead formally entered into its anti-competitive agreement with BMS for Atripla.  Gilead's December 2004 press release concerning the agreement noted that Gilead and BMS's joint work on developing the project had "been ongoing throughout most of 2004."  Notably, in October 2004—the same month that Gilead announced the shelving of its TAF project—the co-conspirators announced favorable results from an ongoing clinical trial of Atripla.

293.    Gilead's arrangement with BMS gave it the means to protect TDF from prospective generic competition, even if generic manufacturers were to successfully challenge the TDF patents.  Thus, it no longer made economic sense for Gilead to do what competition would otherwise have forced it to do—to bring out TAF as soon as possible to take sales from any rival HIV medications.  The economic calculus changed: Gilead could make more profits by defeating generic competition to its TDF-based HIV medications through anti-competitive means, and then rolling out TAF much later as part of a line extension.

294.    Gilead itself eventually made explicit the connection between its anticompetitive deal with BMS and the shelving of TAF.  At an investor conference in March 2011, Kevin Young, the executive vice president of Gilead's commercial operations, admitted that in 2004 Gilead "didn't bring TAF through development because at the time we were launching Truvada, launching Atripla…."  Gilead never amended the BMS joint venture agreement at this time to provide BMS with the opportunity to

101

commercialize a TAF-based successor to Atripla.  Nor did Gilead, at the time, file an

NDA to market a TAF-based successor product to Atripla.

295.  And on May 3, 2011, another Gilead executive confirmed why Gilead had

sat on TAF for over a decade.  Holding TAF in reserve to later reformulate TDF-based

FDCs would "bring quite a bit of longevity to the Gilead portfolio," securing an

"important opportunity for Gilead long-term."

296.  Gilead's unlawful conduct also caused a delay in the ability of generic

manufacturers and other competitors to challenge Gilead's TAF-related patents.  NCE

exclusivity prohibits a generic manufacturer from even filing an ANDA with respect to

the branded product until a year before the end of the NCE exclusivity.  Moreover, the

Hatch-Waxman automatic 30-month stay does not commence until after the five-year

NCE exclusivity expires.  So, a generic version of an NCE-protected drug cannot

realistically launch until at least 7.5 years after the brand manufacturer first receives

approval of the NCE-protected drug.

297.  Accordingly, Gilead's delay in marketing TAF-based drugs dramatically

delayed the date on which generic manufacturers could challenge TAF patents.  Earlier

generic challenges and competition would have significantly reduced pricing for these

drugs.

298.  Absent Gilead's and BMS's agreement, these generic entry dates would

have been much earlier.  If Gilead had not shelved TAF development, a reasonable

manufacturer in its position would have begun marketing TAF and TAF-based FDCs like

Descovy no later than 2007.

299.    Thus, instead of the NCE protection for the TAF-based products, like Descovy, expiring in November 2020, and the Hatch-Waxman 30-month stays expiring in May 2023, the NCE exclusivity protecting those products would have expired in November 2011, and the Hatch-Waxman 30-month stays would have expired in May 2013.  And those living with HIV or at risk for infection of HIV would already have generic versions of TAF-based products.

300.    Foregoing introduction of TAF caused Gilead to lose millions of dollars in TAF-based drug sales every year.  Withholding TAF only made economic sense for Gilead because of its anticompetitive effects, including impairing and delaying competition for its TAF-based line extension, supported by its schemes to switch prescriptions from TDF-based to TAF-based products.  As a result of Gilead's anticompetitive business tactics, purchasers and payors have paid anticompetitive prices for not only Gilead's TDF-based drugs, but also for its delayed TAF-based medications.

301.    Gilead's switching of patients from Truvada to Descovy also helped position it to secure greater profits on the newer patent-protected drug for the PrEP indication.  Rather than innovate and invest in costly research and development, Gilead passively sat on its hands for years, letting the government do the foundational research to ultimately lead to an FDA approval of Descovy for PrEP.  (The game-changing 2012 approval of Truvada for PrEP was also primarily based on research and development done by others—namely the government and charitable foundations.)

302.    Gilead's 2019 Annual Report acknowledges the market dynamics and likely impact of its anticompetitive schemes to switch prescriptions from Truvada (soon

to be facing generic competition and reduced pricing) to patent and exclusivity protected

Descovy for PrEP:

> Truvada (FTC/TDF)-based product sales decreased in the United States and
> Europe in 2019 compared to 2018.  The decrease in U.S. sales was
> primarily due to lower sales volume as a result of patients switching to
> newer regimens containing FTC/TAF, partially offset by the increased
> usage of Truvada for PrEP.  The decrease in Europe sales was primarily
> due to lower sales volumes of Truvada and Atripla as a result of broader
> availability of generic versions and patients switching to newer regimes
> containing FTC/TAF.  We expect a decline in our sales of Truvada in the
> United States as patients switch to Descovy for PrEP from Truvada for
> PrEP and expected entry of generic versions in late 2020.[38]

### 2. Gilead Intentionally Delayed the Introduction of Vemlidy (Standalone TAF)

303.   Gilead also intentionally delayed seeking FDA approval to market

standalone TAF (Vemlidy), and altogether withheld it from the market from November

2015 to November 2016.  During that window, TAF was only available as a component

of Gilead's FDCs.  By delaying standalone TAF and only making it available as a

component of an FDC, Gilead ensured that physicians could not pair TAF with other

component drugs on the market.  During that critical time, while Gilead aggressively

moved prescriptions from the TDF-based products to TAF-based products, there could be

no usage of standalone TAF together with HIV drugs manufactured by Gilead's

competitors.  Any patient who wanted TAF could get it only by switching to a Gilead

fixed dose combination drug.

---

[38] Gilead Sciences, Inc., 2019 Annual Report (Form 10-K) (Feb. 18, 2020), *available at*
https://www.sec.gov/ix?doc=/Archives/edgar/data/0000882095/000088209520000006/a2
019form10-k.htm.

304.   By withholding Vemlidy from the market while moving the TDF-based prescription bases to the TAF-based FDCs, Gilead used its control over Tenofovir to impair competition and maintain a dominant position in the cART market.  Without a standalone TAF on the market, Gilead forced anyone who wanted to buy TAF to also buy a Gilead TAF-based FDC.  Those FDCs were unlawfully protected from competition by the amended—broader and more extensive—No-Generics Restraints.

305.   In addition, as Gilead knew and intended, the FDA did not approve Vemlidy until November 10, 2016, just over a year after approving its FDC Genvoya.  By then Gilead had succeeded in converting more than half of all TDF-based Stribild prescriptions to Genvoya, and its TDF-based Complera prescriptions to TAF-based Odefsey.  That pattern of rapid cannibalization continued through 2018.

306.   When Gilead did ultimately seek FDA approval of standalone TAF, it did so at what it knew to be a less safe level of 25mg, when it had sought and received approval for the safer 10mg level only for use in Gilead's FDCs.  Consistent with its same anticompetitive scheme, Gilead refused to make Vemlidy (standalone TAF) or the TAF in Descovy available in 10mg strength—and still refuses through present day. Gilead has done this with the knowledge that if Vemlidy and Descovy were available with a dosage of 10mg of TAF, many doctors and patients would prefer to prescribe or take Vemlidy or Descovy together with a non-Gilead third agent, rather than Gilead's FDC Genvoya (and, later, Symtuza).

### 3.   Gilead Intentionally Did Not Seek Approval for an HIV Indication on Vemlidy (Standalone TAF)

307.   Consistent with its anticompetitive scheme, when Gilead did seek FDA approval for Vemlidy, it only sought approval for use in the treatment of chronic Hepatitis B, and not for HIV.

308.   Gilead obviously knew that standalone TAF was active against HIV, as demonstrated by, among many other facts, Gilead's having sought FDA approval of HIV indications for numerous TAF-containing FDCs.  Obtaining FDA approval of an HIV indication for standalone TAF would have been a trivial undertaking for Gilead.  In connection with its November 5, 2014 application for approval of Genvoya, Gilead performed and submitted to FDA studies demonstrating the efficacy of both standalone TAF and TAF/FTC in the treatment of HIV.  FDA approval of standalone TAF for treatment of HIV would have required, at most, that Gilead submit some bioequivalence data that would have been trivial and inexpensive for Gilead to obtain.

309.   Gilead nevertheless chose not to seek an HIV indication for standalone TAF.  As in Gilead's intentional delay in marketing TAF as a standalone product at all, and in its intentional refusal to make TAF available as a 10mg pill, the purpose and effect of Gilead's continuing refusal to seek and obtain FDA approval for use of standalone TAF in the treatment of HIV is to force patients to purchase Gilead's FDCs rather than standalone TAF plus a competing HIV drug.

310.   By not seeking approval for Vemlidy for HIV treatment, Gilead further limited the potential for earlier substitution of TAF (in combination with Gilead's

competitors' generic and/or comparable standalone components), which would undoubtedly take sales away from Gilead's TDF-based and TAF-based FDCs. For example, by refusing to seek an HIV indication, physicians were dissuaded from writing prescriptions for standalone TAF in combination with other standalone components for HIV treatment, because to do so would have required an "off-label" prescription. Further, by steering the market away from standalone TAF for HIV treatment, Gilead also effectively prevented the production of TAF-based versions of Atripla consisting of TAF/generic EFV/generic 3TC or TAF/generic EFV/FTC, which would have reduced pricing. Withholding an HIV indication made economic sense for Gilead only because it impaired competition.

### 4. Gilead Intentionally Made Stribild Less Safe

311. As part of its scheme to move TDF-based FDCs to TAF-based FDCs, Gilead intentionally refused to reduce the toxicity of TDF-based Stribild. Making Stribild less safe than other TDF products would help Gilead later move prescriptions from TDF-based Stribild to TAF-based Genvoya.

312. Gilead's clinical trials on Stribild showed that it was more toxic than upboosted TDF and resulted in more adverse events and treatment discontinuations. Gilead formulated Stribild with 300 mg of TDF together with the pharmacokinetic booster cobicistat. This is the same dosage in which Gilead sold TDF as a standalone product, i.e., for use without a booster. Gilead did not reduce the dose of TDF to reduce the toxicity of Stribild.

313.   At the same time, Gilead artificially increased Stribild's price.  Since launching Stribild in 2012, Gilead had consistently raised its price once a year, approximately 5% to 7%.  In connection with the switch to TAF-based Genvoya in 2016, however, Gilead took its normal annual increase on Stribild plus another mid-year increase of 7%.  That price increase boosted the wholesale price of a 12-month supply of Stribild to $34,686, substantially higher than the $30,930 price of Genvoya.  This price increase only made economic sense to Gilead because it encouraged doctors to switch from Stribild to Genvoya and thereby avoided generic competition.

### D.   Market Power

#### 1.   The Individual Markets for Specific cART Drugs

314.   At all relevant times, there existed a separate relevant product market for each of the following relevant branded drugs and its corresponding AB-rated generic equivalents:  (1) Viread (TDF); (2) Truvada (TDF/FTC); (3) Atripla (TDF/FTC/EFV); (4) Complera (TDF/FTC/RPV); (5) Stribild (TDF/FTC/EVG/COBI); (6) Vemlidy (TAF); (7) Descovy (TAF/FTC); (8) Odefsey (TAF/FTC/RPV); (9) Genvoya (TAF/FTC/EVG/COBI); (10) Symtuza (TAF/FTC/DRV/COBI); (11) Biktarvy (TAF/FTC/BIC); (12) Emtriva (FTC); (13) Sustiva (EFV); (14) Vitekta (EVG); (15) Edurant (RPV); (16) Tybost (COBI); (17) Prezista (DRV); (18) Prezcobix (DRV/COBI); (19) Reyataz (ATV); and (20) Evotaz (ATV/COBI).

315.   The respective seller of each of the foregoing drugs possessed substantial market power in that relevant market, having the power to maintain the price of that drug

at supracompetitive levels without losing sufficient sales to other drugs to make the supracompetitive prices unprofitable.

316.    A small but significant, non-transitory increase in the price of each of the foregoing drugs above the competitive level did not cause a loss of sales sufficient to make the price increase unprofitable.  At competitive prices, none of these drugs exhibits significant, positive cross-price elasticity of demand with respect to any product other than the AB-rated generic versions of each relevant drug.  Contributing to this is the fact that each brand drug and its AB-rated generic version is not reasonably interchangeable with other drugs because once the physician and patient find that one of these drugs is well tolerated, at competitive prices the doctor and patient are very unlikely to switch to a different HIV drug based on variations of price of 10% or less.

317.    The existence of other branded HIV drugs has not constrained the price of each of these drugs to the competitive level.

318.    Each seller needed to control only that drug and its AB-rated generic equivalents, and no other products, to maintain the price of the drug profitably at supracompetitive prices.  Only the entry of a competing, AB-rated version(s) of that brand drug would render the brand manufacturer unable to profitably maintain supracompetitive prices.

319.    The seller of each of the foregoing drugs, respectively, sold that drug at prices well in excess of marginal costs, substantially in excess of the competitive price, and enjoyed unusually high profit margins.

320.    Each such seller had the ability to control the prices of that drug and exclude relevant competitors.  Among other things: (a) generic versions of each drug would have entered the market at substantial discounts to the brands but for Defendants' anticompetitive conduct; (b) the gross margin on each drug was at all times at least 70%; and (c) the seller of each drug never lowered the price of the drug to the competitive level in response to the pricing of non-AB-rated branded or generic drugs.

321.    At all relevant times, Gilead's gross profit margin on its cART drugs, collectively, has exceeded 75% and has reached as high as 91%.  These margins are approximately 15 times those that indicate substantial market power.

322.    One purpose and effect of Defendants' anticompetitive conduct was to impair competition from AB-rated generic versions of each of the foregoing drugs.

323.    At all relevant times, the market for each drug was protected by high barriers to entry due to patent protection, the high cost of entry and expansion, expenditures in marketing and physician detailing, and state statutes that require prescriptions for the purchase of the products at issue and restrict substitution of those products at the pharmacy counter.  The products in these markets require significant investments of time and money to design, develop, and distribute.  In addition, the markets require government approvals to enter and/or may be covered by patents or other forms of intellectual property.  Defendants' unlawful conduct further restricted entry.  Thus, during the relevant period, existing and potential market entrants lacked the ability to enter the market and/or expand output quickly in the short run in response to Defendants' higher prices or reduced output.

## 2.    The Market for cART Drugs

324.    In addition to the separate product markets for each of the above individual drugs and their respective AB-rated equivalents, there is a broader relevant product market for cART drugs generally.  This broader market of cART drugs covers all antiretroviral drugs used in the treatment of HIV as part of a combination therapy, and includes:  Agenerase, Aptivus, Atripla, Biktarvy, Cimduo, Combivir, Complera, Crixivan, Delstrigo, Descovy, Dovato, Edurant, Emtriva, Epivir, Epzicom, Evotaz, Fortovase, Fuzeon, Genvoya, Hivid, Intelence, Invirase, Isentress, Juluca, Kaletra, Lexiva, Norvir, Odefsey, Pifeltro, Prezcobix, Prezista, Rescriptor, Retrovir, Retrovir IV Infusion,   Reyataz, Selzentry, Stribild, Sustiva, Symfi, Symfi Lo, Symtuza, Temixys, Tivicay, Triumeq, Trizivir, Trogarzo, Truvada, Tybost, Videx, Viracept, Viramune, Viread, Vitekta, Zerit, Ziagen, and their AB-rated generic substitutes.

325.    A seller that controlled the entire output of cART drugs (*e.g.*, as a result of mergers) would have even greater market power, and would charge even higher prices, than a seller that controlled the output of a single relevant drug.  The fact that the price of an individual cART drug is set so high that it may be constrained by the existence of other cART drugs *at current prices* does not alter the fact that those other cART drugs do not constrain prices to the competitive (i.e., generic) level, or that there are relevant product markets for each of the individual drugs and their respective AB-rated generic equivalents.  Indeed, it is not implausible that, at competitive prices, two different cART drugs may be weak substitutes for one another, but if one company raises its drug's prices

to high levels, this may induce a consumer to substitute away from that drug in favor of a different drug.

326.    Moreover, from a clinical perspective, although different types of antiretrovirals target different steps in the HIV life cycle, all of them are used to prevent successful reproduction of the HIV virus.  In fact, as noted above, HHS guidelines for the treatment of HIV illustrate the interchangeability of use of different types of cART drugs. The HHS guidelines also have recommended regimens that include NRTIs and third agents together, as well as regimens that include third agents and no NRTIs, showing that cART drugs—i.e., NRTIs and third agents—sometimes may be complements for one another but at other times may be substitutes.

327.    Some of the anticompetitive conduct alleged in this Complaint was designed to suppress competition in the broader market for cART drugs generally, which Gilead dominates.  More than 80% of patients starting a cART regimen in the United States, and more than 80% of patients continuing such a regimen, take one or more of Gilead's products every day.

328.     The relevant geographic market for each of the drugs and each of the product markets is the United States and its territories, including, but not limited to, Minnesota.

### E.    Effects on Interstate and Minnesota Commerce

329.    The drugs at issue in this case were and are sold in interstate commerce. Defendants' unlawful activities, as alleged above, have occurred in, and have had a substantial impact on, interstate commerce.

112

330.   At all material times, the drugs at issue were shipped across state lines and sold to customers outside the state of manufacture and throughout the United States, including into Minnesota.

331.   Defendants' unlawful activities, as described in this Complaint, affected both intrastate commerce in Minnesota and interstate commerce flowing into or out from Minnesota.

332.   At all relevant times (to the end-payor claims asserted herein), UHS, a Minnesota corporation headquartered in Minnesota, was contractually responsible for the payments for the drugs at issue dispensed to UnitedHealthcare Insureds.  UHS entered agreements with PBMs, pursuant to which UHS was, and is, responsible for paying for pharmaceutical drugs, including the drugs at issue, prescribed and dispensed to UnitedHealthcare Insureds throughout the United States.  UHS entered these contracts, received invoices, and ensured and administered payment pursuant thereto in amounts totaling several hundreds of millions of dollars for the drugs at issue at its headquarters in Hennepin County, Minnesota.  Employees involved with making, processing, and managing payments to the PBMs for UnitedHealthcare Insured's claims for the drugs at issue work and reside in Minnesota.  Likewise, employees with knowledge of UHS's agreements and payment relationships work and reside in Minnesota.

333.   The anticompetitive acts by Defendants and their co-conspirators had, and continue to have, a direct, substantial, and reasonably foreseeable effect on Minnesota trade and commerce, including by artificially raising and fixing prices for the drugs at

issue, as were paid in, and/or out from, Minnesota, and otherwise injuring corporations and persons located in Minnesota.

334.   Defendants willfully and unlawfully engaged in schemes for the anticompetitive purpose of delaying and impairing competition and thereby maintaining supracompetitive prices for their products in the United States and in Minnesota.

335.   Each scheme had the purpose and effect of restraining competition unreasonably and injuring competition by protecting the relevant products from competition.  This exclusionary conduct in fact enabled Defendants to sell their products free from vigorous price competition.  But for Defendants' unlawful conduct, each of the relevant drugs would already be facing competition from AB-rated drugs, would be facing competition from comparable FDCs, or would face such competition sooner than it will; and competition in the cART Market would be substantially more vigorous than it is.

336.   The anticompetitive effects of Defendants' conduct are still ongoing.

**F.   Antitrust Injury**

337.   During the relevant period, UHS (and its DP Assignors) paid for substantial quantities of cART drugs at supracompetitive prices.  As a result of the illegal conduct by Defendants and their co-conspirators, UHS was compelled to pay, and is still paying, artificially inflated prices for the drugs at issue.  The prices UHS paid, and will in the future pay, were and are substantially greater than the prices that would have been paid absent the illegal conduct alleged in this Complaint, because: (1) the prices were artificially inflated by Defendants' illegal conduct; (2) UHS was deprived of the

opportunity to purchase or pay for lower-priced generic versions, which it would have done had it had the opportunity; and (3) when they ultimately became or will become available, the prices of generic versions were or will be higher than they would have been absent Defendants' unlawful conduct.

338.    By impeding competition and creating and extending monopolies for the drugs at issue, Defendants' anticompetitive conduct caused UHS and its assignors to pay more than they would have paid for branded and generic versions of those drugs.

339.    As a result of Defendants' unlawful conduct, UHS and its assignors also continue to pay overcharges today.  This is true notwithstanding the launch of generic versions of some of the drugs at issue.  The commencement of generic competition does not immediately create a competitive environment indistinguishable from the environment that would have existed had generic competition begun much earlier.  In fact, it can take considerable time for the process of generic competition to eliminate the effects of prior anticompetitive conduct.  The fact that generic substitution rates and generic prices can take considerable time to reach the equilibrium levels they would have reached had generic competition begun earlier means that Plaintiff will continue to pay overcharges for the drugs at issue, and, where available, their generic equivalents, for some time to come.  Plaintiff's injury is thus ongoing.

340.    But for Defendants' anticompetitive conduct, UHS and its DP Assignors would have without limitation (1) purchased and/or paid for lower-priced generic cART drugs, instead of higher-priced branded cART drugs, during the period when Defendants delayed their entry to the market; (2) paid a lower price for cART drugs during applicable

180-day exclusivity periods; and (3) paid lower prices for cART drugs, as a result of the entry of generics and an earlier date, sooner.

341.    Generic entrants typically price their products at a discount to the then-prevailing price for the branded product.  The first generic entrant generally prices at a modest discount to the branded price.  When more than one generic manufacturers enter the market, generic prices fall rapidly and those generic products capture most of the branded's sales volumes.  This is known as the generic "cliff."  That is what happened with Viread, Truvada, and Atripla.  Had generic entry occurred earlier, the first generic entrant would have discounted from a lower price point and competition would have rapidly driven prices down to competitive levels.

342.    As a direct and proximate result of Defendants' conduct, UHS and its DP Assignors sustained substantial losses and damages to their business and property in the form of overcharges, the exact amount of which will be the subject of proof at trial.

343.    The impact of Defendants' conduct on the prices of the specified cART drugs is measurable and quantifiable.  Commonly used and well-accepted economic models can be used to measure both the existence and the amount of the supracompetitive charges paid by UHS and its DP Assignors.  Thus, the economic harm alleged can be quantified.

## G.    Accrual and Tolling of the Statute of Limitations

344.    Each time that UHS and its DP Assignors paid an overcharge for the drugs at issue in this Complaint—i.e., each time payment was made at a price higher than

would have been paid absent Defendants' unlawful conduct—a new cause of action accrued for that overcharge.

345.    In addition, prior to the filing of this Complaint, UHS's DP Assignors were absent members of the putative class asserted in the class action complaint filed on September 29, 2020, which currently remains pending.[39]  Pursuant to the United States Supreme Court decision in *American Pipe Construction Co. v. Utah*, 414 U.S. 538 (1974) and its progeny, the class action complaint tolled the applicable statute of limitations as to the claims assigned to UHS by its DP Assignors.  Accordingly, UHS is entitled to recover overcharges (and treble damages) for direct purchases made starting at least four years prior to the filing of that class action, i.e., September 29, 2016 and later.

346.    UHS reserves its right to allege overcharges that were incurred at an earlier time based on evidence disclosed in discovery.

## VII.   CLAIMS FOR RELIEF

### COUNT ONE: VIOLATION OF 15 U.S.C. § 1
### Reverse Payment—Viread Agreement (Gilead and Teva)
### (Damages/Monetary Relief with Respect to Assignor Direct Purchases)

347.    UHS incorporates by reference the allegations in all preceding paragraphs.

348.    This claim is asserted against Defendants Gilead and Teva.

349.    Defendants Gilead and Teva unlawfully entered into and have adhered to a contract, combination or conspiracy in unreasonable restraint of trade, namely Gilead's

---

[39] *See FWK Holdings, LLC v. Gilead Sciences, Inc., et al.*, Case No. 3:20-cv-06793-EMC (N.D. Cal.).

agreement to make a reverse payment to Teva in exchange for Teva's agreement to delay its launch of generic Viread until December 15, 2017.

350.    At all relevant times, Gilead and/or Teva possessed monopoly power in the market for Viread and its AB-rated generic equivalents.

351.    As alleged in detail above, on or about February 22, 2012, Gilead and Teva entered into a reverse-payment agreement, under which Gilead agreed to pay, and Teva agreed to receive, substantial consideration in exchange for Teva's agreement to delay bringing a generic version of Viread to the market.  The purpose and effect of that agreement was to:  (a) prevent the sale of a generic version of Viread in the United States, thereby lengthening the period of time when Viread was protected from generic competition; (b) allow Teva to earn supracompetitve profits on generic Viread due to the absence of competition from other generic manufacturers; (c) delay the date when other generic manufacturers would enter the market; and (d) maintain prices for Viread and its AB-rated generic equivalents at supracompetitive levels.

352.    By entering into the unlawful agreement, Gilead and Teva unlawfully conspired in restraint of trade and committed a violation of the Sherman Act.

353.    To the extent that Defendants Gilead and Teva are permitted to assert the existence of any legitimate procompetitive justification for the anticompetitive restraint, there was and is no such justification.  Even if there were some conceivable and cognizable justification, the reverse payment was not necessary to achieve such a purpose, and, in any event, such procompetitive effects would be outweighed by the

restraint's anticompetitive effects on competition and market participants, including purchasers and payors.

354. As a direct and proximate result of Defendants' antitrust violation, UHS and its DP Assignors have been injured in their business or property and continue to suffer such injury. Their injury consists of having paid and continuing to pay higher prices for Viread and/or its AB-rated equivalents than they would have paid in the absence of the violation. Such overcharges are the type of injury the antitrust laws were designed to prevent and flow from that which makes Defendants' acts unlawful.

355. UHS, by virtue of its assignments from DP Assignors, seeks and is entitled to treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for all overcharges proximately caused by the antitrust violations alleged above. Such damages have been suffered in an amount to be proven at trial.

### COUNT TWO: VIOLATION OF 15 U.S.C. § 1
### Reverse Payment—Truvada Agreement (Gilead and Teva)
### (Damages/Monetary Relief with Respect to Assignor Direct Purchases)

356. UHS incorporates by reference the allegations in all preceding paragraphs.

357. This claim is asserted against Defendants Gilead and Teva.

358. Defendants Gilead and Teva unlawfully entered into and have adhered to a contract, combination or conspiracy in unreasonable restraint of trade, namely Gilead's agreement to make a reverse payment to Teva in exchange for Teva's agreement to delay its launch of generic Truvada until September 30, 2020.

359. At all relevant times, Gilead and/or Teva possessed monopoly power in the market for Truvada and its AB-rated generic equivalents.

360.    As alleged in detail above, on or about February 2014, Defendants Gilead and Teva entered into a reverse payment agreement, a continuing illegal contract, combination, and restraint of trade under which Gilead agreed to pay, and Teva agreed to receive, substantial consideration in exchange for Teva's agreement to delay bringing its generic version of Truvada to the market.  The purpose and effect of that agreement was to: (a) prevent the sale of a generic version of Truvada in the United States, thereby lengthening the period of time when Truvada was protected from generic competition; (b) allow Teva to earn supracompetitive profits on generic Truvada due to the absence of competition from other generic manufacturers; (c) delay the date that other generic manufacturers would enter that market; and (d) raise and maintain the prices that Plaintiffs would pay for Truvada and its AB-rated equivalents at supracompetitive levels.

361.    By entering into the unlawful agreement, Gilead and Teva unlawfully conspired in restraint of trade and committed a violation of the Sherman Act.

362.    To the extent that Defendants Gilead and Teva are permitted to assert the existence of any legitimate procompetitive justification for the anticompetitive restraint, there was and is no such justification.  Even if there were some conceivable and cognizable justification, the reverse payment was not necessary to achieve such a purpose, and, in any event, such procompetitive effects would be outweighed by the restraint's anticompetitive effects on competition and market participants, including purchasers and payors.

363.    As a direct and proximate result of Defendants' antitrust violation, UHS and its DP Assignors have been injured in their business or property and continue to suffer

such injury.  Their injury consists of having paid and continuing to pay higher prices for Truvada and its AB-rated equivalents than they would have paid in the absence of the violation.  Such overcharges are the type of injury the antitrust laws were designed to prevent and flow from that which makes Defendants' acts unlawful.

364.    UHS, by virtue of its assignments from DP Assignors, seeks and is entitled to treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for all overcharges proximately caused by the antitrust violation(s) alleged above.  Such damages have been suffered in an amount to be proven at trial.

### COUNT THREE: VIOLATION OF 15 U.S.C. § 1
### Reverse Payment—Atripla Agreement (Gilead and Teva)
### (Damages/Monetary Relief with Respect to Assignor Direct Purchases)

365.    UHS incorporates by reference the allegations in all preceding paragraphs.

366.    This claim is asserted against Defendants Gilead and Teva.

367.    Defendants unlawfully entered into and have adhered to a contract, combination or conspiracy in unreasonable restraint of trade, namely Gilead's agreement to make a reverse payment to Teva in exchange for Teva's agreement to delay its launch of generic Atripla until September 30, 2020.

368.    At all relevant times, Gilead and/or Teva possessed monopoly power in the market for Atripla and its AB-rated generic equivalents.

369.    As alleged in detail above, on or about February 2014, Defendants Gilead and Teva entered into a reverse payment agreement, a continuing illegal contract, combination, and restraint of trade under which Gilead agreed to pay, and Teva agreed to receive, substantial consideration in exchange for Teva's agreement to delay bringing its

generic version of Atripla to the market.  The purpose and effect of that agreement as to: (a) prevent the sale of a generic version of Atripla in the United States, thereby lengthening the period of time when Atripla was protected from generic competition; (b) allow Teva to earn supracompetitive profits on generic Atripla due to the absence of competition from other generic manufacturers; (c) delay the date that other generic manufacturers would enter that market; and (d) raise and maintain the prices that Plaintiffs would pay for Atripla and its AB-rated equivalents at supracompetitive levels.

370.    By entering into the unlawful agreement, Gilead and Teva unlawfully conspired in restraint of trade and committed a violation of the Sherman Act.

371.    To the extent that Defendants Gilead and Teva are permitted to assert the existence of any legitimate procompetitive justification for the anticompetitive restraint, there was and is no such justification.  Even if there were some conceivable and cognizable justification, the reverse payment was not necessary to achieve such a purpose, and, in any event, such procompetitive effects would be outweighed by the restraint's anticompetitive effects on competition and market participants, including purchasers and payors.

372.    As a direct and proximate result of Defendants' antitrust violation, UHS and its DP Assignors have been injured in their business or property and continue to suffer such injury.  Their injury consists of having paid and continuing to pay higher prices for Atripla and/or its AB-rated equivalents than they would have paid in the absence of the violation.  Such overcharges are the type of injury the antitrust laws were designed to prevent and flow from that which makes Defendants' acts unlawful.

373.    UHS, by virtue of its assignments from DP Assignors, seeks and is entitled to treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for all overcharges proximately caused by the antitrust violation(s) alleged above.  Such damages have been suffered in an amount to be proven at trial.

## COUNT FOUR: VIOLATION OF 15 U.S.C. § § 1, 2
### Conspiracy to Monopolize (Gilead with co-conspirator BMS)
### (Damages/Monetary Relief with Respect to Assignor Direct Purchases)

374.    UHS incorporates by reference the allegations in all preceding paragraphs.

375.    This claim is asserted against Defendant Gilead.

376.    At all relevant times, Gilead has possessed monopoly power in the market for cART drugs and narrower markets therein.

377.    Gilead's substantial market power is coupled with strong regulatory and contractual barriers to entry.

378.    As alleged above, Gilead willfully obtained and maintained its monopoly power in the cART market and individual drug markets for specific drugs by enlisting BMS in a scheme and conspiracy to monopolize that included, without limitation and as will be further developed through discovery:

(a)    Entering into and abiding by the illegal No-Generics Restraints;

(b)    Entering into and abiding by the Atripla Agreement and Evotaz Agreement, each of which was a horizontal market allocation agreement;

(c)    Degrading Stribild and artificially raising its price to drive patients to TAF-based FDCs that it had shielded from competition;

123

(d)     Degrading standalone TAF, also in furtherance of the scheme to drive patients to TAF-based FDCs that it had shielded from competition;

(e)     Abusing the regulatory process, by withholding an HIV indication from standalone TAF, to raise rivals' costs and delay their entry into the market; and

(f)     Causing delayed entry of generic versions of Viread, Truvada, and Atripla.

379.    BMS consciously committed to the monopolization when it provided the No-Generics Restraints protecting Gilead's drugs from generic competition, received the No-Generics Restraints from Gilead protecting its drugs from generic competition, and abided by those restraints.

380.    BMS knew Gilead was seeking to obtain and maintain monopoly power in the cART market and the markets for specific cART drugs.  It knew that: (1) Tenofovir was a critical backbone of cART therapies and TDF would dominate the cART market; (2) TDF had a limited patent life; and (3) Gilead was pursuing a strategy of creating FDCs with other manufacturers and developers of cART components with longer or stronger patent life so as to extend the "product life cycle" of TDF and TDF-based cART regimens.

381.    BMS carefully monitors sales in the cART market and the contractual arrangements between and among participants in that market.

382.    By the time it received the Evotaz No-Generics Restraint from Gilead in October 2011, BMS knew that Gilead had a market share greater than 70% of the cART market.  As of that date, BMS also knew from Gilead's public SEC filings that Gilead

had entered into a No-Generics Restraint with Janssen in 2009 protecting Gilead's cART monopoly from competition, and that the Gilead-Janssen No-Generics Restraint was substantially identical to BMS's No-Generics Restraint.  And BMS knew that its No-Generics Restraints and Janssen's enabled Gilead, BMS and Janssen to tie up more than 75% of sales of NRTIs, more than 50% of sales of third agents, and more than 70% of sales of all cART drugs.  BMS therefore knew that its unlawful agreements substantially contributed to Gilead's unlawful maintenance of a monopoly in the cART market.

383.    BMS participated in the conspiracy to monopolize because BMS benefitted directly from it, including from:  (a) the Atripla No-Generics Restraint, which incentivized Gilead to switch patients to Atripla thereby increasing BMS's sales of its third agent EFV as a component of Atripla; (b) Gilead's unlawful deals with Teva to delay entry of generic versions of Atripla, which increased BMS's profits on the sales of Atripla; (c) the No-Generics Restraint protecting BMS's third agent ATV and its FDC Evotaz from competition; and (d) the other elements of Gilead's scheme, which enabled Gilead to obtain and maintain its monopoly power and supracompetitive prices for cART drugs generally, and thereby allowed BMS to charge higher prices on its other cART drugs.

384.    To the extent that Defendant Gilead is permitted to assert one, there is and was no legitimate procompetitive justification for the conduct comprising the anticompetitive scheme that outweighs its harmful effects.  Even if there were some conceivable such justification that Defendant was permitted to assert, the scheme is and was broader than necessary to achieve such a purpose.

385.   As a direct and proximate result of these antitrust violation(s), UHS and its DP Assignors have been injured in their business or property and continue to suffer such injury unless the unlawful conduct is enjoined.  Their injury consists of having paid and continuing to pay higher prices than they would have paid in the absence of the violation. Such overcharges are the type of injury the antitrust laws were designed to prevent and flow from that which makes the acts unlawful.

386.   UHS, by virtue of its assignments from DP Assignors, seeks and is entitled to treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for all overcharges proximately caused by the antitrust violation(s) alleged above.  Such damages have been suffered in an amount to be proven at trial.

### COUNT FIVE: VIOLATION OF 15 U.S.C. § § 1, 2
### Conspiracy to Monopolize (Gilead with co-conspirator Janssen)
### (Damages/Monetary Relief with Respect to Assignor Direct Purchases)

387.   UHS incorporates by reference the allegations in all preceding paragraphs.

388.   This claim is asserted against Defendant Gilead.

389.   At all relevant times, Gilead has possessed monopoly power in the market for cART drugs and narrower markets therein.

390.   Gilead's substantial market power is coupled with strong regulatory and contractual barriers to entry.

391.   As alleged above, Gilead willfully obtained and maintained its monopoly power in the cART market and individual drug markets for specific drugs by enlisting Janseen in a scheme and conspiracy to monopolize that included, without limitation and as will be further developed through discovery:

126

(a)   Entering into and abiding by the illegal No-Generics Restraints;

(b)   Entering into and abiding by the Complera Agreement, Prezcobix Agreement, Odefsey Agreement, and Symtuza Agreement, each of which was a horizontal market allocation agreement;

(c)   Degrading Stribild and artificially raising its price to drive patients to TAF-based FDCs that it had shielded from competition;

(d)   Degrading standalone TAF, also in furtherance of the scheme to drive patients to TAF-based FDCs that it had shielded from competition;

(e)   Abusing the regulatory process, by withholding an HIV indication from standalone TAF, to raise rivals' costs and delay their entry into the market; and

(f)   Causing delayed entry of generic versions of Viread, Truvada, and Atripla.

392.   Janssen consciously committed to the monopolization when it provided the No-Generics Restraints protecting Gilead's drugs from generic competition, received the No-Generics Restraints from Gilead protecting its drugs from generic competition, and abided by those restraints.

393.   Janssen knew Gilead was seeking to obtain and maintain monopoly power in the cART market and the markets for specific cART drugs.  It knew that: (1) Tenofovir was a critical backbone of cART therapies and TDF would dominate the cART market; (2) TDF had a limited patent life; and (3) Gilead was pursuing a strategy of creating FDCs with other manufacturers and developers of cART components with longer or stronger patent life so as to extend the "product life cycle" of TDF and TDF-based cART regimens.

394.    Janssen carefully monitors sales in the cART market and the contractual arrangements between and among participants in that market.

395.    When it provided its first No-Generics Restraint to Gilead in July 2009 on Complera, Janssen knew that Gilead had a market share of more than 70% of the cART market.  As of that date, Janssen also knew from Gilead's public SEC filings that Gilead had entered into a No-Generics Restraint with BMS protecting Gilead's drugs from competition.

396.    By December 2014, when it entered into No-Generics Restraints on Odefsy and Symtuza, Janssen knew that Gilead's scheme included switching its Tenofovir-based cART monopoly to TAF-based FDCs.  It also knew that Gilead's cART market share was more than 70%; nine out of ten patients new to treatment were prescribed a Gilead medicine and approximately 85% of all patients receiving cART therapy were on a Gilead drug.  And Janssen knew that its No-Generics Restraints and BMS's enabled Gilead, BMS, and Janssen to tie up more than 80% of sales of NRTIs, more than 50% of sales of third agents, and more than 75% of sales of booster drugs.  Janssen therefore knew that its unlawful agreements substantially contributed to Gilead's unlawful maintenance of a monopoly in the cART market.

397.    Janssen participated in the conspiracy to monopolize because Janseen benefitted directly from it, including from: (a) the Complera and Odefsy No-Generics Restraints, which incentivized Gilead to switch patients to those drugs and thereby increased Janssens's sales of its third agent RPV as a component of Complera and Odefsy; (b) the lump-sum payments Janssen received from Gilead; (c) the degrading of

standalone TAF, which increased sales of Odefsy; (d) the No-Generics Restraints protecting Janssen's Prezcobix and Symtuza from competition; and (e) the other elements of Gilead's scheme which enabled Gilead to obtain and maintain its monopoly power and supracompetitive prices for cART drugs generally, and thereby allowed Janssen to charge higher prices on its other cART drugs.

398.   To the extent that Defendant Gilead is permitted to assert one, there is and was no cognizable, non-pretextual procompetitive justification for the conduct comprising the anticompetitive scheme that outweighs its harmful effects.  Even if there were some conceivable such justification that Defendant was permitted to assert, the scheme is and was broader than necessary to achieve such a purpose.

399.   As a direct and proximate result of these antitrust violation(s), UHS and its DP Assignors have been injured in their business or property and continue to suffer such injury unless the unlawful conduct is enjoined.  Their injury consists of having paid and continuing to pay higher prices than they would have paid in the absence of the violation. Such overcharges are the type of injury the antitrust laws were designed to prevent and flow from that which makes the acts unlawful.

400.   UHS, by virtue of its assignments from DP Assignors, seeks and is entitled to treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for all overcharges proximately caused by the antitrust violation(s) alleged above.  Such damages have been suffered in an amount to be proven at trial.

## COUNT SIX: VIOLATION OF 15 U.S.C. § 2
### Monoplization (Gilead)
### (Damages/Monetary Relief with Respect to Assignor Direct Purchases)

401.    UHS incorporates by reference the allegations in all preceding paragraphs.

402.    This claim is asserted against Defendant Gilead.

403.    At all relevant times, Gilead has possessed monopoly power in the market for cART drugs and narrower markets therein.

404.    Gilead's substantial market power is coupled with strong regulatory and contractual barriers to entry.

405.    As alleged above, Gilead willfully obtained and maintained its monopoly power in the cART market and narrower markets therein using restrictive or exclusionary conduct, rather than by means of greater business acumen.

406.    Gilead's conscious objective was to further its dominance in the cART market and narrower markets therein by and through its exclusionary conduct.

407.    As alleged above, Gilead knowingly, willfully, and wrongfully obtained and maintained its monopoly power and harmed competition by, without limitation and as will be further developed through discovery:

(a)    Entering into and abiding by the illegal No-Generics Restraints;

(b)    Entering into and abiding by the Atripla Agreement, Complera Agreement, Prezcobix Agreement, Evotaz Agreement, Odefsey Agreement, and Symtuza Agreement, each of which was a horizontal market allocation agreement;

(c)    Degrading Stribild and artificially raising its price to drive patients to TAF-based FDCs that it had shielded from competition;

130

     (d)    Degrading standalone TAF, also in furtherance of the scheme to drive patients to TAF-based FDCs that it had shielded from competition;

     (e)    Abusing the regulatory process, by withholding an HIV indication from standalone TAF, to raise rivals' costs and delay their entry into the market; and

     (f)    Causing delayed entry of generic versions of Viread, Truvada, and Atripla.

408.    Gilead's anticompetitive conduct identified above is exclusionary conduct the purpose and effect of which is to willfully maintain Gilead's monopoly power, which harms competition, purchasers and payors, in violation of antitrust law.

409.    To the extent that Gilead is permitted to assert one, there is and was no cognizable, non-pretextual procompetitive justification for its exclusionary conduct that outweighs that conduct's harmful effects.  Even if there were some conceivable such justification that Gilead were permitted to assert, the conduct is and was broader than necessary to achieve such a purpose.

410.    As a direct and proximate result of Defendant's antitrust violation(s), UHS and its DP Assignors have been injured in their business or property and continue to suffer such injury unless the unlawful conduct is enjoined.  Their injury consists of having paid and continuing to pay higher prices than they would have paid in the absence of the violation.  Such overcharges are the type of injury the antitrust laws were designed to prevent and flow from that which makes Defendant's acts unlawful.

411.    UHS, by virtue of its assignments from DP Assignors, seeks and is entitled to treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for all overcharges

proximately caused by the antitrust violation(s) alleged above.  Such damages have been suffered in an amount to be proven at trial.

## COUNT SEVEN: VIOLATION OF 15 U.S.C. § 2
### Attempted Monopolization (Gilead)
### (Damages/Monetary Relief with Respect to Assignor Direct Purchases)

412.   UHS incorporates by reference the allegations in all preceding paragraphs.

413.   This claim is asserted against Defendant Gilead.

414.   At all relevant times, Gilead possessed substantial market power (i.e., monopoly power), or possessed a dangerous probability of achieving monopoly power, in the cART market and narrower markets therein.

415.   With the specific intent to achieve a monopoly, Gilead attempted to acquire and/or willfully maintain monopoly power in the cART market and narrower markets therein by means of restrictive or exclusionary conduct, rather than by means of greater business acumen, and thereby injured UHS and its DP Assignors.

416.   Gilead's conscious objective was to further its dominance in the cART market and narrower markets therein by and through its exclusionary conduct.

417.   As alleged above, Gilead knowingly, willfully, and wrongfully attempted to acquire and/or maintain monopoly power by, without limitation and as will be further developed through discovery:

(a)   Entering into and abiding by the illegal No-Generics Restraints;

(b)   Entering into and abiding by the Atripla Agreement, Complera Agreement, Prezcobix Agreement, Evotaz Agreement, Odefsey Agreement, and Symtuza Agreement, each of which was a horizontal market allocation agreement;

(c)   Degrading Stribild and artificially raising its price to drive patients to TAF-based FDCs that it had shielded from competition;

(d)   Degrading standalone TAF, also in furtherance of the scheme to drive patients to TAF-based FDCs that it had shielded from competition;

(e)   Abusing the regulatory process, by withholding an HIV indication from standalone TAF, to raise rivals' costs and delay their entry into the market; and

(f)   Causing delayed entry of generic versions of Viread, Truvada, and Atripla.

418.    Gilead's anticompetitive conduct identified above is exclusionary conduct the purpose and effect of which is to willfully attempt to acquire and/or maintain monopoly power through exclusionary means, in violation of Section 2 of the Sherman Act.

419.    To the extent that Gilead is permitted to assert one, there is and was no cognizable, non-pretextual procompetitive justification for its exclusionary conduct that outweighs that conduct's harmful effects.  Even if there were some conceivable such justification that Gilead were permitted to assert, the conduct is and was broader than necessary to achieve such a purpose.

420.    As a direct and proximate result of Defendant's antitrust violation(s), UHS and its DP Assignors have been injured in their business or property and continue to suffer such injury unless the unlawful conduct is enjoined.  Their injury consists of having paid and continuing to pay higher prices than they would have paid in the absence of the violation.  Such overcharges are the type of injury the antitrust laws were designed to prevent and flow from that which makes Defendant's acts unlawful.

421.   UHS, by virtue of its assignments from DP Assignors, seeks and is entitled to treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for all overcharges proximately caused by the antitrust violation(s) alleged above.  Such damages have been suffered in an amount to be proven at trial.

## COUNT EIGHT: VIOLATION OF 15 U.S.C. § 1
### Conspiracy in Restraint of Trade (Gilead with co-conspirator BMS)
### (Damages/Monetary Relief with Respect to Assignor Direct Purchases)

422.   UHS incorporates by reference the allegations in all preceding paragraphs.

423.   This claim is asserted against Defendant Gilead.

424.   Gilead and BMS have engaged in a continuing illegal contract, combination, and conspiracy in restraint of trade by agreeing to and abiding by the No-Generics Restraints with respect to Atripla and Evotaz, the purpose and effect of which was to impair competition. By entering into these unlawful agreements, Gilead and BMS unlawfully conspired in restraint of trade and violated Section 1 of the Sherman Act, 15 U.S.C. § 1.  The agreements between Gilead and BMS are horizontal market allocation agreements in violation of Section 1.

425.   If Gilead and BMS had competed in a full and timely fashion, UHS and its DP Assignors would have substituted lower-priced generic products for the higher-priced brand products for some or all of their brand purchases, would have paid lower prices on some or all of their remaining brand and/or generic purchases, and/or would have received a superior product for the purchases that they made.

426.   UHS and its DP Assignors have been injured in their business and property by reason of the unlawful contracts, combinations, and/or conspiracies, and continue to

suffer such injury unless the unlawful conduct is enjoined.  UHS and its DP Assignors have paid more for the brand and generic products than they would otherwise have paid, and/or were prevented from substituting a less expensive, generic alternative for their purchases of the more expensive brand and/or the more expensive generic products.

427.    As a direct and proximate result of this unlawful conduct, UHS and its DP Assignors paid more than they would have paid for the following drugs and/or their generic equivalents absent the unlawful conduct:  Viread, Emtriva, Truvada, Atripla,Tybost, Reyataz, Evotaz, and other cART drugs.  But for Gilead and BMS's unlawful conduct, competitors would have begun marketing generic versions of branded products much sooner than they did and/or would have been able to market such versions more successfully.

428.    During the relevant period, UHS and its DP Assignors purchased and/or paid for substantial amounts of the products at issue.  As a result of Gilead and BMS's unlawful conduct, UHS and its DP Assignors were compelled to pay, and did pay, artificially inflated prices for their brand and generic products.  They paid prices for brand and generic products that were substantially greater than the prices they would have paid absent the unlawful conduct alleged herein because: (1) they were deprived of the opportunity to purchase lower-priced generic products instead of expensive brand products; (2) they were forced to pay artificially inflated prices for the brand products; and/or (3) the product was inferior to what it would have been absent Gilead and BMS's conduct.

429.     UHS, by virtue of its assignments from DP Assignors, seeks and is entitled to treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for all overcharges proximately caused by the antitrust violation(s) alleged above.  Such damages have been suffered in an amount to be proven at trial.

## COUNT NINE: VIOLATION OF 15 U.S.C. § 1
### Conspiracy in Restraint of Trade (Gilead with co-conspirator Janssen)
### (Damages/Monetary Relief with Respect to Assignor Direct Purchases)

430.     UHS incorporates by reference the allegations in all preceding paragraphs.

431.     This claim is asserted against Defendant Gilead.

432.     Gilead and Janssen have engaged in a continuing illegal contract, combination, and conspiracy in restraint of trade by: (a) agreeing to and abiding by the No-Generics Restraints with respect to Complera, Odefsey, Prezcobix, and Symtuza; (b) agreeing that, and abiding by the agreement that, in exchange for Janssen's providing a No-Generics Restraint with respect to Odefsey, Gilead would provide a No-Generics Restraint with respect to Prezcobix and Symtuza; and (c) agreeing to and abiding by mutual No-Generics Restraints with respect to Symtuza.  By entering into these unlawful agreements, Gilead and Janssen unlawfully conspired in restraint of trade and violated Section 1 of the Sherman Act, 15 U.S.C. § 1.  The agreements between Gilead and Janssen are horizontal market allocation agreements in violation of Section 1.

433.     If Gilead and Janssen had competed in a full and timely fashion, UHS and its DP Assignors would have substituted lower-priced generic or comparable products for the higher-priced brand products for some or all of their brand purchases, would have

paid lower prices on some or all of their remaining purchases, and/or would have received a superior product for the purchases that they made.

434.    UHS and its DP Assignors have been injured in their business and property by reason of the unlawful contracts, combinations, and/or conspiracies, and continue to suffer such injury unless the unlawful conduct is enjoined.  UHS and its DP Assignors have paid more for brand and generic products than they would otherwise have paid, and/or were prevented from substituting a less expensive, generic alternative for their purchases of the more expensive brand and/or the more expensive generic products.

435.    As a direct and proximate result of this unlawful conduct, UHS and its DP Assignors paid more than they would have paid for the following drugs and their generic equivalents absent the unlawful conduct:  Viread, Emtriva, Truvada, Tybost, Vemlidy, Descovy, Complera, Odefsey, Prezista, Prezcobix, Edurant, Symtuza, and other cART drugs.  But for Gilead and Janssen's unlawful conduct, competitors would have begun marketing generic versions of branded products much sooner than they did and/or would have been able to market such versions more successfully.

436.    During the relevant period, UHS and its DP Assignors purchased and/or paid for substantial amounts of the products at issue.  As a result of Gilead and Janssen's unlawful conduct, UHS and its DP Assignors were compelled to pay, and did pay, artificially inflated prices for their brand and generic products.  They paid prices for brand and generic products that were substantially greater than the prices they would have paid absent the unlawful conduct alleged herein because: (1) they were deprived of the opportunity to purchase lower-priced generic products instead of expensive brand

products; (2) they were forced to pay artificially inflated prices for the brand products;

and/or (3) the product was inferior to what it would have been absent Gilead and

Janssen's conduct.

437.    UHS, by virtue of its assignments from DP Assignors, seeks and is entitled

to treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for all overcharges

proximately caused by the antitrust violation(s) alleged above.  Such damages have been

suffered in an amount to be proven at trial.

### COUNT TEN: VIOLATION OF MINNESOTA ANTITRUST LAW
### Conspiracies to Restrain Trade and Monopolization (All Defendants)
### (Damages/Monetary Relief with Respect to All UHS Indirect/End-Payor Payments)

438.    UHS incorporates by reference the allegations in all preceding paragraphs.

439.    UHS asserts this Count under Minnesota state antitrust law for the same

conduct that is the subject of each of the preceding counts under federal law.  This Count

is accordingly asserted against each Defendant to the extent that the Defendant is the

subject of each of the preceding counts, respectively.

440.    By this Count, UHS seeks to recover for UHS's injury and damages arising

from UHS's indirect/end payor payments and the overcharges incurred as a result of

Defendants' unlawful contracts, combinations, and/or conspiracies in restraint of trade

(and each of them), and monopolization conduct.

441.    By entering into the unlawful agreements alleged above and referenced in

the preceding counts, Defendants unlawfully conspired in unreasonably restraining trade

or commerce, in violation of the Minnesota Antitrust Law, Minn. Stat. § 325D.51.

442.   Defendants' conduct alleged above and referenced in the preceding counts further constitutes establishment, maintainance, and/or use of monopoly power in trade or commerce for the purpose of affecting competition or controlling, fixing, or maintaining prices, in violation of the Minnesota Antitrust Law, Minn. Stat. § 325D.52.

443.   To the extent that Defendants are permitted to assert one, there is and was no legitimate, procompetitive justification for the anticompetitive restraints.  Even if there were some conceivable and cognizable justification, the conduct was not necessary to achieve such a purpose, and, in any event, such procompetitive effects would be outweighed by the restraints' anticompetitive effects on competition and market participants, including purchasers and payors.

444.   During the relevant period, through either Defendants themselves or the regional and national distributors and retailers that they have engaged for the sale of the drugs at issue, many millions of dollars' worth of the drugs at issue have been, and continue to be, sold and/or paid for in Minnesota each year.

445.   The anticompetitive acts by Defendants had a substantial and foreseeable effect on Minnesota commerce by artificially raising and fixing prices for the drugs at issue, as they were paid in, and/or out from, Minnesota, and otherwise injuring corporations and persons located in Minnesota.

446.   Defendants' unlawful activities, as described in this Complaint, affected both intrastate commerce in Minnesota and interstate commerce flowing in to or out from Minnesota, and had direct, substantial and reasonably foreseeable effects upon trade and commerce in Minnesota.

447.     As a direct and proximate result of Defendants' antitrust violation(s), UHS has been injured in Minnesota in its business or property and continues to suffer such injury unless the unlawful conduct is enjoined.  The injury consists of having paid and continuing to pay higher prices than it would have paid in the absence of the violation.  Such overcharges are the type of injury the antitrust laws were designed to prevent and flow from that which makes Defendants' acts unlawful.

448.     UHS seeks and is entitled to treble damages for all overcharges incurred and paid by UHS as a result of Defendants' conduct, as well as attorneys' fees and costs, and all other forms of relief available under Minn. Stat. § 325D.49, *et seq.*

### COUNT ELEVEN: VIOLATION OF VARIOUS STATE ANTITRUST AND CONSUMER PROTECTION LAWS
### Conspiracies to Restrain Trade and Monopolization (All Defendants)
### (Damages/Monetary Relief with Respect to All UHS Indirect/End-Payor Payments)

449.     UHS incorporates by reference the allegations in all preceding paragraphs.

450.     This claim for relief is pleaded in the alternative to Count Ten, in the event that the Court disagrees that all of UHS's end-payor based statutory claims for damages and/or monetary relief for payments for drugs dispensed to UnitedHealthcare Insureds (to the extent made indirectly) are governed by Minnesota law.  This claim is accordingly asserted against each Defendant to the extent that UHS has asserted each of the preceding counts, respectively, against that Defendant.

451.     By engaging in the anticompetitive conduct alleged above, Defendants have alternatively violated the antitrust and competition statutes of all states and territories that

may provide any relief for indirect purchasers/payors, including but not limited to each of the following such laws (provided here as exemplars):[40]

    a.  Arizona Rev. Stat. §§ 44-1403, *et seq.*,

    b.  Cal. Bus. & Prof. Code §§ 16600, *et seq.*, Cal. Bus. & Prof. Code §§ 17200, *et seq.*, and the California common law,

    c.  Conn. Gen. Stat. Ann. §§ 35-24, *et seq.*,

    d.  D.C. Code §§ 28-4503, *et seq.*,

    e.  Fla. Stat. §§ 501.201, *et seq.*,

    f.  Hawaii Code §§ 480, *et seq.*,

    g.  740 Ill. Comp. Stat. 10/3, *et seq.*,

    h.  Iowa Code §§ 553.5, *et seq.*,

    i.  Kan. Stat. Ann. §§ 50-101, *et seq.*,

    j.  Mass. Gen. L. Ch. 93A, *et seq.*,

    k.  Md. Code, Com. Law §§ 11-204, *et seq.*,

    l.  Me. Rev. Stat. Ann. 10, §§ 1102, *et seq.*,

    m.  Mich. Comp. Laws Ann. §§ 445.773, *et seq.*,

    n.  Minn. Stat. §§ 325D.52, *et seq.*,

    o.  Miss. Code Ann. §§ 75-21-3, *et seq.*,

    p.  Neb. Code Ann. §§ 59-802, *et seq.*,

---

[40] UHS reserves all rights to assert any and all other state laws that may provide any relief to indirect purchasers/payors (whether conferred by antitrust, unfair deceptive trade practices, consumer protection statutes, or the like).

q.  Nev. Rev. Stat. Ann. §§ 598A.060, *et seq.*,

r.  N.C. Gen. Stat. §§ 75-2.1, *et seq.*,

s.  N.D. Cent. Code §§ 51-08.1-03, *et seq.*,

t.  N.H. Rev. Stat. Ann. §§ 356.1, *et seq.*,

u.  N.M. Stat. Ann. §§ 57-1-2, *et seq.*,

v.  New York Gen. Bus. Law §§ 340, *et seq.*,

w.  Or. Rev. Stat. §§ 646.705, *et seq.*,

x.  R.I. Gen. Laws §§ 6-36-1, *et seq.*,

y.  S.D. Codified Laws §§ 37-1-3.2, *et seq.*,

z.  Utah Code Ann. §§ 76-10-911, *et seq.*,

aa. Tenn. Code Ann. §§ 47-25-101, *et seq.*,

bb. Vt. Stat. Ann. 9, §§ 2453, *et seq.*,

cc. W.Va. Code §§ 47-18-4, *et seq.*, and

dd. Wis. Stat. §§ 133.03, *et seq.*

452.   In addition, Defendants' conduct further constitutes unfair competition or unfair, unlawful, unconscionable, deceptive, and/or fraudulent acts or practices in violation of the consumer protection statutes including, but not limited to each of the following states and territories:

a.  Ariz. Code §§ 44-1522, *et seq.*,

b.  Ark. Code §§ 4-88-101, *et seq.*,

c.  Cal. Bus. & Prof. Code §§ 17200, *et seq.*,

d.  Colo. Rev. Stat §§ 6-1-105, *et seq.*,

e. D.C. Code §§ 28-3901, *et seq.*,

f. Fla. Stat. §§ 501.201, *et seq.*,

g. Iowa Code §§ 714.16, *et seq.*,

h. Idaho Code §§ 48-601, *et seq.*,

i. 815 ILCS §§ 505/1, *et seq.*,

j. Ind. Code §§ 24-5-0.5-1, *et seq.*,

k. Kan. Stat. §§ 50-623, *et seq.*,

l. La. Rev. Stat. Ann. §§ 51:1401, *et seq.*,

m. 5 Me. Rev. Stat. §§ 207, *et seq.*,

n. Mass. Ann. Laws ch. 93A, *et seq.*,

o. Mich. Stat. §§ 445.901, *et seq.*,

p. Miss. Code. Ann. §§ 75-24-1, *et seq.*,

q. Missouri Stat. §§ 407.010, *et seq.*,

r. Mont. Code Ann. §§ 30-14-101, *et seq.*,

s. Neb. Rev. Stat. §§ 59-1601, *et seq.*,

t. Nev. Rev. Stat. §§ 598.0903, *et seq.*,

u. N.H. Rev. Stat. §§ 358-A:1, *et seq.*,

v. N.M. Stat. §§ 57-12-1, *et seq.*,

w. N.Y. Gen. Bus. Law §§ 349, *et seq.*,

x. N.C. Gen. Stat. §§ 75-1.1, *et seq.*,

y. N.D. Cent. Code §§ 51-15-01, *et seq.*,

z. Or. Rev. Stat. §§ 646.605, *et seq.*,

aa. 73 Pa. Stat. Ann. §§ 201-1, *et seq.*,

aa. S.C. Stat. Ann. §§ 39-5-10, *et seq.*,

bb. S.D. Code Laws §§ 37-24-1, *et seq.*,

cc. Utah Code §§ 13-11-1, *et seq.*,

dd. 9 Vt. §§ 2451, *et seq.*,

ee. Va. Code Ann. §§ 59.1-196, *et seq.*,

ff. W.Va. Code §§ 46A-6-101, *et seq.*,

gg. Wis. Stat. §§ 100.18; Wis. Stat. §§ 100.20, *et. seq.*, and

hh. Wyo. Stat. Ann. §§ 40-12-101, *et seq.*

453.   The unlawful acts by Defendants had, and continue to have, a substantial and foreseeable effect on the commerce of each above State and territory by artificially raising and fixing prices for the drugs at issue paid for, and/or dispensed in each State or territory.

454.   Defendants' unlawful activities, as described in this Complaint, affected both intrastate commerce and interstate commerce flowing in to or out from each of the above States and territories, and had direct, substantial and reasonably foreseeable effects upon trade and commerce in each respective State or territory.

455.   During the relevant period, through either Defendants themselves or the regional and national distributors and retailers that they have engaged for the sale of the drugs at issue, many millions of dollars' worth of those drugs have been, and continue to be, sold in each of the above States and territories every year.

456.    As a direct and proximate result of Defendants' violation of each of the foregoing laws, UHS has been harmed in its business or property and continues to suffer such injury unless the unlawful conduct is enjoined.  The injury consists of having paid artificially inflated, supra-competitive prices for the drugs at issue dispensed to insureds throughout the United States, and UHS has suffered damages in an amount to be proven at trial.

457.    There was and is a gross and unconscionable disparity between the price that UHS paid for the drugs at issue, and the value received, given that more cheaply priced drugs should have been available, and would have been available, absent Defendants' illegal conduct.

458.    UHS has been injured in its business and property by paying more for the drugs at issue than in the absence of Defendants' unlawful conduct and violation of the foregoing laws.

459.    Defendants' conduct in violation of each of the foregoing laws was done knowingly, willfully, and flagrantly.

460.    UHS seeks damages, trebled or multiplied to the full extent permitted by each of the foregoing States and territories, for all overcharges incurred and paid by UHS as a result of Defendants' conduct, restitution, as well as attorneys' fees and costs, and all other forms of relief available.

## VIII.   DEMAND FOR JUDGMENT

WHEREFORE, UHS prays for judgment against Defendants and for the following relief:

A.      A declaration that the conduct alleged herein is in violation of Sections 1 and 2 of the Sherman Act;

B.      A declaration that the conduct alleged herein is in violation of Minnesota Antitrust Law;

C.      A declaration that the conduct alleged herein is in violation of the laws of the states and territories set forth above;

D.      Grant permanent injunctive relief pursuant to Section 16 of the Clayton Act and applicable state law to remedy the ongoing anticompetitive effects of Defendants' unlawful conduct;

E.      An award to UHS of actual, consequential, compensatory, treble, punitive, and/or other damages, in an amount to be proven at trial, including pre- and post-judgment interest at the statutory rates;

F.      An award to UHS of equitable relief in the nature of disgorgement, restitution, and the creation of a constructive trust to remedy Defendants' unjust enrichment;

G.      An award to UHS of its reasonable costs and expenses, including attorneys' fees; and

H.      An award of all other legal or equitable relief as the Court deems just and proper.

## IX.    JURY DEMAND

Plaintiff demands a jury trial on all claims so triable under Federal Rule of Civil

Procedure Rule 38(b).


DATED: October 19, 2021


**BOIES SCHILLER FLEXNER LLP**
Hamish P.M. Hume*
Abby L. Dennis*
1401 New York Ave, NW
Washington, D.C. 20005
Telephone:  (202) 895-7580
hhume@bsfllp.com
adennis@bsfllp.com

Edward H. Takashima*
725 S. Figueroa Street, 31st Floor
Los Angeles, CA 90017
Telephone:  (213) 629-9040
etakashima@bsfllp.com

Beko Reblitz-Richardson*
44 Montgomery Street, 41st Floor
San Francisco, CA 94104
Telephone:  (415) 293-6804
brichardson@bsfllp.com


*\* pro hac vice* applications
to be submitted

*ATTORNEYS FOR PLAINTIFF*
*UNITED HEALTHCARE SERVICES, INC.*

**ZELLE LLP**
By: */s/ William Bornstein*
William Bornstein (MN Bar #0392098)
500 Washington Avenue South,
Suite 4000
Minneapolis, MN 55415
Telephone:  (612) 339-2020
wbornstein@zelle.com

Judith A. Zahid*
Eric W. Buetzow*
James S. Dugan*
555 12th Street, Suite 1230
Oakland, CA 94607
Telephone:  (415) 693-0700
jzahid@zelle.com
ebuetzow@zelle.com
jdugan@zelle.com

147

4836-3191-8076v7